IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.13 Civ 06437 (AJN)

AMERICAN FEDERATED TITLE
CORPORATION, a Florida
corporation,

        Plaintiff,

v.

GFI MANAGEMENT SERVICES,
INC., a New York corporation,
ALLEN I. GROSS, an individual,
and EDITH GROSS, an individual,

        Defendants.

_____/

## AMENDED COMPLAINT

Plaintiff, AMERICAN FEDERATED TITLE CORPORATION ("AFTC"), by and through its undersigned counsel, sues Defendants, GFI MANAGEMENT SERVICES, INC. ("GFI Management"), ALLEN I. GROSS ("Mr. Gross"), and EDITH GROSS ("Mrs. Gross")(collectively as the "Defendants"), and states as follows:

### Nature of the Action

1.  This is an action for post-judgment relief to "pierce the corporate veil" and for fraudulent conveyances under New York Debtor and Creditor Law §§273, 273-a and 276, to recover monetary damages against Defendants, all of whom have manipulated the assets of their wholly-owned and affiliated entities to perpetrate a substantial injustice upon AFTC.

2.  Defendants knowingly and intentionally abused the corporate form of their wholly-owned entities by treating the entities as mere alter egos and leaving those entities

without assets, before during and after the entities were indebted to AFTC for millions of dollars, including but not limited to, a stipulated money judgment totaling $7,500,000.00.

3.      After two unsuccessful efforts to avoid liability to Plaintiff in the Bankruptcy Court of the United States District Court for the Southern District of New York, which also included one of the largest discovery sanctions ever issued in that Court, and after summary judgment was granted against them on every issue, claim and defense, the Defendants caused their A & M Entities and their GFI Acquisition entity to dismiss their bankruptcies and agree to a judgment in the amount of $7,500,00.00.

4.      Defendants intentionally and methodically stripped these entities of their assets by disregarding all corporate formalities and manipulating the revenue and expenses of these entities being controlled and dominated by Mr. and Mrs. Gross for the purpose of defrauding creditors, and in particular, to avoid collection by AFTC.   The systematic creation and domination of these entities and the manipulation of their assets represents the Defendants' abuse of the privilege of doing business in the corporate form to further their personal interests and cause harm to AFTC, a known creditor.

## The Parties

5.      AFTC is Florida corporation having its principal place of business in the state of Florida.   AFTC acts as trustee for Trust #9651, Trust #61530, Land Trust #0751, Land Trust #EO-479, Land Trust #9548-sha and Land Trust #1045-sil.

6.      At all times material hereto, GFI Management was a New York corporation having its principal place of business in the state of New York.

7.      At all times material hereto, Mr. Gross was an individual with a permanent residence in the state of New York.

8.     At all times material hereto, Mrs. Gross was an individual with a permanent residence in the state of New York.

9.     Mr. and Mrs. Gross are husband and wife.

## Jurisdiction and Venue

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because this action is between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

11.     Pursuant to 28 U.S.C. §1391(b), venue lies in the Southern District of New York because each of the Defendants resides within the judicial district of the Court and because a substantial part of the events giving rise to the claims asserted herein occurred within the judicial district of the Court.

## General Allegations

## Background Facts

12.     At all times material hereto, AFTC was a trustee of multiple land trusts holding real property in Florida.     Each of the four properties consisted of residential, multi-unit apartment complexes (the "Properties"), located in three separate Florida counties, as follows:

A.  Trust #61530--Carib Villas Apartments, located in Miami-Dade County, Florida;

B.  Trust #9651-- Cutlerwood Apartments, located in Miami-Dade County, Florida;

C.  Land Trust #0751 (Parcel 1) and Land Trust #EO-479 (Parcel 2)-- Palm Gardens Apartments, located in Broward County, Florida;

D.  Land Trust #9548-sha (Parcel A) and Land Trust #1045-sil (Parcels B and C)-- Shady Oaks Apartments located in Pinellas County, Florida.

13.     Beginning in the Summer of 2000, each of the Properties was leased to Mr. and Mrs. Gross through their various shell entities known as A & M Florida Properties, LLC ("A & M")(leased the properties described in paragraphs 12(A) and 12(B)), A & M Florida Properties II, LLC ("A & M II")(leased the property described in paragraph 12(C)), and A & M Florida Properties III, LLC ("A & M III)(leased the property described in paragraph 12(D)).  A & M, A & M II and A & M III are hereinafter collectively referred to as the "A & M Entities."

14.     The A & M Entities were created for the sole purpose of being the lessees under the long-term leases with AFTC.  The A & M Entities have never been a party to any business dealings that were not associated to their leases with AFTC.

15.     At the time they created the A & M Entities, Mr. and Mrs. Gross had used the same system of utilizing single-purpose, no-asset corporate entities to lease or own real property throughout the country.   At her deposition taken during the Bankruptcy Actions, as defined below in Paragraph 29 below, Judith Crook, GFI Management's former controller testified that Mr. and Mrs. Gross had between 50 and 60 properties under their control at one time.  Attached hereto and incorporated by reference as Exhibit "1" is a true and correct copy of Ms. Crook's deposition transcript.

16.     At the time A & M and A & M II were created, Mrs. Gross was the sole owner of these entities.  Subsequent to their creation, Mr. Gross obtained a 1% ownership interest in both A & M and A & M II.  At the time A & M III was created, Mr. Gross was the sole owner and member of said entity.  Upon information and belief, subsequent to its creation, Mrs. Gross obtained a 1% ownership interest in A & M III.  No person or entity other than Mr. and Mrs. Gross has ever held an ownership interest in the A & M Entities.

17.     As part of the lease agreements with AFTC, the A & M Entities were required to pay an aggregated deposit of $2,600,000.00 to secure their performance under the ground leases.

18.     Since the A & M Entities were mere alter egos of Mr. and Mrs. Gross, Mr. and Mrs. Gross contributed their own personal funds to pay the security deposits.  The payment by Mr. and Mrs. Gross was not documented through a corporate ratification by the A & M Entities, a loan agreement or any other formal corporate acknowledgement to characterize the nature of the payment. Attached hereto and incorporated by reference as Exhibit "2" is the transcript of the deposition given by Mr. Gross filed in the Bankruptcy Actions (as defined in Paragraph 29, below).  Attached hereto and incorporated by reference as Exhibit "3" is the transcript of the deposition given by Mrs. Gross in the Bankruptcy Actions (as defined in Paragraph 29, below).

19.     After each of the ground leases were executed, the Defendants took control of the Properties through GFI Management.  Under this entirely un-documented, "insider" arrangement (i.e. not an "arms-length" negotiated agreement), GFI Management operated every aspect of the A & M Entities' existence, including all of the administrative services, all accounting, all bookkeeping, all record keeping, all payroll and all staffing.  GFI Management also obtained insurance, purchased supplies, managed tenant accounts and advertised for the Properties.

20.     While Defendants leased the Properties, the Properties each generated millions of dollars in annual revenue.  Because GFI Management operated every facet of the A & M Entities' existence, the A & M Entities had no independent identity.  This allowed Defendants to control all of the revenue and freely move funds wherever they wanted between the Entities.

21.     Approximately seven (7) years after the first of the ground leases was executed, Mr. Gross expressed to AFTC that he wanted to purchase all four of the Properties.

22.     In April 2007, Mr. Gross created GFI Acquisition, LLC ("GFI Acquisition"), for the purpose of acting as the entity to ultimately purchase the Properties from AFTC.  At all times material hereto, Mr. Gross was the sole owner of GFI Acquisition, which was entirely asset-less when it was formed.

23.     On July 3, 2007, AFTC entered into a Purchase and Sale Agreement with GFI Acquisition (the "PSA"), wherein AFTC agreed to sell the Properties to GFI Acquisition for the sum of $41,457,647.46.

24.     As part of the PSA, Mr. Gross asked for and received an adjournment of the rent owed by the A&M Entities to AFTC, with such rents being added to the purchase price under the PSA.  Accordingly, Defendants began collecting all sub-tenant rents without the obligation to pay rent to AFTC pending the closing.

25.     Unsuspecting of Mr. Gross' bad faith, at the time, AFTC agreed to Defendants' request to delay closing, all while the Defendants continued collecting sub-tenant rent and moving those revenues away from the A & M Entities, on the one hand, and secretly trying to sell the Properties to other potential buyers on the other hand.

26.     In due course, GFI Acquisition, acting through the Defendants, failed to attend the closing, failed to pay the agreed upon deposits and failed to prepare the closing documents, all as required by the PSA.

27.      In order to perpetuate its scheme to continue to collect the sub-tenant rent without the obligation to pay rent to Plaintiff, the Defendants caused GFI Acquisition and the A&M Entities to sue AFTC in the Circuit Court in and for Miami-Dade County, Florida.

28.     AFTC challenged the lawsuit as a "sham" and sought an emergency evidentiary hearing in the Florida Court.[1]

29.     After the Defendants lawsuit was exposed as a "sham", the Defendants caused A & M and A & M II[2] to separately file voluntary Chapter 11 petitions (the "Bankruptcy Actions") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), staged several months apart to draw out Defendants' ability to line their pockets with the sub-tenant rents while not paying rent to AFTC. All of the claims and counterclaims asserted in the Florida case were subsequently transferred to the Bankruptcy Court.

30.     AFTC successfully obtained summary judgment on the claims asserted by GFI Acquisition, ultimately resulting in a dismissal of the action initiated by GFI Acquisition.

31.     In addition to defending GFI Acquisition's claim, AFTC asserted affirmative claims against the A & M Entities to recover unpaid rents owed under the ground leases and a claim against GFI Acquisition for breaching the PSA. While litigating AFTC's claims, on or about October 20, 2010, AFTC, GFI Acquisition and the A & M Entities entered into a Settlement Stipulation in the Bankruptcy Actions ("Settlement Stipulation") to resolve AFTC's affirmative claims against the A & M Entities and GFI Acquisition. Attached hereto and incorporated by reference as Exhibit "4" is a true and correct copy of the Settlement Stipulation.

---

[1] RULE 1.150, FLORIDA RULES OF CIVIL PROCEDURE. -- SHAM PLEADINGS
(a) Motion to Strike. If a party deems any pleading or part thereof filed by another party to be a sham, that party may move to strike the pleading or part thereof before the cause is set for trial and the court shall hear the motion, taking evidence of the respective parties, and if the motion is sustained, the pleading to which the motion is directed shall be stricken. Default and summary judgment on the merits may be entered in the discretion of the court or the court may permit additional pleadings to be filed for good cause shown.

[2] A & M III did not file for bankruptcy, but the claims it asserted in the Florida Case were transferred to the Bankruptcy Court and consolidated with the Bankruptcy Actions by A & M and A & M II.

32.     The Settlement Stipulation constituted AFTC's acceptance of new contractual obligations by the A & M Entities and GFI Acquisition, separate and distinct from the ground leases and the PSA.

33.     Pursuant to the terms of the Settlement Stipulation, on October 28, 2010, the Bankruptcy Court entered an Order and Judgment in favor of AFTC against GFI Acquisition and the A & M Entities (the "Final Judgment").   Attached hereto and incorporated by references as Exhibit "5" is a true and correct copy of the Final Judgment.

34.     Under the Final Judgment, AFTC is entitled to $7,000,000.00 from the A & M Entities, jointly and severally.   Under the Final Judgment, AFTC is entitled to $500,000.00 from GFI Acquisition.

35.     At the time AFTC entered into the Settlement Stipulation, AFTC did not know that the Defendants had never treated the A & M Entities or GFI Acquisition as legitimate businesses and instead abused those entities to obtain the benefits of the corporate shield while defrauding known creditors.   Nor was AFTC aware that Defendants systematically transferred the assets of the A & M Entities and GFI Acquisition away from those entities in order to hinder, delay and defraud AFTC of its ability to collect on the Final Judgment.

**AFTC's Efforts to Enforce the Final Judgment and Discovery of Corporate Abuses**

36.     Mr. and Mrs. Gross, through GFI Management and the other Operating Entities, use these single-purpose entities as a tool to turn the privilege of doing business in the corporate form into a weapon to actively defraud creditors, including AFTC, by ignoring the independent nature of these entities, comingling their personal funds, freely moving assets in to these entities at their whim and then fraudulently conveying assets away from these entities when they incur

financial obligations to third parties like AFTC and undertake this conduct through their disregard of all corporate formalities.

37.     On or about August 3, 2011, AFTC served the A & M Entities and GFI Acquisition with a Restraining Notice, Information Subpoenas and a Request for Production.

38.     On or about May 2, 2012, AFTC instituted a proceeding in the Supreme Court of the State of New York (Index No. 152378/2012), seeking post-judgment discovery from the A & M Entities and GFI Acquisition under New York Civil Practice Law and Rule §5222 (the "New York Discovery Proceeding").

39.     The A & M Entities and GFI Acquisition refused to provide the significant majority of the post-judgment documents sought by AFTC.  After the Supreme Court granted AFTC's Motion for Contempt and Motion to Compel, in its entirety, the A & M Entities and GFI Acquisitions produced approximately 3,000 pages of documents including tax returns, payroll records and tenant rolls for the Properties.

40.     The A & M Entities also produced certain electronically stored information ("ESI"), from GFI Management's computerized accounting system used to track revenues and expenses for each of the Properties.  A & M's ESI, which is in a form commonly known as "Yardi Reports," reflects the expenses, revenues, balance statements, income statements and net change figures of the A & M Entities between the 2003 and 2012.

41.     On October 30, 2013, AFTC deposed Mr. and Mrs. Gross in the New York Discovery Proceeding.  Attached hereto and incorporated by reference as Exhibit "6" is Mr. Gross' deposition transcript.  Attached hereto and incorporated by reference as Exhibit "7" is Mr. Gross' deposition transcript.

42.     From this discovery, AFTC learned for the first time the extent by which the Defendants disregarded corporate formalities, dominated their alter ego entities and manipulated the cash flow and expenses of the A & M Entities to fraudulently transfer assets rendering them uncollectable.

43.     Indeed, AFTC also learned how Mr. and Mrs. Gross, through GFI Management, treat their entire network of entities as one giant organization that is nothing more than an extension of their personal business interests.

44.     At the top of their corporate network is Mr. and Mrs. Gross' flagship entity, GFI Capital Resources, Inc. ("GFI Resources").  At all times since its inception, GFI Resources was 100% owned by Mr. Gross.

45.     Below GFI Resources are multiple sub-entities involved in various aspects of the real estate industry including mortgage brokerage, insurance, property management and development (the "Operating Entities").

46.     Below the Operating Entities, Mr. and Mrs. Gross have created hundreds of affiliated single-purpose entities to participate in various aspects of the real estate business.

47.     GFI Management is the main Operating Entity used by Mr. and Mrs. Gross to manage and control the various single-purpose entities.

48.     To date, AFTC has been unable to identify any recoverable assets of the A & M Entities or GFI Acquisition that are currently still in those entities' possession.  As of the date of this Amended Complaint, the Final Judgment remains completely unsatisfied, with no portion of the Final Judgment ever having been paid by the A & M Entities or GFI Acquisition.

**Abuse of the Corporate Form and Domination of the A & M Entities and GFI Acquisition**

49.     As set forth herein, the Defendants, individually and through GFI Management, abused the privilege of doing business through the A & M Entities and GFI Acquisition by treating those entities as alter egos, disregarding the corporate form and fraudulently conveying any assets that could be used to satisfy the financial obligations owed under the Final Judgment.

50.     Defendants manifested this fraud by making numerous inter-company, undocumented "loans" to move money between entities at their sole discretion, paying affiliated entities without receiving fair consideration and comingling the personal funds of Mr. Gross, Mrs. Gross and Defendants' other wholly-owned affiliated entities.

51.     Defendants intentionally undertook this conduct, including the very use of no-asset entities, for the purpose of maximizing their ability to self-deal while simultaneously defrauding creditors.  To that end, Mr. and Mrs. Gross improperly used the corporate form as both a sword and a shield.

52.     Piercing the corporate veil and holding the Defendants liable, jointly and severally, for the debt owed to AFTC under the Final Judgment is appropriate based a multitude of factors as set forth herein.

      A.   Inadequate Capitalization and Lack of Funding to Meet Financial Obligations

53.     A & M was initially required to pay security deposits totaling $2,000,000.00, while A & M II and A & M III were required to pay security deposits totaling $600,000.00.  The A & M Entities were also required to pay AFTC an aggregated amount in excess of $2,000,000.00 for the first year of rent.  This base rent amount did not include the hundreds of thousands of dollars that the A& M Entities were also obligated to pay under their respective leases for real estate taxes and insurance.

54.     Because they were formed without sufficient capital, the A & M Entities could not meet these financial obligations which lead to immediate "loans" from other affiliates as detailed in Paragraphs 58-75 herein.

55.     Upon entering into the PSA less than three (3) months after its creation, GFI Acquisition became contractually obligated under to pay AFTC an amount in excess of $41,000,000.00 to purchase the Properties.

56.     During the Florida Court, Mr. Gross testified that the assets GFI Acquisition relied upon to fulfill its financial obligations under the PSA consisted of his personal monies along with the corporate line of credit held by GFI Resources.  Other than Mr. Gross' personal assets and GFI Resources' line of credit, Mr. Gross failed to identify any independent assets of GFI Acquisition at the time it entered into the PSA.

57.     As such, Mr. and Mrs. Gross considered their personal assets to also be the assets of their wholly-owned entities and freely comingled their personal assets with those of their alter ego entities.  Further, Mr. and Mrs. Gross exchanged monies between their entities when Mr. and Mrs. Gross determined such transfers were necessary, and did so without any consideration of corporate independence.

B.  <u>Intercompany Transfers Without Consideration and Co-Mingling of Funds</u>

58.     The Defendants routinely transferred money between the A & M Entities and other affiliated entities and reflect them as loans on the books and records of the A & M Entities for accounting purposes.  Because the "loans" were between wholly-owned, affiliated entities, Defendants could freely move money to avoid collection from creditors such as AFTC without paying attention the formalities expected in such a commercial lending transaction.

59.     At various times in 2007, A & M had anywhere between $28,000.00 and more than $1,200,000.00 in outstanding "loans" from GFI Management and the other A & M Entities.

60.     Between 2009 and 2010, A & M II reported liabilities on its Federal Income Tax Returns in the form of loans to its affiliates starting at more than $300,000.00 and decreasing until the loans are shown having a zero balance at the end of 2010.

61.     Judith Crook's testimony in the Bankruptcy Actions outlined the nature of the "loans" as nothing more than a series of transfers, varying in size, between entities.  Ms. Crook testified that the transfers were administered by GFI Management informally because all parties involved were within Defendants' network of companies.

62.     Ms. Crook testified that the transfers originated upon a request by an entity, which was not required to be in writing.  GFI Management would review and verbally approve the request.  GFI Management would then make the wire-transfer from one entity to the other.

63.     Ms. Crook also testified that the only documentation of these intercompany transfers would be the wire request that GFI Management's check signer would sign to authorize the transfer or the account statement reflecting a transfer.

64.     Thus, the Defendants treated their entities as nothing more than different accounts between which they could transfer money when it was needed to serve the Defendants' interests.

65.     No agreements or promissory notes were executed by the parties reflecting the amount of any particular "loan", "loan" terms or repayment schedules.

66.     None of the A & M Entities paid interest on any of the "loans."

67.     Defendants' re-designation of the $2,600,000.00 in security deposits paid by Mr. and Mrs. Gross on behalf of the A & M Entities under the AFTC leases is an example of Defendants' comingling the funds of all of their wholly-owned entities.

68.     Mr. and Mrs. Gross directed those security deposits, which were being held on account of the A & M Entities' obligations under their leases with AFTC, be transferred to GFI Acquisition to meet GFI Acquisition's obligations under the PSA.

69.     The re-designation of the security deposits was not memorialized by a loan agreement or promissory note between the A & M Entities and GFI Acquisition.  GFI Acquisition gave no consideration to the A & M Entities for the transfer of the security deposit funds.

70.     Mr. Gross subsequently demonstrated his total disregard for any distinction among the corporate finances by submitting a sworn Proof of Claim against A & M's bankruptcy estate to recover $2,000,000.00 of the security deposit monies by claiming that those funds were owed to him in repayment of a loan he made to A & M.

71.     There were no agreements or promissory notes between Mr. Gross and A & M memorializing the purported loan.  During the Bankruptcy Actions, Mr. Gross again tried to re-characterized the $2,000,000.00, claiming that the money was a capital contribution, not a loan.

C.  Lack of Independent Business Discretion

72.     Mr. Gross, who is the President of GFI Resources, testified in the New York Discovery Proceeding that GFI Resources provides services to the Operating Entities, but when asked what kind of services GFI Resources provides, Mr. Gross testified "nothing really."

73.     Mr. Gross initially testified in the Florida Court that GFI Resources employs over 1,000 people.  He later testified in the New York Discovery Proceeding that as sole owner and President of GFI Resources, he has no idea what these employees do or how those employees are compensated.

74.     He further testified that he has no knowledge of how his entities are structured, what ownership interest he and others have in those entities, or generally, why the entities were

formed.  For example, Mr. Gross flippantly testified that he formed GFI Resources because it had a nice name.

75.     During the New York Discovery Proceeding, Mr. Gross admitted that all of his Operating Entities are treated as one company.  Mr. Gross testified that Jennifer McLean, the Chief Financial Officer of GB Lodging, LLC and GFI Management, is the person with the most knowledge of how GFI Resources compensates its employees because "she is a person that knows a lot of the inner workings of the company."

76.     When asked which company he was referring to, Mr. Gross answered that he was referring to GFI Mortgage Bankers, GFI Insurance and GFI Development, all of which, upon are among the Operating Entities.

77.     Mr. Gross has repeatedly testified that he does anything he wants for his entities from being the chief cook to the bottle washer, but at the same time he denies that he has any knowledge of or control over these entities.

78.     In one attempt to deny any authority over GFI Management, Mr. Gross initially testified that he has no role in GFI Management other than to sometimes provide advice.  Mr. Gross later testified that he had the authority to fire Mr. Wiser, GFI Management's Executive Vice President.  When asked what role he held with GFI Management that give him that authority, Mr. Gross testified that he could fire Mr. Wiser because he was older than Mr. Wiser or simply because Mr. Wiser reported to Mr. Gross.

79.     Mr. Gross also had the authority over GFI Management's Chief Executive Officer, Fred Mehlman, during the time GFI Management was completely responsible for the operation of the A & M Entities.

80.     As part of A & M's voluntary Chapter 11 Bankruptcy petition, Mr. Mehlman was the representative of A & M tasked with submitting an affidavit attesting to the basis for A & M's bankruptcy.  In addition, Mr. Mehlman executed the Limited Liability Company Resolution authorizing A & M's filing of the Chapter 11 Bankruptcy.  Attached hereto and incorporated by reference as Exhibit "8" is a true and correct copy of the Limited Liability Company Resolution

81.     All of these actions taken by Mr. Mehlman on behalf of A & M were performed through his employment with GFI Management, but in his deposition in the Bankruptcy Actions, Mr. Mehlman acknowledged that he reported to Mr. Gross and that decision to terminate Mr. Mehlman was solely within the discretion of Mr. Gross.  Attached hereto and incorporated by reference as Exhibit "9" is a true and correct copy of Mr. Mehlman's deposition transcript.

82.     As demonstrated by his glib testimony, Mr. Gross disregards any semblance of true corporate form to do whatever he wants with the entities owned by he and Mrs. Gross.  This lack of formality allows Mr. Gross, at his sole discretion, to freely pick and choose which entity he works for on a particular day, the job title he gives himself each day, what his job and his responsibilities are each day, what his authority is on any particular day, who is hired and who is fired from these entities.

D.  Lack of Arm's Length Relationship

83.     The Defendants regularly charged the A & M Entities for all costs associated with any service required to operate the Properties.  Defendants were solely responsible for selecting third-party vendors, negotiating contracts on behalf of the A & M Entities and enforcing the A & M Entities' contractual rights.

84.     This allowed the Defendants to charge the A & M Entities a "management fee" for running the Properties.   However, there were no written management agreements

memorializing the amount of GFI Management's fee, the manner in which the fee was calculated, the services included in the fee or any additional expenses that may be charged to the A & M Entities.

85.     To maximize their gains and leave the A & M Entities asset-less, the Defendants used their insider status to manipulate the cash flow of the A & M Entities by passing on as many of GFI Management's own operating costs to the A & M Entities and charging those costs as expenses of the A & M Entities.

86.     This practice included charging for services that would typically be included in the management fee such as the salaries and benefits for GFI Management's employees, GFI Management's office expenses, travel expenses for GFI Management's employees, and GFI Management's mobile communications costs.

87.     Defendants also procured services for the A & M Entities from other insider Operating Entities.  Defendants' purchase of insurance for the Properties is an example.

88.     The Defendants charged the accounts of the A & M Entities for the cost of property, liability and umbrella policy insurance premiums.  However, the Defendants did not shop the open market for insurance or seek to obtain the most cost effective coverage.  Instead, the Defendants purchased insurance from an affiliate, GFI Insurance Brokerage, Inc. ("GFI Insurance").

89.     Each time the Defendants paid an insurance premium out of the A & M Entities' accounts, GFI Insurance earned a profit and the money would funnel directly back to Mr. and Mrs. Gross.  The Defendants continued this pattern of manipulating the A & M Entities' cash flow through the pendency of the Bankruptcy Actions as GFI Insurance was paid tens of thousands of dollars out of the A & M and A & M II debtor-in-possession accounts.

90.     All the while, the Defendants controlled the A & M Entities to maximize their own gains leaving the A & M Entities with little to no assets and their creditors with no recourse.

E.   Lack of Corporate Formalities

91.     At all times material hereto, the A & M Entities and GFI Acquisition did not hold regular corporate meetings, keep corporate minutes, keep records of the decisions of the corporate managers or hold votes to approve or authorize corporate activities.

92.     As part of its post-judgment discovery efforts, AFTC requested that the A & M Entities and GFI Acquisition produce documents reflecting their independent governance of the A & M Entities and GFI Acquisitions.  Such documents included, but were not limited to, LLC membership agreements, minutes of member meetings and voting records of LLC members.

93.     Despite being compelled to produce these documents, the A & M Entities and GFI Acquisition, failed to provide any documents demonstrating the observance of corporate formalities in the operation of the A & M Entities and GFI Acquisition, and the reason they were not produced is because they do not exist.

F.   Common Office Space and Shared Facilities

94.     Other than limited office space and equipment located at each of the respective Properties, the A & M Entities, GFI Acquisition, GFI Management and the Operating Entities all shared office space and facilities at GFI Resources's headquarters in New York City.

95.     In its voluntary Chapter 11 Bankruptcy petition, A & M identified GFI Management's office and address as its debtor's street address in the Court record.

96.     In their tax returns, each of the A & M Entities identifies its address as "c/o GFI Management Services, Inc." at the street address of GFI Management's office in New York City.

G.  Purpose of Corporate Formation

97.   Ms. Crook testified that GFI Acquisition was created solely as a vehicle to enter into the PSA with AFTC.

98.   Ms. Crook also testified that GFI Acquisition was never intended to acquire the Properties despite its status as the purchaser under the PSA.

99.   During his deposition in the New York Discovery Proceeding, Mr. Gross, who is the sole owner of GFI Acquisition, testified that he did not know either a) why GFI Acquisition was formed; or b) what business GFI Acquisition was in.

H.  Overlapping Officers, Directors and Personnel

100.   All of the entities connected to the GFI Resources network are linked through Mr. and Mrs. Gross.  Although Mr. and Mrs. Gross determine on their own if they hold a corporate title in any of their entities.

101.   At all times material hereto, all of the administrative functions of the A & M Entities were provided by employees and personnel of GFI Management, including the bookkeeping, payroll and accounting.

102.   GFI Management employees were also used to supervise the day-to day operations of the A & M Entities at the Properties.

103.   At all times material hereto, Pamela Albright was an employee of GFI Management and the property supervisor for all of the Properties.  Ms. Albright's salary was paid by GFI Management, in part, through the A & M Entities' revenue.

104.   When Settlement Stipulation was signed, Frederick Mehlman was an employee and Chief Executive Officer of GFI Management.  At the same time, Mr. Mehlman served as the Vice President and Secretary of GFI Acquisition.

## Count I – Alter Ego/Piercing the Corporate Veil

AFTC repeats and re-alleges paragraphs 1 through 104 as if fully set forth herein.

105.    Defendants have completely dominated and controlled the A & M Entities and GFI Acquisition so that these entities are mere alter egos of the Defendants and have no separate existence apart from the Defendants.

106.    Defendants used their domination over the A & M Entities and GFI Acquisition to improperly transfer assets away from these entities thereby hindering, delaying and defrauding AFTC of the ability to collect on the Final Judgment that was stipulated and agreed to by the A & M Entities and GFI Acquisition.

107.    The lack of any independent corporate governance or separateness among Defendants, the A & M Entities and GFI Acquisition allowed Defendants to perpetrate a wrongful act against AFTC and unjustly deprive AFTC of the ability to enforce its rights under the Final Judgment.

108.    AFTC's inability to collect on the stipulated Final Judgment is an inequitable consequence that was directly and proximately caused by the Defendants' unjust conduct and which will continue if the Defendants are not held responsible for the debt owed to AFTC under the Final Judgment.

109.    Defendants' wrongful conduct was intended to and did cause substantial harm and injustice to AFTC.  Piercing the corporate veil and imposing liability, jointly and severally, on the Defendants is necessary to achieve equity and hold Defendants responsible for the debts of the A & M Entities and GFI Acquisition, specifically with respect to the debt owed to AFTC under the Final Judgment.

WHEREFORE, Plaintiff, American Federal Title Corporation, demands judgment against Defendants, Allen I. Gross, Edith Gross and GFI Management Services, Inc., jointly and severally, in the amount of $7,500,000.00, along with interest at the statutory rate, the cost of bringing this action, and such further relief as the Court deems fair and just.

## Count II – Fraudulent Conveyances
## (Debtor and Creditor Law §273)

AFTC repeats and realleges paragraphs 1 through 104 as if fully set forth herein.

110.    Since their inception, the A & M Entities, through the Defendants have improperly transferred assets of the A & M Entities to the Defendants without any consideration.

111.    Among the improper transfers were hundreds of thousands of dollars in monies the Defendants conveyed to GFI Management each year out of the accounts of the A & M Entities which the Defendants disguised as a "management fee."

112.    In the last six (6) years, Defendants caused A & M to convey $679,559.45 to GFI Management.

113.    In the last six (6) years, Defendants caused A & M II to convey $346,789.47 to GFI Management.

114.    In the last six (6) years, Defendants caused A & M III to convey $142,755.89 to GFI Management.

115.    Defendants' transfer of these amounts to GFI Management out of the A & M Entities' accounts represented nothing more than Mr. and Mrs. Gross' conveyance of the revenue generated by one of their wholly-owned entities to another one of their wholly-owned entities.

116.    The Defendants' conveyance of these monies out of the A & M Entities' accounts and to GFI Management was fraudulent because the transfers were made without fair consideration.

117.    At the time of the fraudulent conveyances between the A & M Entities and GFI Management, each of the A & M Entities was indebted to AFTC for the rents owed under the long-term ground leases, which liability was adjudicated by the Bankruptcy Court's entry of the Final Judgment.

118.    By systematically transferring monies from the A & M Entities to GFI Management and disguising them as an operating expense, Defendants removed approximately $1,169,104.81 from the A & M Entities at a time when they were indebted to AFTC.

119.    By transferring funds from the entities that were indebted to AFTC, to an entity that was not at the time indebted to AFTC, the Defendants rendered the A & M Entities insolvent and unable to pay its debts, including the amounts owed under the Final Judgment.

120.    The Defendants' transfer of the assets of the A & M Entities constitutes a fraud on the creditors of the A & M Entities.

121.    The Defendants have acted in conspiracy to defraud the A & M Entities' creditors, particularly AFTC, and to render the Final Judgment uncollectible.

122.    As result of the fraudulent conveyances, AFTC has sustained damages in the amounts of the unpaid balance of the Final Judgment against the A & M Entities.

123.    AFTC requests that the conveyances made by Defendants to GFI Management out of the accounts of the A & M Entities be set aside.  AFTC should be entitled to receive from the Defendants, any economic benefit received by the Defendants as a result of the fraudulent conveyances.

WHEREFORE, Plaintiff, American Federal Title Corporation, demands judgment against Defendants, Allen I. Gross, Edith Gross and GFI Management, Inc., jointly and severally, for

$1,169,104.81, and awarding reasonable attorney's fees, costs and expenses of this action, along with such further relief that the Court deems fair and just.

### Count III – Fraudulent Conveyances
### (Debtor and Creditor Law §273-A)

AFTC repeats and realleges paragraphs 1 through 104 and 110 through 123 as if fully set forth herein.

124.    Some or all of the conveyances by the Defendants to GFI Management out of the accounts of the A & M Entities were made at a time when the A & M Entities were defendants in the Florida Cases.

125.    The A & M Entities have failed to pay any portion of the award under the Final Judgment, and upon information and belief, the A & M Entities have insufficient funds to satisfy the Final Judgment.

WHEREFORE, Plaintiff, American Federal Title Corporation, demands judgment against Defendants, Allen I. Gross, Edith Gross and GFI Management, Inc., jointly and severally, for $1,169,104.81, and awarding reasonable attorney's fees, costs and expenses of this action, along with such further relief that the Court deems fair and just.

### Count IV – Fraudulent Conveyances
### (Debtor and Creditor Law §276)

AFTC repeats and realleges paragraphs 1 through 104 and 110 through 125 as if fully set forth herein.

126.    The conveyances made by the Defendants to GFI Management out of the accounts of the A & M Entities were made with intent to hinder, delay and defraud AFTC so that AFTC would be unable to collect on the debt owed to it by the A & M Entities.

127.     The transfers by the Defendants out of the accounts of the A & M Entities were made with the intent to hinder, delay and defraud AFTC so that AFTC would be unable to collect on the Final Judgment

128.     AFTC has been caused to retain the undersigned counsel to represent it in this matter.  Pursuant to New York Debtor Creditor Law § 276-a, Defendants are liable, jointly and severally, to AFTC for the attorney's fees incurred in this action.

WHEREFORE, Plaintiff, American Federal Title Corporation, demands judgment against Defendants, Allen I. Gross, Edith Gross and GFI Management, Inc., jointly and severally, for $1,169,104.81, and awarding reasonable attorney's fees, costs and expenses of this action, along with such further relief that the Court deems fair and just.

## JURY DEMAND

The Plaintiff hereby demands a trial by jury on all issues so triable as of right.

Dated this 27th day of December, 2013.

Arnstein & Lehr LLP
*Attorneys for Plaintiff*
200 E. Las Olas Blvd., Suite 1700
Ft. Lauderdale, FL 33301
Tel.:    (954) 713-7600
Fax:    (954) 713-7700
E-Mail: ladelson@arnstein.com
               Franklin.zemel@arnstein.com


By: /s Lori Adelson
       Lori Adelson, Esq.
       New York Bar No. 3011632
          and
       Franklin L. Zemel, Esq.
       Florida Bar No. 816620
       *Pro Hac Vice*

## CERTIFICATE OF SERVICE

We hereby certify that on December 27, 2013, we electronically filed the foregoing document with the Clerk of the Court using CM/ECF.   We also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

**ARNSTEIN & LEHR LLP**
Attorneys for Plaintiff
American Federated Title Corporation

By:   s/Lori Adelson
        Franklin L. Zemel
        Lori Adelson
200 East Las Olas Blvd., Suite 1700
Fort Lauderdale, FL  33301
(954)713-7600 Fax:(954) 731-7700
franklin.zemel@arnstein.com
ladelson@arnstein.com

## AMERICAN FEDERATED TITLE CORPORATION v GFI MANAGEMENT
## CASE NO. 13-CIV-06437 (AJN) (AJP)

### SERVICE LIST

**STAHL & ZELMANOVITZ**
Attorneys for Defendants
GFI Management Services, Inc., Allen I.
Gross And Edith Gross
747 Third Avenue, Suite 33B
New York, New York  10017
(212) 826- 6422 Fax: (212) 826-6402
joezelmanovitz@aol.com
aneuhaus@szlawllp.com

Page 1

1
2 UNITED STATES BANKRUPTCY COURT
  SOUTHERN DISTRICT OF NEW YORK
3 -----------------------------------X
4 A&M FLORIDA PROPERTIES, LLC,
5         Debtor.
6 -----------------------------------X
7
8
9      DEPOSITION OF JUDITH CROOK
10         New York, New York
11       Wednesday, July 7, 2010
12
13
14
15
16
17
18
19
20
21
22
23
24 Reported by:
   JOAN WARNOCK
25 JOB NO. 311707

Page 2

1
2
3         July 7, 2010
4         11:00 a.m.
5
6      Deposition of JUDITH CROOK, held at
7 the offices of GFI Management Services,
8 50 Broadway, New York, New York, before
9 Joan Warnock, a Notary Public of the
10 State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2 A P P E A R A N C E S:
3
4     ARNSTEIN & LEHR, LLP
5     Attorneys for American Federated Title
6     Corporation
7         200 East Las Olas Boulevard
8         Ft. Lauderdale, Florida  33301
9     BY:  FRANKLIN L. ZEMEL, ESQ.
10
11     GOLDBERG WEPRIN FINKEL GOLDSTEIN, LLP
12     Attorneys for Debtor
13         1501 Broadway
14         New York, New York  10036
15     BY:  KEVIN J. NASH, ESQ.
16
17
18
19
20
21
22
23
24
25

Page 4

1              J. Crook
2 J U D I T H   C R O O K, called as a
3   witness, having been duly sworn
4   by a Notary Public, was examined
5   and testified as follows:
6      COURT REPORTER:  Please state your
7   name and address for the record.
8      THE WITNESS:  Judith Crook,
9   4 Waterview Lane, Randolph, New Jersey.
10 EXAMINATION BY
11 MR. ZEMEL:
12   Q.  Good morning.
13   A.  Hi.
14   Q.  How are you currently employed?
15   A.  By GFI Management Services, Inc.
16   Q.  And how long have you been employed
17 by GFI Management Services, Inc.?
18   A.  Since November 2005.
19   Q.  And what did you do before that?
20   A.  I worked at a commercial real
21 estate developer and property manager.
22   Q.  Who was that?
23   A.  SJP properties.
24   Q.  Is that here in New York?
25   A.  New Jersey.

**EXHIBIT**

**"1"**

Page 5

1                J. Crook
2     Q.   Doesn't anybody in this part of the
3  country have a real estate company with a
4  name?  Why is everything initials?  Sorry.
5     A.   Because we're all individuals.
6     Q.   GFI, SJP.  Okay.  How long were you
7  with SJP in New Jersey?
8     A.   Five years.
9     Q.   What were your responsibilities at
10  SJP?
11     A.   I was assistant controller.
12     Q.   What were your duties as assistant
13  controller?
14     A.   I ran the accounting department.
15  We kept the books and records for various
16  properties, did budgets.
17     Q.   What kind of properties?
18     A.   Office buildings.
19     Q.   Not residential?
20     A.   No.
21     Q.   Approximately how many properties
22  did SJP own or manage while you were there?
23     A.   I'm remembering about twelve.  I'm
24  not a hundred percent sure.  It was always a
25  moving target.

Page 6

1                J. Crook
2     Q.   But approximately a dozen
3  buildings?
4     A.   Yes.
5     Q.   And where did you work before SJP?
6     A.   I worked at National Exchange
7  Carrier Association.
8     Q.   What is that?
9     A.   It's an association of all the
10  telephone networks across the country.  It
11  did the billing.  It accounted for the all
12  the back-office billing between Sprint and
13  AT&T and who paid for the switches in any
14  location, you know.
15     Q.   What did you do for them?
16     A.   I was the manager of -- what was my
17  title.  Manager of budgets and accounts
18  payable, I think.
19     Q.   Can you give me the benefit of your
20  formal education, please.
21     A.   I have a civil engineering degree.
22     Q.   Interesting.
23     A.   From London University.  And I am a
24  chartered accountant.
25         MR. NASH:  You mean that's not a

Page 7

1                J. Crook
2     New Jersey accent you have?
3         THE WITNESS:  Isn't it?
4     Q.   When did you get your civil
5  engineering degree?
6     A.   That would be telling you how old I
7  am.
8     Q.   No, not necessarily.
9         MR. NASH:  Well, it would be a
10  range.
11     1975.  I was very young.
12     Q.   And when did you become a chartered
13  accountant?
14     A.   I became a chartered accountant in
15  England in 1978 and then in Canada in 1981.
16     Q.   So fill in the blanks for me.
17  Civil engineering degree, London University,
18  but instead you went and became an accountant
19  or a chartered accountant.
20     A.   Yes.
21     Q.   What did you like about
22  engineering?
23     A.   I liked applied math, so I went
24  into engineering.  But then I decided -- the
25  plan was I would go get my accounting degree

Page 8

1                J. Crook
2  and then I would go work for a development
3  company where I would have the engineering
4  knowledge and of the finance side of it.
5     Q.   What side of civil engineering did
6  you like?
7     A.   I did structural, bridges, office
8  buildings and stuff.
9     Q.   Interesting.  Don't you think that
10  would have been more interesting than being a
11  controller in a company doing accounts
12  payable and budgets?  I'm just asking.
13         MR. NASH:  Maybe, maybe not.
14     There's monotony in everything.
15     Q.   Don't you miss the civil
16  engineering?
17     A.   A little bit.  It was a long time
18  ago.  Back then I think accounting was more
19  conducive to, you know, my -- I mean it's
20  personal stuff.  I don't know why it's
21  relevant.  But, you know, that was my choice.
22  And my choice was it was more flexible as a
23  woman who would probably get married and have
24  kids.  I would have flexibility to work
25  part-time, if you really want to know.

J. Crook

2   Q.  Okay.  I did really want to know.
3      MR. NASH:  All right.
4   Q.  Have you applied for --
5      MR. NASH:  He's trying to be nice.
6   Let's hope he's nice the whole time,
7   Judith.
8   Q.  I'm always nice, despite what
9   you've heard.  Make up your own mind.
10      Have you applied for a CPA license
11   anywhere in the States?
12   A.  I sat the exams.
13   Q.  I'm sorry?
14   A.  I have taken the CPA exams and
15   passed them.  I have not applied for a CPA
16   license.
17   Q.  When did you take and pass the
18   exams?
19   A.  1999.
20   Q.  Is there a specific reason you
21   didn't follow through and obtain the CPA
22   licensing?
23   A.  Yeah.  Procrastination probably.
24   Q.  But there was no legal impediment
25   to that?

J. Crook

2   A.  No.  No.
3   Q.  Are you still a citizen of the
4   U.K.?
5   A.  I am.
6   Q.  And your status here?
7   A.  I am a TN.
8   Q.  TN?
9   A.  Um-hmm.  TN visa.
10   Q.  And what does that mean?
11   A.  Treaty NAFTA.  It's called a TN
12   visa for Treaty NAFTA, North American Free
13   Trade Agreement.
14   Q.  Okay.  I hadn't heard about that
15   visa before.  What does that mean, Treaty
16   NAFTA?  Obviously I know what NAFTA is --
17      MR. NASH:  Franklin --
18      MR. ZEMEL:  Nash, don't even start
19   with me.
20      MR. NASH:  All right.
21   Q.  What is it?
22   A.  It's a work visa.  Basically it's a
23   temporary work visa.  It's given annually, so
24   I renew it annually.
25   Q.  I see.  Okay.  So it's an annual

J. Crook

2   visa, essentially?
3   A.  Yeah.
4   Q.  And you have to be fully employed
5   in order to keep that visa?
6   A.  Well, it's good for a year, and
7   then you -- it's good for a year.  So if I
8   were to renew it, I couldn't renew it without
9   a job.
10   Q.  So you have to be fully employed at
11   the time you're renewing?
12   A.  You have to have an offer of
13   employment.
14   Q.  Or at least an offer of employment?
15   A.  Yes.  Yes.
16   Q.  Okay.  And what is your job title
17   at GFI Management Services?
18   A.  Controller.
19   Q.  Are there any assistant
20   controllers?
21   A.  No.
22   Q.  And to whom do you report?
23   A.  Fred Mehlman.
24   Q.  Anyone else?
25   A.  No.

J. Crook

2   Q.  Do you have a written employment
3   contract?
4   A.  I have a letter.  It's not a formal
5   contract, not what I would call a formal
6   contract.  I got an offer of employment, and
7   I accepted.
8   Q.  Do you serve at the pleasure of GFI
9   Management Services?
10      MR. NASH:  Objection.  Do you
11   understand the question?
12      THE WITNESS:  Well, isn't it like
13   -- isn't it work at will or whatever it
14   is?
15      MR. NASH:  Yes.
16   A.  Yes.  I think everybody does here.
17   Q.  So GFI Management Services could
18   terminate you at any time; is that correct?
19   A.  Yes.
20   Q.  And you could quit at any time; is
21   that correct?
22   A.  Yes.
23   Q.  Do you report to Mr. Gross, Alan
24   Gross?
25   A.  Not directly.

Page 13

```
 1            J. Crook
 2    Q.  Do you indirectly report to
 3 Mr. Gross?
 4    A.  Can you -- I'm not quite sure
 5 what --
 6    Q.  Well, I asked you did you report to
 7 Mr. Gross.  You said not directly.  So --
 8    A.  No.  I report to Fred.  Do I have
 9 interaction with Mr. Gross?  I do
10 occasionally.
11    Q.  Now, can you tell me what is your
12 understanding as to why you're being examined
13 today?
14    A.  Because you want to gather some
15 facts about the Carib Villas.  That's all I
16 know really, that, you know, we have a legal
17 battle going on, and I'm here to maybe
18 provide information and be asked questions.
19       MR. NASH:  I just want to note for
20    the record, we did have an agreement
21    that Judith would speak to Dr. Cornfeld,
22    which she has done, in lieu of her
23    examination.
24       THE WITNESS:  Right.
25       MR. NASH:  And she's been providing
```

Page 14

```
 1            J. Crook
 2 Dr. Cornfeld information on a -- I'm not
 3 going to say a regular basis, but when
 4 he asks for information.  I do believe
 5 they speak on multiple occasions.  So,
 6 in fairness, Franklin, that question,
 7 she wasn't supposed to be examined.  She
 8 was supposed to give Dr. Cornfeld
 9 information.  But we are here today.
10       MR. ZEMEL:  Are you finished?
11       MR. NASH:  Yes.
12       MR. ZEMEL:  That was never the
13    stipulation.  The understanding was that
14    if Dr. Cornfeld and Ms. Crook could
15    speak directly, it was hoped that the
16    examination could be either shortened or
17    eliminated.  But there was never a
18    stipulation that one would substitute
19    for the other.  It was hoped for, but,
20    especially in light of events that
21    occurred two weeks ago, certainly I'm
22    going to have questions.  So if you'll
23    stop obstructing the deposition, we can
24    just move right along.
25       MR. NASH:  I'm not.  You asked that
```

Page 15

```
 1            J. Crook
 2 question.  I think it was an appropriate
 3 time to put that on the record.  That's
 4 all.
 5       MR. ZEMEL:  Last question, please.
 6       (Record read.)
 7    Q.  Now, are you represented by
 8 Mr. Nash in this examination?
 9       Ma'am?
10    A.  I'm not sure what you mean.
11    Q.  Do you have an understanding
12 whether or not Mr. Nash and his law firm are
13 currently representing you, Judith Crook, in
14 this particular examination?
15    A.  I don't know.
16    Q.  Can you tell me what discussions
17 have you had with Mr. Nash in preparation for
18 this examination?
19    A.  Well, I wanted to know what it
20 would be like.  So he, you know, said you're
21 going to ask me some background information,
22 and I'm going to be asked to give -- maybe
23 tell you about, you know, how my department
24 works, that it was, you know, nothing to be
25 worried about, because, you know, we don't
```

Page 16

```
 1            J. Crook
 2 like being here.  I certainly don't like
 3 being here.  So it was -- he just provided
 4 reassurance that this was, you know, normal
 5 and nothing to be worried about.
 6    Q.  Did you discuss with him any
 7 specific issues?
 8       MR. NASH:  I'm going to object.
 9    I'm going to state why I object.  She's
10    here as a representative of the debtor
11    even though she works for the management
12    company as the debtor's agent.  So I'm
13    going to object as to my discussions
14    with Judith on the attorney client
15    privilege knowing that she is an agent
16    of the debtors, and this is a 2004
17    examination.
18       MR. ZEMEL:  Are you representing
19    Ms. Crook in the examination?
20       MR. NASH:  I am representing the
21    debtors.  She's a witness as an agent on
22    behalf of the debtors.  So I am
23    representing the debtors' agent for the
24    purposes of this examination.  If you
25    recall, we agreed that the three
```

Page 17

J. Crook

1
2 individuals you listed would be produced
3 on behalf of the debtors.
4        MR. ZEMEL: Actually, you made me
5 subpoena --
6        MR. NASH: No, but you never did.
7        MR. ZEMEL: Yes, I did.
8        MR. NASH: You never did.
9        MR. ZEMEL: I did. Mr. Donovan, by
10 agreement, accepted service of process.
11        MR. NASH: Well, I'm not aware that
12 he accepted service of process, but we
13 produced her because -- actually, the
14 fact of the matter is, Franklin, we
15 produced her to Dr. Cornfeld in the
16 belief that we could, in your words,
17 eliminate any of this deposition.
18        MR. ZEMEL: Listen, I'm not here to
19 argue with you.
20        MR. NASH: Okay. So yes, I am the
21 lawyer. I am representing Ms. Crook. I
22 am representing the debtors. I don't
23 represent GFI Management. She's here as
24 an agent of the debtors.
25        MR. ZEMEL: Just mark that for a

Page 18

J. Crook

1
2 ruling, please.
3        Q. Now, last year, as you know, A&M
4 Florida Properties filed for bankruptcy here
5 in New York, or, as you like to say, or as he
6 likes to say, New Yawk (phonetic). You're
7 familiar with that bankruptcy?
8        MR. NASH: She says it much more
9 articulate than I do.
10        MR. ZEMEL: She's European. Excuse
11 me. British. Sorry.
12        Q. Are you familiar with the
13 bankruptcy?
14        A. Yes.
15        Q. Were you involved at all in the
16 filing of the various petitions and schedules
17 with respect to that bankruptcy?
18        A. I assisted in putting the --
19 providing the information to go into the
20 submission.
21        Q. Can you tell me what exactly were
22 you asked to do? What tasks were you given
23 to perform?
24        A. I was asked to go through, you
25 know, our general ledger and provide numbers,

Page 19

J. Crook

1
2 you know, for the various forms.
3        Q. So were you provided the various
4 forms?
5        A. Yes. I believe so.
6        Q. Well, let me see if I can refresh
7 your recollection. If you hadn't been
8 provided with the various forms, how would
9 you have known what information to search
10 for?
11        A. Yes. So I had the forms. Yes. I
12 mean --
13        Q. Okay. Were the forms in blank?
14        A. Yeah. I think they were blank
15 forms, and I just hand-wrote stuff on them.
16        Q. Okay. And --
17        A. You know, it's nearly a year ago,
18 so --
19        Q. Of course.
20        A. And we have 60 properties. So, you
21 know, this is just a small part of my world,
22 so you'll have to forgive me if my memory
23 isn't as tuned into this as maybe you think
24 it might be.
25        Q. Understood. Well, look, these are

Page 20

J. Crook

1
2 not the trick questions, okay. Don't worry
3 about --
4        A. Are you going to tell me when the
5 trick questions come?
6        Q. I will tell you that these are not
7 the trick questions, okay. Although you
8 have --
9        MR. NASH: Okay. Whenever they say
10 they're not the trick questions, you've
11 got to think -- whenever they say it's
12 not about the money, it's about the
13 money.
14        Q. Well, when you say to me, when you
15 have a prefatory sentence to an answer that
16 begins with, well, to tell you the truth, I
17 don't presume that meant you have been lying
18 to me everything up until that point, okay.
19 So these are not the trick questions. To
20 tell you the truth.
21        MR. NASH: No. The question is why
22 people say that is because they are
23 telling the truth, but they don't know
24 if the listener is going to believe
25 them. So the thing is to say "to tell

Page 21

J. Crook
1
2    you the truth" --
3        MR. ZEMEL:  Okay.  Let's move one.
4        MR. NASH:  -- to emphasize you
5    should believe them.
6        MR. ZEMEL:  All right.
7    Q.   You mentioned that GFI Management
8    Services is currently managing approximately
9    60 properties; is that correct?
10   A.   Yes.  Fifty, 60.  It varies.
11   Q.   But how many of those properties
12   under GFI Management are now currently in
13   bankruptcy?
14   A.   Two.
15   Q.   A&M Florida Properties and A&M
16   Florida Properties II?
17   A.   Correct.
18   Q.   And have you ever in your career
19   been asked to review bankruptcy schedules and
20   forms and gather information?
21   A.   No.
22   Q.   Was this time the first you've ever
23   been involved with a bankruptcy proceeding?
24   A.   Yes.
25   Q.   So even though you may have had 50

Page 22

J. Crook
1
2    or 60 properties under management, it was the
3    very first time you had been asked to gather
4    information with respect to a bankruptcy
5    filing; is that correct?
6    A.   Correct.
7    Q.   And would it be fair to say that
8    you understood that the information that you
9    were being asked to gather was going to be
10   filed in the court?  You understood that;
11   correct?
12   A.   Yes.
13   Q.   And because you knew it was going
14   to be filed in court, you certainly knew that
15   the bankruptcy court and the judge was going
16   to rely on that information; isn't that
17   right?
18   A.   Yes.
19   Q.   And because you knew that the
20   bankruptcy court and the judges were going to
21   rely on that, you certainly wanted to make
22   sure that all of that information was as
23   accurate as possible; isn't that right?
24   A.   Yes.
25   Q.   And you understood that Mr. Mehlman

Page 23

J. Crook
1
2    was going to be signing his name on those
3    petitions and schedules; isn't that right?
4    A.   I quite honestly -- here we go,
5    quite honestly.  At the time I didn't know
6    who was going to sign them, because I did put
7    some numbers together.  They were submitted
8    to the law firm, who then did the papers, and
9    then they came back.  And that's when -- I
10   didn't know whether it would have been Fred
11   Mehlman, whether it would have been our
12   general counsel, and I didn't know who was
13   going to sign them.
14   Q.   But you understood when you saw the
15   forms, you knew that somebody was going to
16   have to sign these various forms and
17   schedules; isn't that right?
18       MR. NASH:  Objection.  Answer the
19       question to the best that you -- he's
20       asking what you knew at the time.
21   A.   I didn't really think about it.
22   This was my first time in a bankruptcy.  I
23   really didn't -- didn't know the whole -- I
24   didn't know the process.  You know, it was a
25   new experience for me.

Page 24

J. Crook
1
2    Q.   And so tell me --
3    A.   And I was not involved in the first
4    bankruptcy.  I was asked for specific
5    information that I gave to somebody, and I
6    was not involved in actual filing of things.
7    I was a little bit more involved with the
8    second one.
9    Q.   So let me see if I understand.  The
10   first bankruptcy was Palm Gardens, A&M
11   Florida Properties 2; is that correct?
12   A.   Yes.
13   Q.   Describe the involvement you had
14   with the preparation of the schedules and the
15   petition in the Palm Gardens bankruptcy?
16   A.   I was asked for a balance sheet,
17   and I provided from our accounting system a
18   balance sheet.  And somebody else actually
19   handled everything else.
20   Q.   So to the best of your
21   recollection, your only involvement in the
22   Palm Gardens filings were you provided a
23   balance sheet; is that correct?
24   A.   Yes.
25   Q.   And how with respect to the Carib

Page 25

J. Crook

1   J. Crook
2   Cutlerwood bankruptcy filings did your tasks
3   change?
4       A.   I actually got the forms this time
5   and went through and tried to answer the
6   questions as best as I could, interpreting
7   what the questions meant, which isn't always
8   that clear.
9       Q.   And if you didn't understand
10  something, was there somebody available for
11  you to ask?
12      A.   Our law firm.
13      Q.   And do you recall ever having any
14  questions that went unanswered or unexplained
15  by your counsel?
16      A.   I don't recall.
17      Q.   Would it be fair to say that when
18  you provided the information and the answers
19  on these schedules and petitions, that you
20  felt comfortable that the information was
21  complete and accurate?
22      A.   Yes.
23      Q.   And at the time that you did that,
24  did you feel that you had an understanding of
25  what the questions were asking you?  When you

Page 26

J. Crook

1   supplied the information, did you have any
2   doubts in your mind as to what information
3   was being requested on those schedules and
4   petitions?
5       A.   No.  I thought that the answers I
6   gave were, you know, reasonable.  Some were
7   estimates.  Accounting has a lot of estimates
8   in it.  That's the way I would characterize
9   accounting.
10      Q.   Was there a particular reason that
11  you're aware of why your involvement in the
12  Carib Villas bankruptcy was much more
13  heightened than it was during the Palm
14  Gardens bankruptcy?
15      A.   Just a change in people in our
16  office.
17      Q.   Such as?
18      A.   David Arnow was here and did the --
19  basically took charge of the Palm Gardens
20  one.
21      Q.   And David Arnow's title before he
22  left was what?
23      A.   COO.
24      Q.   COO of what?

Page 27

J. Crook

1       A.   GFI Management Services.
2       Q.   Is there a chief operating officer
3   now of GFI Management?
4       A.   No.
5       Q.   Has David Arnow's position been
6   replaced by anyone?
7       A.   I would say Fred was kind of his
8   replacement, but they were both here for a
9   while.  So Fred is the CEO.  Similar roles.
10  It's, you know.
11      Q.   Were Mr. Arnow's responsibilities
12  essentially given to Mr. Mehlman?
13      A.   I would say so.
14      Q.   Now, can you tell me prior to the
15  time that you were given these forms and you
16  began your research to answer the various
17  questions, did you meet with anyone to give
18  you direction as to what it is you were
19  supposed to do?
20      A.   I don't remember.
21      Q.   Did Mr. Mehlman ever sit with you
22  and give you direction about what your tasks
23  were with respect to gathering the
24  information to go into these bankruptcy

Page 28

J. Crook

1   schedules and other filings?
2       A.   I think I would have met with
3   Mr. Mehlman and Mr. Zlotnick at that time.
4       Q.   Are you hypothesizing that you
5   would have done that, or do you have a
6   recollection of meeting with either one or
7   both of them about the bankruptcy schedules?
8   By the way, let me just tell you --
9       A.   I mean I think we talked.  We
10  talked about them.  I don't, you know, I
11  don't remember anybody sitting me down and
12  say do this, this, this, and this, you know.
13  We said we've got to gather this information,
14  do what you can.  So, you know, it was that
15  kind of approach.
16      Q.   Have you ever been deposed before?
17      A.   No, I haven't.  So, you know, if
18  you're trying to direct me in some direction,
19  I'm not understanding what you want to get
20  out of me, so.
21      Q.   Let me just tell you that if I ask
22  a question and you don't know or you don't
23  remember, that's a perfectly valid answer.
24      A.   Okay.

Page 29

J. Crook

1
2      Q.   As long as it's the truth.  Okay.
3   So if I ask you a question and you say,
4   well --
5      A.   Okay.
6      Q.   -- I might have met with --
7      A.   Okay.  I don't remember.
8      Q.   If the answer is --
9      A.   I don't remember.
10     Q.   Okay.  I don't need you to make
11  things up.
12     A.   Okay.
13     Q.   We'll deal with that later.  But I
14  don't need you to --
15        MR. NASH:  Franklin, she's a nice
16     woman.  Please.  She's trying to do her
17     best.  And I appreciate you saying "I
18     don't know" or "I don't remember" is a
19     valid answer.  It is.  So --
20        MR. ZEMEL:  Can we move on?
21        MR. NASH:  Yes, but, you know, go
22     easy, Franklin, please.
23     Q.   Part of this process is -- because
24  I could see you're a bit nervous, is I really
25  just want to have a conversation with you.

Page 30

J. Crook

1
2   And I have to ask questions somewhat artfully
3   and formally for various technical reasons.
4   But really, I just want to have a
5   conversation with you, and I just want to get
6   some information, and we can all go on our
7   way, okay.  Remember, these are not the trick
8   questions, okay.  So you can relax.
9        MR. NASH:  When you say that, it's
10     not really fair to the witness that you
11     said it twice, because she's trying to
12     give you forthright answers and so
13     forth.  So just ask the questions, and
14     we'll go forward.  And that's all I ask
15     you at this point.  Just ask the
16     questions.
17     Q.   Now, do you recall Mr. Mehlman
18  directing you to gather information for the
19  bankruptcy schedules and other filings?
20     A.   No.
21     Q.   Now, you mentioned Mr. Zlotnick.
22  That would be Andrew Zlotnick?
23     A.   Correct.
24     Q.   And he was formerly in-house
25  general counsel --

Page 31

J. Crook

1
2      A.   Yes.
3      Q.   -- to GFI?
4      A.   Yes.
5      Q.   And as far as you know, he was
6   general counsel to GFI Management Services,
7   Inc.?
8      A.   I'm not sure.  I don't know whether
9   it was -- I don't know.
10     Q.   So to be clear, you have no
11  specific recollection of actually being
12  directed by either of those two gentlemen?
13     A.   You asked me if I remembered being
14  directed by Mr. Mehlman.  I feel that I
15  recall that I was asked by Mr. Zlotnick.
16     Q.   So your recollection is that
17  Mr. Zlotnick asked you to gather the
18  information to go on these schedules?
19     A.   Yes.
20     Q.   Now, did you see these bankruptcy
21  schedules before they were filed in the
22  court?
23     A.   Yes.
24     Q.   Did you have a chance to review
25  them before they were filed with the court?

Page 32

J. Crook

1
2      A.   Yes.
3      Q.   Did you review these schedules with
4   the completed information with anyone?
5      A.   No.
6      Q.   Did you have an assistant or
7   someone help you gather this information that
8   went on those schedules?
9      A.   I had some people in my department
10  run some reports probably, yes.  Some --
11  yeah.  I don't know specifically who, but.
12     Q.   But the reports would have been run
13  at your direction; is that correct?
14     A.   Say that again.
15     Q.   The reports that you just mentioned
16  would have been run at your direction; isn't
17  that right?
18     A.   Yes.
19     Q.   Can you tell me with respect to
20  determining what liabilities that A&M Florida
21  Properties had at the time, tell me what you
22  did to gather that information.
23     A.   I reviewed our accounting, the
24  reports generated by our accounting system.
25     Q.   Did you exclude any information?

J. Crook

1
2    MR. NASH: Objection. Do you
3 understand his question?
4    THE WITNESS: Did I exclude any
5 information.
6    Q.  Were there any liabilities which
7 A&M Florida Properties owed to anyone which
8 were found in your general ledger but were
9 not reported on the bankruptcy schedules?
10    A.  On the initial filing?
11    MR. NASH:  Well, I'm just going to
12 object.  When you say the bankruptcy
13 schedules, you're aware that we amended
14 the schedules?
15    MR. ZEMEL:  Yes.  I'm only talking
16 about the original filings.
17    MR. NASH:  Okay.  But I think,
18 because there were amendments that have
19 been filed, so, you know, I think --
20    MR. ZEMEL:  I'm well aware.
21    MR. NASH:  -- you should be clear
22 on that.
23    Q.  At the time that you ran various
24 reports or did whatever research was
25 necessary in order to determine what

J. Crook

1
2 the liabilities were of A&M Florida
3 Properties, would it be fair to say that you
4 or someone under your direction and control
5 generated certain reports from the general
6 ledger?
7    A.  Yes.
8    Q.  And would it be a true statement
9 that the liabilities of A&M Florida
10 Properties would be located in the general
11 ledger?
12    A.  Do I have to answer yes or no to
13 that?
14    Q.  No, you don't.
15    A.  Because there's an accounting
16 history that goes along with this particular
17 entity.
18    Q.  Talk to me.  Explain it to me.
19 Explain to me --
20    MR. NASH:  If you can't answer yes
21    or no, say I can't answer that question
22    yes or no, here is my answer.
23    A.  So I can't answer yes or no, but I
24 would like to explain.
25    Q.  Let me just try to make it simple,

J. Crook

1
2 okay.  Certain bankruptcy schedules were
3 filed when the bankruptcy was first
4 initiated.  What I want to know is what did
5 you or those under your direct supervision
6 and control do to determine that all of the
7 liabilities of the debtor were reported on
8 the schedules filed with the court?  That's
9 what I want to know.  So I need you to tell
10 me what you did to make sure that all of the
11 liabilities were properly reported on those
12 schedules.  Your turn.
13    A.  I took -- we took the information
14 from the general ledger.  However, the
15 general ledger had information that was put
16 on there based on tax returns provided to us
17 in 2005.  We changed -- and I'm going to
18 explain this, because you've got to
19 understand the system to understand why I'm
20 having a hard time.  I feel like I know where
21 you're going with the question, and I just
22 need to just explain something.
23    So we had a different -- B.J.
24 Murray, which is an accounting software,
25 through 2004.  We no longer have that system.

J. Crook

1
2 I don't have access to any of that
3 information.  We got a new accounting system
4 in January 2005.  And this was prior to my
5 time with GFI.  The only things brought into
6 the accounting system at that time was all
7 the tenant information, the tenant, you know,
8 the rent-rolls, etc., the cash balance and
9 expense.  So since that time we had to
10 basically build up the opening balances which
11 we took from -- we would take from the tax
12 returns, because I didn't have any other
13 information.  Now --
14    Q.  Let me just -- I don't want to
15 interrupt you, but let me just see if I
16 understand where you are now.
17    Prior to your employment with GFI
18 Management, a new accounting system was put
19 into place?
20    A.  Um-hmm.
21    MR. NASH:  Not a new accounting
22    system.  A new software program.
23    A.  New software, yes.
24    Q.  I think it's all the same thing,
25 but okay.  So a new computer system, a new

J. Crook

2 software program is put into place. What is
3 the name of the system?
4    A.   Yardi.
5    Q.   Spell it for me.
6    A.   Y-a-r-d-i, Yardi.
7    Q.   And I think what you're telling me
8 is that the legacy information from the old
9 system was --
10    A.   The old system didn't have a
11 balance sheet. Didn't have a balance sheet.
12    Q.   I see.
13    A.   So it was basic like cash flows,
14 income and cash flow statements. So it
15 didn't have a balance sheet. There was no
16 assets liabilities on these entities in 2005.
17    Q.   Is this for all properties?
18    A.   This was for all properties. So,
19 you know, over the years, we have got
20 everything in order. And this particular
21 entity was a little bit more difficult
22 because of the two properties with one
23 entity, and we in the end found the only way
24 we could do it was to take the tax return and
25 work the assets and liabilities from there.

J. Crook

2 So I took -- those were put onto our books.
3 We, you know, had some assets, some deposits,
4 some liabilities, and equity, and that's
5 where the opening position came from.
6    Q.   So would it be fair to say, then,
7 that with respect to this particular debtor,
8 then, the legacy information, if you will,
9 was derived from the tax returns filed for
10 the entity?
11    A.   Yes.
12    Q.   And did you do that yourself, or
13 did you supervise that being done yourself?
14    A.   I would say I supervised it being
15 done.
16    Q.   And approximately when would that
17 have been done?
18    A.   That was done for 2008 year end to
19 make sure that going into 2008, we had to
20 send the information to the accountants for
21 the tax returns for '08, that we had the
22 information tied to that 2007 tax returns.
23    Q.   So if I understand what you're
24 saying, that this legacy information derived
25 from the tax returns was not inputted into

J. Crook

2 Yardi until the latter end of 2007?
3    A.   Or 2008. It was probably 2008.
4    Q.   The latter part of 2008?
5    A.   Yes.
6    Q.   And with respect to the tax returns
7 that you relied upon, were there any amended
8 tax returns that you also relied upon?
9    A.   No.
10    Q.   Were you told that you could rely
11 on the accuracy of those tax returns in
12 inputting that legacy information into Yardi?
13    A.   No.
14    Q.   You just assumed it was accurate?
15    A.   Um-hmm.
16    Q.   Yes?
17    A.   Yes.
18    Q.   Did anybody ever tell you that the
19 information on those tax returns were
20 inaccurate?
21    A.   No.
22    Q.   Is there a particular process for
23 intercompany loans between the various
24 entities that GFI manages?
25       MR. NASH: Do you understand the

J. Crook

2 question?
3    A.   Particular process you mean in
4 terms of?
5    Q.   Documenting it.
6    A.   Documenting it.
7    Q.   I'll make it simple for you.
8    A.   We usually get a request, and if
9 it's a wire, we'll get it approved, and we'll
10 make a transfer.
11    Q.   And who would approve those
12 intercompany loans?
13    A.   Typically the COO, CEO. We have
14 asset managers who approve loans.
15    Q.   Now, let me ask you, under the old
16 accounting system, if A&M Florida Properties
17 had borrowed money from anybody, wouldn't
18 that have been still in that -- what was it
19 called, B.J.?
20    A.   B.J. Murray.
21    Q.   The B.J. Murray system?
22    A.   I actually got a schedule of loans
23 from the accountants to support the tax
24 returns, so -- because, as you know, tax
25 returns have a balance sheet and a balance

Page 41

J. Crook

1          J. Crook
2 sheet item, so they gave me a schedule which
3 was the starting point.
4      Q.  And so when you looked at those tax
5 returns prior to the filing of this
6 particular bankruptcy, did you notice any
7 loans from GFI Management Services to A&M
8 Florida Properties?
9      A.  But I wasn't looking at the -- I
10 mean the tax returns I looked at were the old
11 -- were the earlier tax returns, and from the
12 general ledger I had the details of the
13 loans.
14      Q.  But the point is that when you
15 looked at those tax returns in 2007 or 2008
16 or to input the legacy information into
17 Yardi, is it your understanding that all of
18 the loans which A&M Florida Properties had
19 taken out would have been reflected on those
20 tax returns and therefore reflected in Yardi?
21      MR. NASH:  Objection.
22      Q.  You have to answer.
23      A.  The intercompany loans, yes.
24      Q.  And so can you explain if it's
25 possible that there could have been an

Page 42

J. Crook

1          J. Crook
2 intercompany loan from A&M Florida Properties
3 III, let's say, to A&M Florida Properties
4 that was not on the tax returns and therefore
5 not journaled or entered, if you will, into
6 the Yardi system?
7      MR. NASH:  Objection.  Do you have
8      a specific transaction you're referring
9      to?
10     Q.  Go ahead.  Answer my question,
11 please.
12     A.  I would think not.
13     Q.  Are you aware of a claim that was
14 filed in the bankruptcy by A&M Florida
15 Properties III for a loan that it claims that
16 it made to A&M Florida Properties?
17     A.  Yes.
18     Q.  You are aware that that loan was
19 not scheduled or identified on the original
20 bankruptcy filings that you oversaw.  You
21 understand that; correct?
22     A.  Yes.
23     Q.  And do you have any understanding
24 that in February of this year Alan Gross
25 filed a claim against this debtor for

Page 43

J. Crook

1          J. Crook
2 two million dollars claiming a loan?  Are you
3 aware of that?
4      A.  Yes.
5      Q.  Now, can you explain to me why the
6 A&M Florida Properties III loan to A&M
7 Florida Properties was not originally
8 scheduled by you on the bankruptcy schedules?
9      MR. NASH:  Objection.
10     A.  I think that a year later and
11 understanding the process a little bit more,
12 I was focusing on trade payables, and that
13 was, you know, the source of the creditor
14 information I put on the initial filing.  I
15 think I made a -- I just -- I made a mistake
16 that I did not include those.
17     (Exhibit 1, Letter dated June 25,
18     2010, to Franklin Zemel from Kevin Nash
19     with schedules, marked for
20     identification, as of this date.)
21     Q.  Let me ask you to look at what I've
22 marked as Exhibit 1 to this examination,
23 which is Mr. Nash's letter to me dated
24 June 25th, 2010, with certain schedules which
25 are represented as having been prepared by

Page 44

J. Crook

1          J. Crook
2 you.  Have you seen this letter before?
3      A.  Yes.
4      Q.  And you understood that when I was
5 here in New York two weeks ago to depose or
6 examine Mr. Mehlman, that he was required to
7 produce certain documents; isn't that right?
8      A.  Yes.
9      Q.  And did Mr. Mehlman give you a copy
10 of the list of documents that were required
11 to be produced and ask you to take care of
12 it?
13     A.  I didn't get them from Mr. Mehlman.
14 I got them from our lawyers.
15     Q.  So my question to you is, did
16 Mr. Mehlman direct you to gather the
17 documents --
18     A.  Yes.
19     Q.  -- requested?
20     A.  Yes.
21     Q.  Mr. Mehlman directed you?  Is that
22 what you're saying?
23     A.  Yes.
24     Q.  Tell me what did Mr. Mehlman say to
25 you?

Page 45

J. Crook

1
2   A.  Well, we received a letter.  We
3   received a letter -- he received a letter
4   from -- who was the letter from.  Was it
5   from the court?
6   Q.  From me.
7   A.  Oh, from you.  And said you need to
8   provide this information.  And I was asked to
9   provide -- well, I read the letter, and you
10  asked for supporting documentation.
11  Q.  And you understood from that list
12  of documentation that I was requesting that I
13  was certainly questioning certain
14  transactions, certain claims that had been
15  filed against this thing.  You understood
16  that; correct?
17      MR. NASH:  Objection.
18  Q.  Is that correct?
19  A.  Yes.
20  Q.  Did you ultimately understand that
21  I was questioning the legitimacy of certain
22  exhibits which had been produced to me during
23  Mr. Mehlman's deposition?
24      MR. NASH:  Objection.  The letter
25      she's referring to, Franklin, is the one

Page 46

J. Crook

1
2   --
3       MR. ZEMEL:  Mr. Nash, please.
4       MR. NASH:  -- that preceded the
5   deposition.
6       MR. ZEMEL:  Please don't.
7       MR. NASH:  You're wrong.
8       MR. ZEMEL:  Please don't.
9       MR. NASH:  The letter she's
10  referring to preceded Fred's deposition.
11      MR. ZEMEL:  I'm well aware of that.
12      MR. NASH:  Okay.  But that's not
13  what your question says.
14      MR. ZEMEL:  Are you finished?
15      MR. NASH:  Read your question back.
16      MR. ZEMEL:  Are you finished?
17      MR. NASH:  Yes.
18      MR. ZEMEL:  Okay.
19  Q.  Did you come to learn that during
20  the deposition or examination of Mr. Mehlman
21  that I began to question the legitimacy of
22  certain exhibits which he produced to me at
23  the deposition?
24  A.  Yes, because you questioned -- I
25  understand that you questioned the invoices,

Page 47

J. Crook

1
2   the, quote, invoices.
3   Q.  Yes.
4   A.  And that was -- the information for
5   the claims came from the general ledger.  And
6   it's hard to document a net result of a lot
7   of transactions.  So I took it upon myself, I
8   just had these -- I created an invoice to
9   represent what was in the balances or per the
10  general ledger.  I didn't realize that that
11  was not what you wanted.  I feel stupid right
12  now.
13  Q.  So you created invoices with legacy
14  dates and provided them through Mr. Mehlman
15  for me to look at; is that correct?
16  A.  Yes.
17  Q.  And you didn't make any provision
18  on the document to identify or alert somebody
19  that these documents were recent
20  fabrications?
21      MR. NASH:  Objection.  It's not a
22  --
23  Q.  Is that correct?
24      MR. NASH:  I object to that.
25  A.  It's a presentation.  It was a

Page 48

J. Crook

1
2   presentation of amounts owed.  And maybe my
3   presentation was not what you were looking
4   for.  I would not call it a fabrication.
5   Q.  Did you alert anyone that -- well,
6   let me try it differently.  Up until the time
7   that you created those documents about two or
8   three weeks ago, would it be fair to say they
9   did not exist anywhere?
10  A.  I would -- no, that is not true.
11  Q.  Is there an original invoice?
12  A.  There are schedules, schedules, and
13  the general ledger that supports those
14  amounts that are owed.
15  Q.  I'm only addressing at the moment
16  those invoices with legacy dates on them.
17  A.  Okay.  Which?
18  Q.  They're not attached to Mr. Nash's
19  letter.  You created in Excel invoices which
20  were exhibits at Mr. Mehlman's examination;
21  isn't that right?
22  A.  Yes.
23  Q.  And you created those invoices in
24  or about June of 2010; isn't that right?
25  A.  Yes.

Page 49

1         J. Crook
2     Q.  And you created them in the Excel
3 spread sheet program; isn't that correct?
4     A.  Yes.  Well, my staff did, but yes.
5     Q.  And when you created these invoices
6 in June of 2010, you created the invoices
7 with dates from years ago; correct?
8         MR. NASH:  Objection.
9     A.  I really didn't focus on the -- I
10 did not focus on that there was an invoice
11 date on there.  I know one referred to the
12 loan and the amount and the year or the time.
13 I really -- I don't remember what invoice
14 date was on it.
15     Q.  Why didn't you just direct your
16 staff to print up the relevant excerpts of
17 the general ledger rather than creating --
18     A.  I don't know.
19     Q.  -- in June of 2010 --
20     A.  I don't know.
21     Q.  -- an invoice with a date from
22 years ago?
23     A.  I don't know.
24     Q.  Did you tell Mr. Mehlman or anybody
25 that you had just created these invoices in

Page 50

1         J. Crook
2 2010 for purposes of Mr. Mehlman's
3 examination?
4     A.  No, I didn't.  I just said here's
5 the -- I brought them up, I believe I brought
6 them up myself to the conference room.
7         MR. ZEMEL:  May I have that
8     exhibit.
9         MR. NASH:  Can I take a break for a
10     second?  I want to use the men's room.
11         MR. ZEMEL:  Yeah, sure.
12         (Recess taken from 11:54 a.m. to
13     11:57 a.m.)
14     Q.  Let's look at this exhibit.  On
15 this page of exhibit at the top do you see
16 where it says "Loan from A&M Properties III,
17 LLC"?
18     A.  Yes.
19     Q.  Is that your handwriting?
20     A.  Yes.
21     Q.  And tell me what did you have to do
22 to prepare this excerpt of the general
23 ledger?
24     A.  I just ran it straight from the
25 accounting software.

Page 51

1         J. Crook
2     Q.  You or someone on your behalf?
3     A.  I did it.
4     Q.  And you did it, and can you tell me
5 what filters did you apply?
6     A.  I did it for the period August '07
7 to July '09.
8     Q.  Why did you choose that period?
9     A.  Because that's when the loan was
10 issued.
11     Q.  Do you see where it says "Balance"
12 in this column?
13     A.  Yes.
14     Q.  On this excerpt of the general
15 ledger there is a negative balance of
16 $248,000.  Can you explain to me what that
17 is?
18     A.  That's other amounts owed by A&M
19 Florida Properties, LLC, to other entities.
20     Q.  Is that anywhere on the bankruptcy
21 schedules?
22     A.  But that's the beginning balance.
23 So it wouldn't be.
24     Q.  Does that negative $248,000 number
25 reflect a liability that the debtor owes to

Page 52

1         J. Crook
2 others?
3     A.  But that's August 2007.  That's the
4 balance as of August 2007.  That's the
5 beginning balance.
6     Q.  Okay.  And this number
7 represents --
8     A.  The ending balance is 48,000,
9 which --
10     Q.  Okay.  I see what you're saying.
11     A.  And within that 48,000, there is
12 28,000 that I do not believe is a liability
13 to anybody, so I did not include it.
14     Q.  Explain that.
15     A.  There was an entry from around
16 about December '04 or December '05, I don't
17 recall the exact date, that was to do with
18 payroll between Carib and Cutlerwood.  And
19 somehow the entry got screwed up, and it's
20 still sitting there, and I don't believe it
21 belonged there.  I think it should be put
22 back into, again, salary expense somewhere
23 along the line, because it's between Carib
24 and Cutler, so -- and it's one entity.  And
25 some accountant, some junior accountant a

J. Crook

1          J. Crook
2 long time ago screwed something up, and then
3 the accountants booked some entries, and it's
4 just like a legacy of a problem that I have
5 not resolved yet. But I did not believe it
6 was a true liability, so I did not include it
7 on the schedule. And the other 20,000 is
8 this 20,000 that I am referring to.
9     Q.   So what this reflects is that at
10 the opening period, that A&M Florida
11 Properties owed $248,000. Is this just
12 intercompany loans? Is that what this is?
13     A.   Yes. Yes.
14     Q.   So this account number -- I can't
15 see that. What is that account number?
16     A.   2290.
17     Q.   So 2290, this is the account in the
18 general ledger reflecting intercompany
19 transfers?
20     A.   Yes.
21     Q.   And so the opening balance is minus
22 -- it means it owed 248,000, and the credit
23 would be -- this credit of 20,000 reflects a
24 loan into this particular entity?
25     A.   Yes.

J. Crook

1          J. Crook
2     Q.   Is that correct?
3     A.   Yes.
4     Q.   And what about this 50,000 entry
5 and this 40,000 entry?
6     A.   They were other loans that were
7 repaid before we filed. This 20,000 was
8 still outstanding.
9     Q.   Now, here we're showing a $200,000
10 debit to Palm Gardens. Does this reflect
11 that this is a repayment of a loan to Palm
12 Gardens for $200,000?
13     A.   That's a repayment of multiple
14 entries. It's a balance. So it's lots of
15 transactions within the opening balance of
16 248, plus, you know, there's one here,
17 50,000, which is from Palm, but this 248
18 includes --
19     Q.   How can you tell that's from Palm?
20     A.   Because it says here "Loan from
21 Palm."
22     Q.   Oh, in the remarks?
23     A.   Yes.
24     Q.   Okay.
25     A.   And that was loan from Shady, which

J. Crook

1          J. Crook
2 is A&M Florida Properties III.
3     Q.   So I want to try to understand
4 this. So you're saying to me, then, that on
5 March 9th Palm Gardens -- I'm sorry. On
6 March 9th the debtor repaid a $200,000 loan
7 to Palm Gardens?
8     A.   It repaid 200,000, which was made
9 up of I would say 15 to 20 transactions that
10 netted out to 200,000.
11     Q.   But when you say transactions,
12 these are intercompany loans.
13     A.   Yes.
14     Q.   Is that correct?
15     A.   Yes.
16     Q.   Is there any documentation, is
17 there an audit trail supporting these various
18 loans or intercompany transfers?
19     A.   Well, they were transfers between
20 entities that were owned a hundred percent
21 that we would have -- somewhere there would
22 be a wire transfer request that is
23 authorized. And it's all in the general
24 ledger. The bank reconciliations are done
25 monthly, so.

J. Crook

1          J. Crook
2     Q.   Do you have an understanding of
3 what an audit trail is?
4     A.   Yes.
5     Q.   Okay. I know you do. What I'm
6 asking is, is there an audit trail that
7 supports each of these transfers listed on
8 this particular schedule?
9     A.   Yes. I have to find the
10 documentation, but yes, we have it somewhere.
11 That "somewhere" is the key word.
12     Q.   So do you have any reason to
13 believe that the audit trail or source
14 documents have been lost or destroyed in any
15 fashion?
16     A.   I think they're -- this particular
17 one, we are looking for it. We have the
18 bank statement --
19     Q.   This particular one is the actual
20 --
21     A.   The $20,000 --
22     Q.   -- $20,000 loan?
23     A.   -- because I asked somebody to pull
24 the wire. The wire. And in the short time
25 frame from yesterday to today, I could not --

Page 57

1        J. Crook
2  from your letter yesterday morning, I have
3  not located it yet.  But I know we have it
4  somewhere.  We've had multiple accountants
5  working on these properties, and so things
6  get filed a little bit differently.
7     Q.   I understand that --
8     A.   It's wires.  You know, if you have
9  a check, it's straightforward.  I can go to
10 the check file and pull it.  But wires, some
11 people filed it here, some people filed it
12 there.
13    Q.   But even the wire transfers doesn't
14 address my entire issue, which is you told me
15 earlier this morning that somebody has to
16 request an intercompany loan and somebody has
17 to approve it; is that correct?
18    A.   Yes.  It's often done -- it can be
19 done very informally.
20    Q.   Without any documentation of any
21 kind?
22    A.   We always have a wire request piece
23 of paper that our check signer, our
24 authorized bank signer signs.  We always have
25 that.  The approval by somebody internally to

Page 58

1        J. Crook
2  make the transfer is often done verbally, you
3  know, can we, you know -- cash flow varies
4  from property to property.  And so to assist
5  with cash flow, it was normal practice to
6  make these intercompany loans, and it would
7  be, okay, you know, in this particular case
8  it was -- well, if you went into AMFP, so
9  AMFP needed 20,000, and we borrowed it from
10 Shady Oaks.  So there is a wire form that has
11 a signed -- there is a signed document
12 somewhere.
13    Q.   Somewhere.
14    A.   Yes, there is.
15    Q.   And you're going to find that for
16 me?
17    A.   I will, yes.
18    Q.   You just referred to AMFP.  For the
19 benefit of the reporter, explain to the
20 reporter what AMFP is.
21    A.   A&M Florida Properties, LLC.
22    Q.   So what I do need, I'm going to see
23 the audit trail and the source documents for
24 these, but I want to focus now on this
25 March 9th entry relating to Palm Gardens.  Am

Page 59

1        J. Crook
2  I correct that this document reflects that on
3  March 9th of 2009 the debtor repaid a loan to
4  Palm Gardens in the amount of $200,000?
5     A.   Yes.  Loans, plural.
6     Q.   Well, that, of course, there is a
7  starting balance of almost 200 --
8     A.   Right.  I just want to reiterate
9  it's not -- we didn't receive 200,000 and
10 paid 200,000 back.
11    Q.   I understand.  It's a series --
12    A.   It's a series of transactions going
13 both ways.
14    Q.   All right.  It's a series of
15 transactions --
16    A.   Yes.
17    Q.   -- over the period of time, but on
18 March 9th, while the debtor was in
19 bankruptcy, it repaid $200,000 to Palm
20 Gardens?
21        MR. NASH:  It's not in bankruptcy.
22 The bankruptcy in July, Franklin.
23    A.   Yes.
24    Q.   Palm Gardens was in bankruptcy --
25    A.   Palm Gardens was in bankruptcy but

Page 60

1        J. Crook
2  we --
3     Q.   Palm Gardens was in bankruptcy --
4        MR. NASH:  They got the money.
5     Q.   -- in December of '08.
6        MR. NASH:  They didn't repay
7  anybody.  They received the money.
8        MR. ZEMEL:  Okay.
9     Q.   So Palm Gardens received $200,000
10 while in bankruptcy?
11    A.   Correct.
12    Q.   When did Carib go into bankruptcy?
13    A.   July 31st?
14        MR. NASH:  The end of July.  I
15 don't know if it's --
16    Q.   The end of July.
17        MR. NASH:  -- the 29th or
18 July 31st.  It's right around there.
19    Q.   Now, when you were preparing the
20 schedules for the bankruptcy, did you note
21 anywhere on the schedules that there had been
22 within twelve months of the filing of the
23 bankruptcy a transfer of $200,000 from the
24 debtor to an affiliated company?
25        MR. NASH:  The debtor didn't

Page 61

```
1              J. Crook
2    transfer the money.  Which debtor are
3    you talking about?
4         MR. ZEMEL:  We just said, A&M
5    Florida Properties --
6         MR. NASH:  Okay.  Why don't we use
7    Carib to Palm Gardens.  I think it would
8    be simpler.
9         MR. ZEMEL:  Okay.
10   Q.  Is that all right with you, ma'am?
11   A.  Yes.
12   Q.  On the original bankruptcy
13   schedules that were filed, did you report
14   anywhere that Carib Villas and Cutlerwood had
15   repaid or transferred $200,000 to Palm
16   Gardens within twelve months of the filing of
17   the bankruptcy?
18        MR. NASH:  Objection.
19   A.  I didn't -- I did not think they
20   were related, affiliated.  I knew we paid
21   nothing to GFI Management, no loans, or
22   anybody else, but.
23   Q.  Are you saying that you don't
24   believe that Palm Gardens and Carib Villas
25   are affiliated?  Isn't the ownership of A&M
```

Page 62

```
1              J. Crook
2    Florida Properties and A&M Florida
3    Properties II the same, as far as you know?
4         MR. NASH:  I'm going to object.  We
5         filed amended schedules.  Why don't you
6         ask the witness about the amended
7         schedules.
8    Q.  Isn't the ownership structure of
9    A&M and A&M II the same, as far as you know?
10   A.  I think so.  Without the tax
11   returns in front of me, I never swear to
12   anything, because, you know, they're very
13   similar, but I don't know they're exactly the
14   same.
15   Q.  And you understand that Alan Gross
16   -- well, let me try it differently.  On the
17   recently filed amendments to the bankruptcy
18   schedules, was this $200,000 payment
19   disclosed?
20   A.  No.
21   Q.  Can you tell me why this $200,000
22   payment was not disclosed even in the amended
23   schedules?
24   A.  If this should have been, then I
25   made a big -- I made a mistake.  If that
```

Page 63

```
1              J. Crook
2    should have been on there, I made a mistake.
3    Q.  Did anybody tell you that it should
4    or should not be disclosed?
5    A.  No.
6    Q.  Now, you understood that the reason
7    that you were being asked to assist in the
8    filing of the amended schedules is because of
9    questions that I had asked Mr. Mehlman about
10   two weeks ago; isn't that right?
11   A.  I understood we were amending them
12   because of some of the creditors were no
13   longer creditors, and we, you know, amended
14   those.  And you had asked questions about the
15   20,000.  That's what I understood.  And
16   there's another loan to management that
17   wasn't on the original one of $5,000.
18   Q.  So you understood that I had
19   questioned Mr. Mehlman and I had asked a
20   number of questions about the original
21   bankruptcy schedules.  You understood that;
22   correct?
23   A.  Yes.
24   Q.  And you understood that not too
25   long after that examination was adjourned,
```

Page 64

```
1              J. Crook
2    that you were asked to participate in
3    preparing amended schedules for Carib and
4    Cutlerwood; isn't that right?
5    A.  Yes.
6    Q.  And who asked you to participate in
7    the amended schedules?
8    A.  Our lawyers.
9    Q.  Who?
10   A.  It would be either Ted Donovan or
11   Kevin Nash.
12   Q.  What specifically were you
13   instructed?
14        MR. NASH:  Objection.  That's
15        privileged communication.
16        MR. ZEMEL:  Just make your record,
17        please.
18        MR. NASH:  Okay.
19        MR. ZEMEL:  Go ahead.  Explain to
20        me why that question asked of the
21        controller of GFI --
22        MR. NASH:  Because she's an agent
23        of the debtor.  These are the debtor's
24        schedules.  And her communications with
25        the bankruptcy counsel in connection
```

Page 65

```
1            J. Crook
2    with preparing the debtor's schedules is
3    privileged.
4            MR. ZEMEL:  Okay.  Would it be your
5    position, then, Mr. Nash, that there is
6    absolutely nobody on the entire planet
7    that I would be able to ask and get an
8    answer to what prompted the filing of
9    these schedules?  Just tell me if there
10   is anyone on the planet that can answer
11   that question without you invoking the
12   privilege.
13           MR. NASH:  Yes, there is somebody
14   on the planet.
15           MR. ZEMEL:  Who would that be?
16   Mr. Nash?  Who would that be?
17           MR. NASH:  The prompting of the
18   schedules is the correct errors in the
19   initial schedules.  Now, I told you at
20   the deposition that I didn't think those
21   schedules were complete because they
22   referred to schedules that weren't
23   attached.  And so when we went back to
24   the office, I didn't understand why
25   there would be schedules that referred
```

Page 66

```
1            J. Crook
2    to schedules that didn't have the
3    attachments.  And I don't think they
4    were filed with those schedules.  And
5    there were certain issues that came up
6    at Mr. Mehlman's deposition.  When we
7    went back and the witness was speaking
8    to Dr. Cornfeld going over the general
9    ledger, and it was the determination
10   made, in consultation with me, to update
11   and amend the schedules.
12           Now, the answer to your question
13   would be, is there anybody in the world
14   that could answer that question without
15   invoking the privilege?  The answer is
16   yes.  And I assume that Mr. Mehlman
17   could answer that question, although he
18   consulted with me, but that's why we did
19   it.  It's self-explanatory why we did
20   it.  I think there were errors, and we
21   might do it again if there's errors in
22   the schedules.
23           Now, I also note that the
24   bankruptcy rule allows liberal
25   amendments, and we just want to get
```

Page 67

```
1            J. Crook
2    accurate information.  We're trying to
3    do it.  You're putting us to the test of
4    every transaction.  We're just trying to
5    get accurate information.  And we will
6    amended them from time to time as need
7    be.  So I'm surprised that this
8    transaction wasn't listed, and I'm
9    double checking to see if it is, but if
10   it was omitted --
11           MR. ZEMEL:  You're talking about
12   the $200,000 transaction?
13           MR. NASH:  Yes, the $200,000
14   transaction, which I gave to you,
15   Franklin, before we filed the amended
16   schedule.  So you already had the
17   $200,000 transaction in your possession
18   before we filed the amended schedules,
19   so it was already disclosed to you
20   before that time.  So I'm just trying to
21   understand this transaction.
22           Now, looking at the schedules, we
23   ran a report of checks within a year's
24   time from 90 days' time.  And I'm just
25   trying to understand why that report is,
```

Page 68

```
1            J. Crook
2    and now that I see it, she ran a report
3    just for GFI Management Services and not
4    the other debtors.
5            THE WITNESS:  And GFI Insurance
6    and --
7            MR. NASH:  Right, and not the other
8    debtors.  And that's the only reason.
9    So this report only has two affiliates
10   and not the debtors which are also in
11   Chapter 11.  So we will not amend the
12   schedule.  We will supplement it with
13   additional reports.  She only ran it for
14   two companies, not all the other
15   companies.  And that's the only reason.
16   So there is no mystery to it.  You had
17   it.  You brought it to our attention.
18   The witness feels she takes pride in
19   what she does, and if an error was made,
20   it was an error that was made in good
21   faith, and we'll supplement it.  She
22   obviously only ran it for two companies
23   and not for the other debtors because of
24   whatever reason.  Maybe she was unclear.
25   Maybe she didn't understand it related
```

Page 69

J. Crook

1
2   to people in bankruptcy.  I didn't speak
3   to her about those schedules.  But I
4   certainly will after the deposition.  I
5   reserve the right to supplement it with
6   additional schedules.  That's all.
7   There's no mystery to it.
8       MR. ZEMEL:  Are you finished?
9       MR. NASH:  Yes.
10      MR. ZEMEL:  What I had asked you to
11  do is to make your record in support of
12  your claim of privilege and tell me is
13  there a human being anywhere on the
14  planet that can answer me under oath
15  what they were told in terms of
16  preparing the amended schedules.
17      MR. NASH:  Well, since I gave the
18  instruction to prepare the amended
19  schedules, they can only testify that
20  counsel instructed us to prepare the
21  amended schedules.
22      MR. ZEMEL:  And when you gave that
23  instruction to these people, whoever
24  they are, was that information which you
25  intended at the time to remain

Page 70

J. Crook

1
2   confidential?
3       MR. NASH:  Was my information
4   intended -- it was a legal communication
5   between an attorney and a client that
6   was intended to remain confidential,
7   yes.
8       MR. ZEMEL:  So when you gave the
9   direction to whomever to update or amend
10  these schedules, did you purposefully
11  in a way so that those communications
12  could not ultimately be discovered by a
13  creditor such as my client.
14      MR. NASH:  No.  I gave it to them
15  to make sure that they could give me a
16  full understanding of their knowledge of
17  the situation.  So I believe it was a
18  legal communication.  Now, Franklin,
19  again, the witness has been very
20  forthright that she made a mistake in
21  only including GFI Management and GFI
22  Insurance and she didn't include the
23  other debtors in running the schedules.
24  She will do that.  We will supplement
25  it.  We ran a 90-day list.  We've given

Page 71

J. Crook

1
2   all this information.  And this is the
3   troubling part of this.  We've given all
4   information to Dr. Cornfeld under the
5   belief, and the emails will check it
6   out, that we wouldn't have to go through
7   this examination.  It would be a free
8   flow of exchange.  And so that's why I
9   allowed Judith to speak directly to
10  Dr. Cornfeld freely, openly at any time
11  so we would avoid this.  There were
12  certain omissions made, they were
13  innocent omissions, and they're easily
14  explained and easily corrected.  And
15  this $20,000 loan, what has been on the
16  general ledger for a long time, and we
17  gave you that information.  And that's
18  the only reason.  It wasn't omitted.  It
19  just wasn't one of the schedules that
20  was put together.  That's it.
21      MR. ZEMEL:  Are you finished yet?
22      MR. NASH:  And I go back to the
23  point, and I think it's a fair point,
24  and you agreed with me going in, we were
25  supposed to have Dr. Cornfeld speak to

Page 72

J. Crook

1
2   Judith directly to avoid this, even
3   though you took advantage of that, you
4   didn't live up to your end of it.  But
5   go ahead.
6       MR. ZEMEL:  You've been speaking
7   non-stop for eight minutes.
8       MR. NASH:  I don't know it's
9   non-stop.  You asked me a question to
10  make a record.  I've made a record.
11      MR. ZEMEL:  Okay.  Let me know when
12  you're done, because I've already
13  emailed my staff to change my plane,
14  because there's no way I'm going to make
15  it now.  Are you finished?
16      MR. NASH:  I've made my record.
17      MR. ZEMEL:  Okay.
18      THE WITNESS:  May I go to the
19  restroom?
20      MR. NASH:  Yes.
21      (Recess taken from 12:21 p.m. to
22  12:27 p.m.)
23  Q.   The next page of Exhibit 1 is
24  another schedule from the general ledger that
25  says, "Loan from GFI Management."  Is that

J. Crook

1
2 your handwriting?
3    A.   Yes.
4    Q.   And did you have this document
5 prepared under your direction, or did you do
6 this yourself?
7    A.   I ran this from Yardi myself.
8    Q.   You ran it from the Yardi program?
9    A.   Yes.  And the filter information is
10 in the top left-hand column.  I was asked
11 before what filter criteria I used, and it's
12 documented on the exhibit.
13    Q.   Can you tell me, please, describe
14 for me what this document is.
15    A.   It's intercompany loan schedule for
16 a period of time from January '07 to
17 June '07.
18    Q.   And, again, it's the same account
19 number, the 2290 general ledger account?
20    A.   Yes.
21    Q.   Now, doesn't the Yardi system
22 provide for a different sub-account under
23 2290 so that each of the various affiliates
24 that was lending money would be separately
25 identified?

J. Crook

1
2    A.   It could.  I mean it depends how
3 you set up each of the accounts.
4    Q.   But it's not done here?
5    A.   On this one everything is in one
6 account.
7    Q.   If all of these intercompany loans
8 are under the GL account number 2290, how did
9 you go about segregating what transfers
10 related to GFI Management, for instance?
11    A.   By analyzing what's in the general
12 ledger, put it into columns by entity.
13    Q.   Explain to me exactly what you did
14 step by step, please.  Were you doing word
15 searches?  I mean tell me exactly step by
16 step what you did.  Or, stated differently,
17 if I asked you to recreate precisely that
18 document right now, tell me the steps --
19    A.   This particular document?
20    Q.   Yes.  Tell me exactly what you
21 would do to recreate that document.
22    A.   Is this a trick question?
23    Q.   No, it's not.
24    A.   Because it sounds like it.
25    Q.   It's not.

J. Crook

1
2    A.   I go to Yardi.  If you want this
3 particular document, I would go to Yardi.  I
4 would put in the same filter criteria, and
5 this report would come out.
6    Q.   But I guess where I'm getting
7 confused is that when we saw the last page
8 that we just looked at where it talked about
9 the loans from A&M III --
10    A.   Yes.
11    Q.   -- it's the same general ledger
12 account number, 2290.
13    A.   Yes.
14    Q.   And so this is where I'm getting
15 confused.  How can the same general ledger
16 account have different balances?
17        MR. NASH:  Objection.
18    A.   It's the same account.  It doesn't
19 have different balances.  It's different --
20 the ending balance here actually is the
21 beginning balance there.  So it's different
22 periods of time for the same account number.
23    Q.   But there must be, I assume,
24 thousands of various transactions in GL
25 account number 2290.  Is that a fair

J. Crook

1
2 statement?
3        MR. NASH:  Objection.
4    A.   That is not a fair statement.
5    Q.   Oh, it's not?
6    A.   No.
7    Q.   Okay.  But there's --
8    A.   There are many transactions, but
9 thousands there are not.
10    Q.   So there are many transactions in
11 GL account number 2290 that reflect
12 intercompany transfers from all of the
13 various affiliates; is that correct?
14    A.   Yes.
15    Q.   But GL 2290 is not broken down by
16 subcategory based upon which particular
17 affiliate is transacting --
18    A.   They have remarks that identify --
19 in the remarks will identify it.
20    Q.   Okay.  That's my point.  So if you
21 were going to go and you were going to
22 generate a report for all loans to and from
23 GFI Management and A&M Florida Properties,
24 you would go to Yardi, you would access the
25 GL account 2290, and then how would you

J. Crook

2 separate out only the transactions relating
3 to GFI Management and Carib Villas?
4     A.  We maintain loan schedules in Excel
5 in addition to -- to analyze what's in the
6 general ledger.  And over time those -- we
7 have, not for this particular property,
8 because it went away Carib, we no longer have
9 Carib or Cutlerwood, but those sub-ledgers
10 were eventually created, and this is just in
11 -- in not this specific property, but we
12 analyzed line by line, put it into a column
13 in Excel that said this was from A&M Florida
14 Properties III, this was from GFI Management.
15 That's how.
16     Q.  And where are those Excel spread
17 sheets?  Is this an Excel spread sheet?
18     A.  This is not.
19     Q.  Where are those Excel spread
20 sheets?
21     A.  It's on our network.  They're an
22 Excel spread sheet.  They're an electronic
23 file.  They're filed on our network.
24     Q.  But those can be printed easily,
25 can they not?

J. Crook

2     A.  Yes.
3     Q.  So I just want to understand.  So
4 you go into Yardi, you open up GL 2290, you
5 see many different transactions.  And then
6 you go through and you searched for the ones
7 that said GFI Management?
8     A.  I went --
9     Q.  And that's what ended up on this
10 schedule?
11     A.  I went to the spread sheet that was
12 prepared a long time ago that said these are
13 the loans, this is who owes who to what, that
14 analyzed this account.  Many people do
15 analysis not in the GL.  They'll take the
16 detail in the GL and create Excel
17 spreadsheets to analyze the data.  That's
18 what we did.  And we didn't just do it last
19 week.  We did this a long time ago.
20     Q.  Well --
21     A.  And then...
22     Q.  It seems like such a simple
23 question.
24     A.  I was asked for the general ledger.
25 I was asked to provide the general ledger.

J. Crook

2 So using the spreadsheet, I could circle the
3 transactions that related to the specific
4 transaction --
5         MR. NASH:  This is an attachment to
6     my letter so you could see just where it
7     was in the general ledger.  That's all,
8     Franklin.  It's my letter you're asking
9     her about.
10        MR. ZEMEL:  I'm asking about the
11     schedule that she said she prepared.
12     Please, Mr. Nash, don't interrupt.
13        MR. NASH:  Sorry, Mr. Zemel.
14     Q.  So if I understand, you looked at
15 the Excel spreadsheets first, you identified
16 the specific transactions, and then you went
17 to Yardi, and then you I guess tagged those
18 specific transactions?
19     A.  I circled them.  They are circled.
20     Q.  Well, what I'm saying, I mean
21 there's only about eight or nine transactions
22 listed on this particular schedule.  There
23 must be more than eight or nine in account
24 2290.
25     A.  Yes.

J. Crook

2     Q.  That's what I'm trying to
3 understand.
4     A.  Well, I just -- for the two items I
5 was asked to support, I printed the relevant
6 period in the GL to show those balances.
7     Q.  I see.  Okay.  So now let me ask
8 you, then, so the starting balance from
9 January of '07 shows that A&M Florida
10 Properties owed $1.2 million to GFI
11 Management?
12     A.  Not to GFI Management.  To various
13 entities.
14     Q.  Oh, I see.  Okay.  Now I'm
15 beginning to understand what you're saying.
16 As far as you know, was that unusual for one
17 of these entities to be so negative?
18     A.  My understanding, again, predating
19 when those loans were made, they were made in
20 2005 because of all the hurricane damage in
21 2004, Carib and Cutler, I understood, and,
22 again, this is just what I was told, that
23 there was a lot of damage, and there was no
24 insurance to cover it, and loans were made.
25     Q.  Now, the $15,000 that we're talking

J. Crook

1              J. Crook
2  about here, this reflects the loan from GFI
3  to Carib; is that correct?
4      A.  Yes.
5      Q.  And what is the audit trail and
6  source documents for this transaction?
7      A.  That would be a wire transfer.
8      Q.  And you can tell that how from
9  looking at this document?
10      A.  Because it's a journal entry.
11      Q.  And do you know what that loan is
12  for?
13      A.  It would be to cover an overdraft.
14  It would be to pay expenses.  The property
15  needed money, so we loaned them money.
16      Q.  And this number --
17      A.  That's a partial repayment.
18      Q.  So the net is that GFI Management
19  claims there's a $5,000 loan payable
20  essentially --
21      A.  Still outstanding.
22      Q.  Still outstanding?
23      A.  Yes.
24      Q.  What can you tell me about this
25  page from Exhibit 1 of Mr. Nash's letter?

1              J. Crook
2      A.  These are December 2008 management
3  fees that were never paid.
4      Q.  And do you have an understanding as
5  to why they were not paid?
6      A.  I don't remember.  I would say -- I
7  don't want to guess.  I don't want to guess.
8      Q.  If you don't know and that's
9  truthful, you can say that.
10      A.  If it was an error, it has to be an
11  error on accounts payable for not paying it.
12      Q.  Is there a written management
13  contract between A&M and GFI Management?
14      A.  I believe so.
15      Q.  Is that standard that there's a
16  written management contract between GFI
17  Management and the various affiliates that it
18  manages?
19      A.  Yes.  Yes.  I'm hesitant because on
20  some of the older properties before my time,
21  if we owned them a hundred percent, we'd have
22  been having an agreement with ourselves.  So
23  in the main, we have written management
24  agreements.  Do we have them for every
25  entity, I don't know.

1              J. Crook
2      Q.  Do you know whether there is a
3  written management contract between GFI
4  Management and A&M Florida Properties?
5      A.  I'm not sure.
6      Q.  Have you ever looked for it?
7      A.  I have not.  I don't know.  I don't
8  do the management agreements.
9      Q.  Nobody asked you to look for it?
10      A.  No, because I am not responsible
11  for keeping the management agreements.
12      Q.  Nobody asked you to look for it and
13  you reported back that you couldn't locate
14  it?
15      A.  No.
16      Q.  That never happened?
17      A.  Not that I recall.
18          (Exhibit 2, Proof of Claim filed by
19      Alan Gross on February 18th, 2010, for
20      two million dollars, marked for
21      identification, as of this date.)
22      Q.  Let me ask you to take a look at
23  what I've marked as Exhibit Number 2, which
24  is the Proof of Claim filed by Alan Gross on
25  February 18th, 2010, for two million dollars.

1              J. Crook
2  Have you ever seen this document before?
3      A.  Yes.
4      Q.  Did you see this document at or
5  about the time that it was filed with the
6  court in February of 2010?
7      A.  Yes.
8      Q.  And did you participate or assist
9  Mr. Gross in any way in filing this proof of
10  claim?
11      A.  Yes.
12      Q.  Tell me what you did.
13      A.  What did I specifically do.  I
14  brought and asked the question that does the
15  two million dollar deposit that was put up by
16  Mr. Gross or Mrs. Gross, and my understanding
17  of that was that it was a loan, it was put up
18  as a deposit and that, you know, at the end
19  of the lease, that it would have been
20  returned to him.
21      Q.  Let me just stop you for a moment.
22  Last week a proof of claim replacing the one
23  from February was filed.  And I don't want
24  you to be confused --
25      A.  No, I'm not.  I will get to that.

Page 85

J. Crook

2   Q.   Okay.  So what you're telling me is
3   your involvement back in February of 2010 on
4   the original proof of claim; is that right?
5   A.   Yes.
6   Q.   Okay.  Go ahead.
7   A.   And I thought this was a loan.  In
8   my mind it was a loan.  When I went back
9   through the tax returns, because I was not
10  showing a two million dollar liability in
11  Yardi, when I went back to the tax returns,
12  the accountants who were keeping our books
13  back in those days, they still do the tax
14  returns, but they really maintained the
15  books, they treated it as capital.
16  Q.   I'm not following you.  Let's start
17  over again.  Prior to February 10th -- I'm
18  sorry.  What was the date of this.
19  February 18th.  Okay.
20        Prior to the filing of this
21  February 18, 2010, two million dollar proof
22  of claim, did you have any discussions with
23  anyone about Mr. Gross's claim for
24  two million dollars?
25  A.   Yes.

Page 86

J. Crook

2   Q.   Tell me how it first came to your
3   attention.
4   A.   I spoke with our then in-house
5   counsel.
6   Q.   Mr. Zlotnick?
7   A.   Mr. Zlotnick.
8   Q.   Okay.
9   A.   And said we have, this entity has a
10  two million dollar deposit out there that was
11  funded by Alan Gross, as I understood, and
12  was that, you know -- that is potentially a
13  claim.
14  Q.   Can you tell me what prompted that
15  discussion at or about February of 2010?
16  A.   Because we had to fill out the
17  proofs of claim.
18  Q.   And can you tell me why was that
19  two million dollars not mentioned anywhere in
20  the original bankruptcy schedules that were
21  filed?
22  A.   I can't tell you.
23  Q.   And who prompted this discussion of
24  the two million dollars, you or someone else?
25  A.   I did.  I raised the question.  And

Page 87

J. Crook

2   I did not ask myself the question when I was
3   filling out the numbers for the original
4   filing.
5   Q.   Well, did you participate in the
6   drafting or filling out of any of the
7   information on Exhibit 2?
8   A.   I don't recall if I filled them out
9   or if Mr. Zlotnick filled them out.  I
10  participated in the process.  I don't
11  physically -- I don't recall who physically
12  typed in the numbers.
13  Q.   And you recognize the signature?
14  A.   Yes.
15  Q.   And whose signature is that?
16  A.   Alan Gross.
17  Q.   And you understood that Alan Gross
18  was signing that under penalties of perjury;
19  is that correct?  Is that correct?
20  A.   No.
21  Q.   Did you understand that you were
22  assisting Mr. Gross to file a claim against
23  the debtor that you're supposed to be
24  managing?
25  A.   Yes.

Page 88

J. Crook

2   Q.   Did you have any cognitive
3   dissonance?
4        MR. NASH:  Objection.  Objection.
5   There's nothing sinister about filing a
6   proof of claim to a bar date.  So
7   cognitive dissonance has nothing to do
8   with this, Franklin.  Now, please,
9   you're the one that imposed the bar
10  date.
11        MR. ZEMEL:  Please don't interrupt
12  and coach the witness.
13        MR. NASH:  I'm not coaching.
14  You're asking a question, cognitive
15  dissonance.
16  A.   Could you explain what it is.
17  Q.   Yes.
18  A.   I'm an accountant, not a lawyer.
19  Q.   Well, I was using an old psychology
20  term that I thought was actually coined in --
21  never mind.  We'll do that off the record.
22        Did you think that there was
23  anything inconsistent with you assisting in
24  the preparation of a claim on behalf of Alan
25  Gross against the debtor that you were

Page 89

J. Crook
1
2 supposed to be managing?
3       MR. NASH: Objection.
4    A.  No.
5    Q.  Now, so if I understand your
6 testimony, you had some sort of an epiphany
7 where the two million dollars --
8       MR. NASH: Objection.
9    Q.  -- just sort of came to mind and
10 you addressed it with Mr. Zlotnick?  Is that
11 about what happened?
12       MR. NASH: Objection.
13    A.  Yes.
14    Q.  And so what research or due
15 diligence did you do to assist Mr. Gross in
16 characterizing this two million dollars as a
17 loan?
18    A.  I don't specifically recall what
19 conversation I had.  I could guess at what
20 was said.  Do you want me to guess and try
21 and recall?
22    Q.  I would like you to refresh your
23 recollection in any way that you feel
24 comfortable.
25       MR. NASH: If you remember, you

Page 90

J. Crook
1
2 remember.  If you don't, please don't
3 guess.
4    A.  Then I don't.  I don't remember.  I
5 knew somebody -- the money had been put up,
6 and it was put up, in my understanding, by
7 Mr. Gross.
8    Q.  Prior to the time that this claim
9 was filed, did you or anyone on your behalf
10 do any research or due diligence of any kind
11 checking the company records to see if there
12 was even a record of the two million dollars
13 ever being received by the entity, meaning
14 A&M Florida Properties?
15    A.  I knew that the money had always
16 gone directly to Greenberg Traurig.  It never
17 came through A&M Florida Properties.  The
18 money directly went directly into escrow with
19 Greenberg Traurig from Mr. Gross.
20    Q.  That was long before you came to be
21 employed here?
22    A.  Yes.
23    Q.  My question is, did you research
24 for an audit trail to determine whether that
25 two million dollars was indeed a loan or not?

Page 91

J. Crook
1
2       MR. NASH: Objection.  Asked and
3 answered.
4    A.  Not with the time of doing this
5 claim.  I know in the past I had spoken with
6 Greenberg Traurig about the deposit and I was
7 aware of it.
8    Q.  But the fact that Greenberg Traurig
9 is holding two million dollars --
10       MR. NASH: Objection.
11    Q.  -- or were holding two million
12 dollars at that time is not my issue.  I'm
13 interested in how things were booked on the
14 records of this debtor.
15    A.  And as I've said, they were booked
16 on the records of the debtor as a capital
17 contribution.
18    Q.  But you didn't know that until just
19 in the last week or so; isn't that right?
20    A.  I didn't think about it.  The
21 question came up, and so I went back through
22 the old tax returns to find it, to look for
23 it.
24    Q.  All right.  If you went searching
25 through the debtor's records right now, would

Page 92

J. Crook
1
2 you find any evidence or audit trail of any
3 kind reflecting that two million dollars as a
4 loan on the books and records of the debtor?
5       MR. NASH: Objection.
6    A.  Not in the general ledger.
7    Q.  Would it be reflected anywhere as a
8 loan to the debtor?
9    A.  I don't know.
10    Q.  You certainly haven't found any
11 piece of paper that characterizes that
12 two million dollars as a loan; is that
13 correct?
14    A.  Correct.  That's why this was an
15 amended return was to say it was capital
16 contribution.
17    Q.  So if we can agree that there is no
18 piece of paper that you've been able to find,
19 and there's certainly no entry on the books
20 and records of the company that characterized
21 the two million dollars as a loan to the
22 debtor.  That's correct?
23       MR. NASH: Objection.
24    Q.  Am I right?
25       MR. NASH: This is asked and

Page 93

J. Crook

1    J. Crook
2    answered.  There is an amendment that
3    was filed, and it's asked and answered.
4    Q.  Am I correct?
5    A.  We filed an amendment.  I don't
6    understand what you want me to say.  I've
7    already said the tax return --
8    Q.  You were wrong.
9    A.  I was wrong.
10   Q.  You were wrong.  That Mr. Gross
11   filed this claim for two million dollars
12   characterized as a loan, and yet you knew
13   there was no piece of paper anywhere at that
14   time that characterized the two million as a
15   loan; is that correct?
16       MR. NASH:  Objection.
17   A.  It was money owed to Mr. Gross.
18   Q.  Are capital contributions the same
19   as loans in your world?
20       MR. NASH:  Objection.  You're
21   arguing with the witness.  She said she
22   went back --
23       MR. ZEMEL:  Mr. Nash.
24       MR. NASH:  No.  No.  You're arguing
25   with the witness.  You can't berate and

Page 94

J. Crook

1    J. Crook
2    argue with the witness.  She said she
3    was mistaken in the initial
4    characterization of it.  They filed an
5    amendment.  She's consulted with the
6    accountants on it.  They booked it as
7    capital contribution is her
8    understanding.  This is all her
9    testimony that it was a loan and it was
10   owed to Mr. Gross, and that's why she
11   assisted him in making the claim.  Now,
12   berating her about that is silly since
13   she's filed an amendment and she's
14   spoken to the accountants, and she went
15   back and she told you where she went
16   back --
17       MR. ZEMEL:  She filed Mr. Gross's
18   amended --
19       MR. NASH:  No.  It's never been
20   filed.  I saw it on the internet.
21       MR. ZEMEL:  No, but you just said
22   that this witness filed it.  Now you're
23   digging a big hole --
24       MR. NASH:  I'm hardly digging a
25   hole, okay.  Mr. Gross filed an

Page 95

J. Crook

1    J. Crook
2    amendment in consultation with the
3    witness.
4        MR. ZEMEL:  All right.  So if
5    you're done now --
6        MR. NASH:  Please.
7        MR. ZEMEL:  -- I would just like to
8    get a straight answer.
9        MR. NASH:  Okay.  You got a
10   straight answer.
11   Q.  Is it true that when this claim was
12   filed for two million dollars as a loan, you
13   had no documentation or support of any kind
14   on the books and records of the company to
15   reflect that it was indeed a loan?
16       MR. NASH:  Objection.  Asked and
17   answered.
18   A.  Yes.
19   Q.  And did you have any understanding
20   that my client would rely upon the
21   information on that claim?
22       MR. NASH:  Objection.  No
23   foundation.  Beyond the witness's
24   knowledge what your client is relying
25   upon.

Page 96

J. Crook

1    J. Crook
2    Q.  Did you have any understanding as
3    to whether my client --
4    A.  No.
5    Q.  -- would rely on those documents?
6    A.  No.
7    Q.  Did you have any understanding as
8    to whether the court was going to rely on the
9    document?
10       MR. NASH:  Objection.  Same
11   grounds.
12   Q.  Ma'am?  Did you have any
13   understanding --
14   A.  I don't know.  I don't know.
15   Q.  When you were providing the
16   information --
17       MR. NASH:  Judith, do you want to
18   take a break?
19       THE WITNESS:  Yeah.
20       MR. NASH:  No.
21       MR. ZEMEL:  I'm sorry.  I'm in the
22   middle of a question.
23       MR. NASH:  No.
24       MR. ZEMEL:  Mr. Nash.
25       MR. NASH:  You're berating the

Page 97

J. Crook

1
2  witness for no reason.  She's told you,
3  and I asked you to do this in a nice
4  way, but now you're berating the witness
5  and you're going to get her upset.  She
6  said she made a mistake in certain
7  areas, which she's corrected.  She's
8  spoken to Dr. Cornfeld on numerous
9  occasions.  She wasn't supposed to be
10 deposed.  That was the agreement.
11      MR. ZEMEL:  There was no such
12 agreement.  And, Mr. Nash, I really --
13      MR. NASH:  But I don't want her to
14 be upset, Franklin.
15      MR. ZEMEL:  All I need are very
16 straightforward answers.  If the witness
17 doesn't want --
18      MR. NASH:  She's told you.  You're
19 pressing her.  She said she made a
20 mistake.  End of story.  She's corrected
21 it.
22      Q.  When you provided the information
23 to Mr. Zlotnick that there was a two million
24 dollar loan, you understood that you had no
25 audit trail or any journal entry of any kind

Page 98

J. Crook

1
2  to support that, you understood that
3  Mr. Gross was going to file the proof of
4  claim, did you have any understanding that
5  anybody would be relying upon that document?
6      MR. NASH:  Objection.
7      A.  I understood money was owed to
8  Mr. Gross, and I understood it was going into
9  the courts.
10     Q.  Okay.  And because of your
11 accounting background, which is far superior
12 to mine, that's for sure, when you say things
13 like you understood that money was owed to
14 Mr. Gross, okay, I just need to understand
15 what that means.  Owed in the sense of it was
16 a loan, owed to Mr. Gross, owed to
17 Mrs. Gross, owed to some other entity?  So,
18 you know, I'm just trying to get the facts.
19 When you say all I knew was --
20     MR. NASH:  I'm going to object to
21 that.  That's a compound question if I
22 ever heard it.  Now, I'm going to ask
23 you to rephrase the question, I'm going
24 to ask the witness to, you know, take a
25 break because she is upset, and, you

Page 99

J. Crook

1
2  know, unless we can ask one question at
3  a time, and, again, Franklin, you asked
4  a compound question there.  So why don't
5  you just do one question at a time, you
6  know.  She's explained to you twelve
7  times her understanding.
8      Q.  Please explain to me what you meant
9  when you just said all you understood was
10 money was owed to Mr. Gross.  What does that
11 mean?
12     A.  I understood he provided that
13 two million dollar deposit.
14     (Exhibit 3, Proof of Claim filed on
15     or about June 29th of 2010, marked for
16     identification, as of this date.)
17     Q.  Now, let me show you what we've
18 marked as Exhibit 3, which is a Proof of
19 Claim that was filed on or about June 29th of
20 2010.  Have you seen this document before?
21     A.  I'm not sure.
22     Q.  Can you tell me in the last 30 days
23 or so have you had any discussions with
24 anyone about Exhibit 2, this original
25 two million dollar proof of claim

Page 100

J. Crook

1
2  characterized as a loan?
3      A.  Yes.
4      Q.  Tell me about those conversations,
5  please.
6      A.  I was told that the question was
7  asked why wasn't this on the original
8  bankruptcy claim filing.
9      Q.  Okay.  By the way, did you think
10 that was a fair question for me to ask?
11     A.  Yes.
12     Q.  And so tell me who asked you that
13 question?
14     A.  And I told you I screwed up the
15 first filing is what I did, giving the
16 information.
17     Q.  Well, wait, wait, wait, wait, wait.
18 First and foremost, if the two million
19 dollars was shown as a loan on the books and
20 records of the debtor, it would have been on
21 the original bankruptcy schedules.  Am I
22 right?
23     MR. NASH:  Objection.
24     Q.  Am I right?
25     MR. NASH:  Objection.

Page 101

J. Crook

1
2    A.   Yes.
3    Q.   And even if you had --
4    A.   I'm confused, because we keep going
5  over the fact that we submitted it as a loan,
6  we resubmitted it saying I made a mistake, it
7  was capital, the accountants treated it as
8  capital, it was a mistake.  And we keep going
9  over and over again.  What else do you want
10  me to say?
11    Q.   No.  I just --
12      MR. NASH:  Okay, yes.  I think you
13    said it better than me.  We keep going
14    over and other again.
15    Q.   I just want to be clear.
16      MR. NASH:  That's been clear.
17    Q.   What you've told me is that on the
18  original bankruptcy schedules you looked more
19  at the trade receivables and payables rather
20  than intercompany transfers.  You told me
21  that; correct?
22    A.   Yes.
23    Q.   And that, I believe, was how you
24  explained initially why intercompany loans
25  were not listed on the original bankruptcy

Page 102

J. Crook

1
2  schedules.  Am I right so far?
3    A.   Yes.
4    Q.   Then you tell me that with respect
5  to Exhibit 2, that you had no journal entry,
6  no source documentation of any kind
7  characterizing the two million as a loan, but
8  that's the way that the claim was filed.  Am
9  I correct?
10      MR. NASH:  Objection.
11    A.   Yes, because I had the assets, and
12  the assets had to be funded by somebody, and
13  I knew it was funded by Mr. Gross.
14    Q.   So now in or about June of 2010 you
15  learn that I've asked the question about why
16  the two million was not on the original
17  bankruptcy schedules, and that's when you
18  started to do research into that issue.  Am I
19  correct?
20      MR. NASH:  Objection.
21    A.   That's when I went -- I went to the
22  tax returns.
23    Q.   Did you first go look at the
24  general ledger 2290 to see if there was a
25  two million dollar intercompany loan for the

Page 103

J. Crook

1
2  debtor?
3    A.   No.
4    Q.   Did you look at any documents of
5  any kind to first confirm that it was, in
6  fact, a loan?
7    A.   You've asked me this ten times.  I
8  don't have a document.
9    Q.   No.  That wasn't my question.  I
10  asked a different question.
11      MR. NASH:  No.  You've asked the
12    same question.
13    A.   I'm not understanding the
14  subtleties of the question, then, Mr. Zemel.
15    Q.   When in the last 30 days you
16  understood I was questioning this two million
17  dollars and you went to research it.  My
18  question is, did you first go to research
19  whether it was, in fact, a loan, or did you
20  first go and start pulling tax returns?
21    A.   I called the accountants.  I called
22  my accountants and asked them about the
23  transaction that was before my time.
24    Q.   I see.  Okay.  And is it the same
25  accountants now as it was back in 2000?

Page 104

J. Crook

1
2    A.   Yes.
3    Q.   So now I understand.  So you asked
4  the accountants --
5    A.   I asked the accountants.
6    Q.   -- as to --
7    A.   Because I don't have those records.
8    Q.   Okay.
9    A.   So they went back and found it for
10  me.
11    Q.   And so who did you speak to --
12    A.   So if I misspoke and said I went
13  and looked, I asked them, because they're my
14  accountants.
15    Q.   All right.  Things will move along
16  much faster.  That's all I needed to
17  understand.  Okay.  So who did you speak with
18  at the accountants?
19    A.   Alan Botwonik.
20    Q.   And he's the man that signs the tax
21  returns for the debtor; is that correct?  I
22  think I've seen his name there before.
23    A.   He's definitely on some of them.  I
24  don't know if he signs the current ones.
25    Q.   So tell me what did you say and

Page 105

```
 1          J. Crook
 2 what did he say about the two million
 3 dollars?
 4     A.  He said that they treated it as a
 5 capital contribution.  I said I thought it
 6 was a loan.  He said for the tax purposes it
 7 made no difference, and they treated it as a
 8 capital contribution.  And they did things on
 9 their own back in those days.
10     Q.  Who is "they"?
11     A.  The accountants.  I understand we
12 would ship them off information, and they
13 kept our -- they kept the books and records.
14     Q.  Now, I've never seen this language
15 phrased this way before.  Do you have an
16 understanding of what it means when it says
17 "capital advanced"?
18     A.  Well, it's English.
19     Q.  Well, capital advanced, isn't that
20 sort of a way of trying to have it both ways
21 and try to characterize it as capital and a
22 loan?
23          MR. NASH:  Objection.  If you're
24     familiar with it, you are.  If you
25     can't, you can't.
```

Page 106

```
 1          J. Crook
 2     A.  No.  That doesn't mean that to me.
 3 I am not a lawyer.  I don't speak
 4 legal-speak.  I'm an accountant.
 5     Q.  Okay.  That's why I was just
 6 asking.  So the accountants confirmed for
 7 you, though, it's not a loan, it was a
 8 capital contribution?
 9     A.  They treated it as a loan.
10     Q.  They treated it as a capital --
11     A.  They treated it as capital.
12     Q.  Okay.  Now I get that, and now I
13 understand why this has been filed this way.
14 Here's the part that I don't understand now.
15 You understood that Mr. Gross made a capital
16 contribution of two million dollars --
17          MR. NASH:  Objection.  That's not
18     what her initial testimony is.  So I
19     object to it even before you get it out.
20          MR. ZEMEL:  Are you finished?
21          MR. NASH:  You're badgering the
22     witness.  She said it herself, you've
23     answered the question ten times, the
24     same question.
25          MR. ZEMEL:  I'm moving on.
```

Page 107

```
 1          J. Crook
 2          MR. NASH:  She's answered it.
 3          MR. ZEMEL:  I'm moving on to
 4     another issue.
 5          MR. NASH:  Then please do.  Move
 6     off of the whole proof of claim,
 7     capital, then you're moving on to
 8     another issue.  If you don't move on to
 9     another issue, what you're doing,
10     Franklin, is just asking the same
11     question another way.
12          MR. ZEMEL:  Are you finished?
13          MR. NASH:  And you're getting the
14     witness upset for no reason.
15          MR. ZEMEL:  Let me know when you're
16     done.  I can wait.
17          MR. NASH:  We'll wait all day.
18          MR. ZEMEL:  Are you done?
19          MR. NASH:  You're getting the
20     witness upset.
21          MR. ZEMEL:  Let me know when you're
22     finished.
23          MR. NASH:  Okay.
24     Q.  Based upon this claim for the
25 capital advanced, based upon this, okay, now
```

Page 108

```
 1          J. Crook
 2 I want to talk about that.  So that according
 3 to the accountants, this two million dollars
 4 was treated as a capital contribution for all
 5 these years.  That's your understanding;
 6 correct?
 7          MR. NASH:  Objection.
 8     A.  My understanding as of when, Frank?
 9     Q.  As of now.
10     A.  I'm sorry.  Mr. Zemel.
11     Q.  As of now.  Your understanding --
12 because you just spoke with the accountants
13 in the last 30 days or so; isn't that right?
14     A.  Right.  My understanding was it
15 should have been a loan.  They treated it as
16 capital.  They screwed up, but the tax
17 returns reflect it as capital.
18     Q.  Okay.  So contemporary times, okay,
19 is that your understanding now is that the
20 two million dollars has always been treated
21 as a capital contribution according to the
22 tax returns of the company; isn't that right?
23     A.  Yes.
24     Q.  That's now your understanding;
25 right?
```

```
1              J. Crook
2    A.  Yes.
3    Q.  Okay.  I don't want to go back in
4  history anymore.  So the accountants, as far
5  as you know, have always treated it as a
6  capital contribution; isn't that right?
7         MR. NASH:  Objection.  Asked and
8  answered.
9    Q.  Just answer it and we'll move on.
10        MR. NASH:  You just answered it.
11   You just asked the same question,
12   identical question back to back.
13        MR. ZEMEL:  I'm just trying to lay
14   a predicate.
15        MR. NASH:  Okay.  You've laid the
16   predicate.  Asked and answered.  You can
17   answer it.
18   Q.  Am I correct?
19   A.  Yes.
20   Q.  Now, you understood that in or
21 about July of 2008 that a purchase and sale
22 agreement had been entered into between
23 Dr. Cornfeld's entity or company and GFI
24 Acquisition for the purchase of Carib and
25 Cutlerwood?
```

```
1              J. Crook
2         MR. NASH:  Objection.
3    Q.  Isn't that right?
4    A.  My understanding, if I can tell you
5  my understanding --
6    Q.  Sure.
7    A.  -- and not what you telling me my
8  understanding is.
9    Q.  I like that.
10   A.  My understanding is A&M Florida
11 Properties or our entities wanted to buy the
12 four properties.  The doctor agreed to sell
13 them to us.  We had a purchase and sale
14 contract.  That was signed by GFI
15 Acquisition, which is our standard policy.
16 We were in the process of -- that entity
17 signs the purchase and sale contracts.  It's
18 not the entity that's going to acquire the
19 properties.  It's the vehicle to sign the
20 purchase contract.  I don't understand the
21 legal ramifications, but that's why they're
22 on -- my understanding is why they're on the
23 purchase and sale agreement.  As part of the
24 purchase and sale agreement, this two million
25 dollars, which was in escrow as a lease
```

```
1              J. Crook
2  deposit for the Carib and Cutlerwood leases,
3  was transferred to Dr. Cornfeld, actually
4  into his control on the signing of a
5  contract, which in itself is pretty amazing
6  that we gave two million dollars to somebody
7  in good faith assuming this purchase and sale
8  agreement would be executed.  That was never
9  executed.  And now we don't have the
10 two million dollars.
11   Q.  I'm sorry.  You thought the --
12        MR. NASH:  She's giving you her
13   understanding.
14        MR. ZEMEL:  Don't yell.
15        MR. NASH:  She's giving you her
16   understanding.  Don't interrupt until
17   she's done with her understanding, all
18   right.  Her understanding may be right,
19   it may be wrong.  You asked for her
20   understanding.  She's giving you her
21   understanding.
22   A.  So this two million dollars now
23 represents a deposit on the purchase and
24 sale.  And it was given to Dr. Cornfeld in
25 good faith that as part of the purchase and
```

```
1              J. Crook
2  sale, all rents and everything else related
3  to rents were up to date, and it was a
4  contract deposit on the purchase and sale.
5  And to this day I still carry that as a
6  deposit because here we are.  Nothing has
7  happened.  He did not sell us the properties.
8  And here we are.  So there's no resolution.
9  To me there's still -- and our books show
10 that there's still a deposit out there, which
11 is now no longer a lease deposit but a
12 purchase and sale contract deposit.
13   Q.  I want to talk about those journal
14 entries.  If the accountants are showing that
15 the two million dollars is a capital
16 contribution on the books of the debtor, at
17 some point --
18        MR. NASH:  Objection.
19        MR. ZEMEL:  What's the objection?
20        MR. NASH:  She told you the
21   accountants are showing it on the tax
22   returns as a capital contribution.
23        MR. ZEMEL:  Right.  That's what I
24   just said.
25        MR. NASH:  Now, you used the word
```

Page 113

J. Crook

1
2  books of the debtor.  I think her
3  testimony was the tax returns, if I'm
4  not --
5      MR. ZEMEL:  All right.
6      MR. NASH:  Okay.  I don't want to
7  mix and match.  She's also told you,
8  Franklin, she disagreed with the
9  accountants, but since that's the way
10 they carried it, she accepted it.
11     MR. ZEMEL:  Okay.
12  Q.   Let me ask you, when I refer to the
13 books and records of the company, in your
14 mind does that include the tax returns that
15 were filed by the accountants?
16  A.   Yes.
17  Q.   Okay.  And whether you agree with
18 it or not isn't my issue.  I'm just talking
19 about straight bookkeeping.  It's just
20 bookkeeping.  There's a two million dollar
21 capital contribution on the books and records
22 of the company.
23     MR. NASH:  Objection.
24  Q.   That money at some point is used by
25 GFI Acquisition as a good faith deposit.

Page 114

J. Crook

1
2  A.   I don't think it's used by GFI
3  Acquisition.  I think -- to me, that money is
4  still owed to A&M Florida Properties.  That's
5  the deposit that -- I feel that you're
6  telling me that my books and records are
7  wrong.
8  Q.   No.
9  A.   And I'm disagreeing with you.  I'm
10 saying I've got this deposit still and
11 Dr. Cornfeld has got it.
12  Q.   Let me --
13  A.   And it's for these two properties.
14 It's for this entity.  And it's owed back to
15 Alan Gross, Edith Gross's capital.
16  Q.   I'm just trying to understand how
17 things were booked.  That's all.  Okay.
18 Carib and Cutlerwood have a two million
19 dollar deposit as security for the
20 performance of the two leases.  You
21 understood that; correct?
22  A.   Yes.
23  Q.   And according to the books and
24 records of the company, that two million
25 dollars was booked as a capital contribution?

Page 115

J. Crook

1
2      MR. NASH:  Now I object.
3  Q.   That's correct; correct?
4      MR. NASH:  I object.  She's
5  testified -- hold on.  She's testified
6  it's on the tax returns.  You're using
7  the word "booked" as if it's in the
8  general ledger.  I think her testimony
9  was it's not in the general ledger.
10 It's reflected on the tax return.
11     MR. ZEMEL:  Her testimony is that
12 the tax returns --
13     MR. NASH:  This is wrong.  This is
14 wrong.  No.  Yes, the tax returns can be
15 books and records, but you used the word
16 "booked," b-o-o-k-e-d, all right.  And
17 she's told you that it was reflected on
18 the tax returns.  It wasn't booked.
19     MR. ZEMEL:  That's the objection?
20 Fine.  Okay.  That's the objection.
21  Q.   So we know that the company has
22 two million dollars, according to the tax
23 returns, as a capital contribution.  That
24 two million dollars serves as the deposit on
25 the two 50-year leases.  You understood that;

Page 116

J. Crook

1
2  correct?
3  A.   Initially, yes.
4  Q.   And then you understood at some
5  point that the two million dollars would
6  actually serve as a good faith purchase
7  deposit between GFI Acquisition and
8  Dr. Cornfeld to purchase the four properties.
9  You understood that; correct?
10  A.   I understood that the lease deposit
11 was, with the agreement of Dr. Cornfeld and
12 GFI, was transitioned to a purchase and sale
13 deposit.
14  Q.   How?  How on the books and records
15 of this company was that --
16  A.   I did not know until yesterday that
17 the purchase and sale was in the name of GFI
18 Acquisition.
19  Q.   Oh.
20  A.   To me, it's still in these
21 entities.  You know, I don't deal with the
22 purchases and sales.  That's somebody else.
23  Q.   So why is this so complicated?
24  A.   Because --
25  Q.   If the answer is that you didn't

Page 117

J. Crook

1       J. Crook
2  know until yesterday that GFI was
3  essentially -- strike that.
4       Are you telling me, then, just
5  simply that there is no journal entry
6  anywhere reflecting what you referred to as
7  the transition of the two million dollars
8  from Carib Villas --
9     A.  Yes.
10    Q.  -- to GFI Acquisition?
11    A.  It wasn't transferred to GFI
12  Acquisition. It went to Dr. Cornfeld, who
13  was the landlord, and we're still -- it's
14  still -- there's no journal entry to reflect
15  any transfer. It was a name change. In my
16  mind, it was just a name change.
17    Q.  All right. So now I understand why
18  there's no intercompany transfer under GL
19  2290 for that two million dollars between the
20  debtor and GFI Acquisition, because you just
21  didn't know, I guess, that one needed to be
22  made or should have been made or -- I don't
23  know how to -- I don't want to testify for
24  you.
25      MR. NASH:  Objection.

Page 118

J. Crook

1       J. Crook
2    Q.  You just didn't make a journal
3  entry for that; is that right?
4    A.  Correct.
5    Q.  Okay. That's really all I needed
6  to know on that.
7      MR. NASH:  She told you that from
8     the start there was no journal entry.
9      MR. ZEMEL:  No. No. That's not
10    true.
11      MR. NASH:  What I'm going to do,
12    I'm going to ask you if we can break for
13    lunch at this point.
14      THE WITNESS:  How much longer is
15    it?
16      MR. NASH:  Is it one o'clock?
17      MR. ZEMEL:  It's 1:15. I could
18    probably finish in probably an hour if
19    we just move along.
20      THE WITNESS:  An hour?
21      MR. ZEMEL:  Um-hmm. I'd prefer to
22    just work through lunch and be done. Or
23    if you want to order something up, but
24    let's --
25      MR. NASH:  Do you want a break or

Page 119

J. Crook

1       J. Crook
2  are you okay?
3      THE WITNESS:  No. I would rather
4    get it over and done with.
5      MR. NASH:  Okay. Fair enough.
6    Q.  Now, with respect to the amended
7  summary of schedules which were just filed,
8  what was your participation in preparing the
9  amended schedules?
10    A.  I went through the list of
11  creditors and made note and had conversations
12  with Dr. Cornfeld about what had subsequently
13  been paid very close to the filing the
14  bankruptcy and took those off. I identified
15  how much you've been paid. So as of now,
16  there's no point in there being a claim there
17  because they're being paid.
18    Q.  Let me ask it a little differently,
19  then.
20    A.  I think you should tell me what you
21  want me to say.
22    Q.  I prefer to just have a
23  conversation.
24      MR. NASH:  Okay, but you tried that
25    with Dr. Cornfeld. That didn't work,

Page 120

J. Crook

1       J. Crook
2    okay.
3    Q.  What did you do to determine
4  whether there are any other intercompany
5  loans or any other obligations owed to any
6  affiliate or insider? In other words --
7    A.  Well, all I looked at was the
8  February proof of claims. I was asked -- I
9  was asked specifically by your office or by
10  you to provide backup for the proof of claims
11  that were filed.
12    Q.  Yes. No, what I'm saying is that
13  you told me that on the original bankruptcy
14  schedules, you did not look at intercompany
15  transfers, okay, which is why they weren't on
16  the original schedules. That's what you've
17  told me. My question is, for purposes of
18  these amended schedules, what did you do?
19  Did you look at everything now?
20    A.  I looked at the claims that we
21  filed in -- that were filed, some of which
22  were filed by us in February. That's what I
23  looked at. I didn't look for any more. I
24  looked to see what had been paid since the
25  first filing was done.

J. Crook

2  Q.  That was my question.  So you
3  haven't searched if there's any other --
4  A.  No.
5  Q.  -- claims or loans or anything out
6  there of any kind other than the claims that
7  were filed?
8  A.  Yes.
9  Q.  Okay.  Now, can you tell me does
10  Greenberg Traurig provide any legal services
11  of any kind to GFI Management Services, Inc.?
12  A.  Yes, they do.
13  Q.  Tell me about that.  What services
14  do they provide?
15  A.  They're a law firm.  They provide
16  legal services.
17  Q.  Do they do that currently, I mean
18  contemporarily?
19  A.  Yes.
20  Q.  And do you know whether they
21  provide legal services to GFI Management
22  Services, Inc.?  Do you know that?
23  A.  I don't know.
24  Q.  But you know that generally they're
25  providing services to I guess the GFI

J. Crook

2  entities itself?  That you understand;
3  correct?
4  A.  Projects, yes.
5  Q.  And you understood that Greenberg
6  Traurig, according to your schedules, is owed
7  roughly $54,000.  Do you remember that?
8  A.  Yes.
9  Q.  And can you tell me has that been
10  paid?
11  A.  I think it's still outstanding.
12  Q.  Okay.  I'm just asking if you know
13  if it's been paid.  And looking at the check
14  summary that's attached to the amended
15  summary of schedules that was just filed, I
16  don't think I need to make it an exhibit
17  here, but I wanted you to just look at these
18  entries in June of 2009.  See all of these
19  transactions relating to Greenberg Traurig?
20  A.  Yes.
21  Q.  Do you have an understanding as to
22  what those are?
23  A.  Well, they would be legal services
24  from Greenberg Traurig.  They provide legal
25  service.

J. Crook

2  Q.  On behalf of A&M Florida
3  Properties?
4  A.  Yep.
5  Q.  So that in June of 2009, roughly
6  $130,000 was paid to Greenberg Traurig?
7  A.  Yes.  They bill us, and we pay
8  every six months.  We do -- they bill us.
9  Q.  Now, I know that I gave you very
10  short notice on gathering additional
11  documents, and I didn't expect for you to
12  have them for me today.  Have you begun the
13  process?
14  A.  Yes.
15  Q.  When do you think those documents
16  would be available?
17  A.  I have some of them now, and some
18  of them you'll never get because they're too
19  old.  It's ten years ago.  We do not have
20  records from ten years ago.  We're not
21  required to keep them for that long.
22  (Exhibit 4, Three-page document
23  first page entitled "JVL Supply," marked
24  for identification, as of this date.)
25  Q.  Let me show you what I marked as

J. Crook

2  Exhibit Number 4.  Are you familiar with a
3  supplier called JVL Supply?
4  A.  JVL.  Not really.
5  Q.  Is there a procedure in place so
6  that expenses to particular properties in
7  Florida are charged only to the property in
8  which the services were provided?
9  A.  We have review procedures.  Things
10  are rented, they're approved, and they get
11  paid.
12  Q.  Tell me about the review
13  procedures.
14  A.  Property managers approve the
15  invoices.  Typically a property supervisor
16  person would approve the invoices, and then
17  checks get cut, and an AP supervisor reviews
18  the check and the backup.
19  Q.  Do you have the check register for
20  Carib Villas here?  I think I just saw
21  Mr. Nash had it in his file.
22  MR. NASH:  No.  It's the schedules.
23  MR. ZEMEL:  The schedules include
24  the check register, do they not?
25  MR. NASH:  The same one you have

1            J. Crook
2      there.
3            MR. ZEMEL:  I don't have the check
4      register here.
5            MR. NASH:  It's in your notebook.
6      You just asked her a question about it.
7      Q.   Do these check numbers represent
8  the DIP check numbers?
9      A.  I don't know what you're looking
10 at.
11     Q.   The check numbers are different.
12 These check numbers.
13     A.   What do you mean they're different?
14 What's different about them?
15     Q.   No, I'm asking.  Is there a
16 difference between -- is there an internal
17 check number versus the actual check number
18 on the physical check that would have been
19 written?
20           MR. NASH:  Do you understand the
21     question?
22           THE WITNESS:  No.
23     Q.   In other words, would the check
24 number on a physical check --
25     A.   The check number is generated --

1            J. Crook
2  the check numbers are generated by the
3  accounting system.
4      Q.   Let me ask you to look at
5  Exhibit 4.  Now, Exhibit 4 on the second
6  page, you recognize that as an invoice -- do
7  you see where it says "Bill to Landmark
8  Tower"?  Do you see that?
9      A.  I do.
10     Q.   That's one of your other
11 properties; is that correct?
12     A.   Yep.
13     Q.   And do you see that there was a
14 heat circuit board carrier for $900 and an
15 invoice submitted for Landmark Towers.  Do
16 you see that?
17     A.   Yes.
18     Q.   Then if you look at next page, also
19 from JVL Supply, you'll see a number of items
20 and services that were provided to Landmark
21 Towers for approximately $1280 more.  Do you
22 see that?
23     A.   Yes.
24     Q.   Do you know whether or not those
25 monies for those two invoices were paid from

1            J. Crook
2  the DIP account for Carib Villas?
3      A.   No.  Somebody has made a note here
4  that indicates that it was, but.
5      Q.   That's not my handwriting.  Do you
6  recognize this general ledger?
7      A.   This is Carib Villas' general
8  ledger.
9      Q.   Does that general ledger indicate
10 that these two invoices for Landmark Towers
11 were paid for by Carib Villas?
12     A.   Yeah.
13     Q.   Is that yes?
14     A.   That's a yes.
15     Q.   Can you explain that?
16     A.   Human error.  That's all I can put
17 it down to.  It must have been a mistake.
18 We, umm...
19           MR. NASH:  That's it.  If you know
20     about it, you know about it.
21     A.   Payable person must have
22 accidentally picked the wrong entity.  I'll
23 make a note of them, and we'll have to
24 reimburse.
25           MR. NASH:  Well, you'll make a note

1            J. Crook
2  of them.  You'll investigate to see if
3  it's even accurate, and you'll see what
4  happened.  Maybe this stuff went to
5  Carib Villas.
6            THE WITNESS:  Okay.
7            MR. NASH:  Maybe it didn't go.
8  We'll understand it.
9            (Exhibit 4-A, Page from General
10     Ledger, marked for identification, as of
11     this date.)
12           (Exhibit 4-B, Page from General
13     Ledger, marked for identification, as of
14     this date.)
15           MR. ZEMEL:  I'm just for the record
16     going to mark these two pages of the
17     general ledger as Exhibits 4-A and 4-B.
18           MR. NASH:  It's all of $1200 on a
19     ledger entry of hundreds of different
20     items.
21           (Exhibit 5, Five-page document,
22     first page entitled "HD Supply
23     Facilities Maintenance, Inc.", marked
24     for identification, as of this date.)
25     Q.   Do you have an understanding what

Page 129

```
1            J. Crook
2  HD Supply Facilities Maintenance, Inc., is?
3      A.  Home Depot.
4      Q.  Part of this composite Exhibit
5  Number 5 includes two pages of the general
6  leverage for Carib Villas, pages 463 and 481.
7  Do you recognize that as the general ledger
8  from Carib Villas?
9      A.  It says Carib Villas.
10     Q.  Now, what we're questioning are the
11 following pages, the rest of this composite
12 Exhibit Number 5.  It would seem to indicate
13 that over $5,000 of charges to Landmark have
14 been charged to Carib Villas.  Do you see
15 that?
16     A.  What does this -- what is this?
17     Q.  That, according to my
18 understanding, is a screen printout provided
19 by Home Depot to our client.
20         MR. NASH:  Well, this is the first
21     we've ever seen it.
22         MR. ZEMEL:  Of course.
23         MR. NASH:  You don't even know what
24     it is.  We'll look into it.  Why don't
25     you give us the list of the transactions
```

Page 130

```
1            J. Crook
2  you want us to look into, we can mark
3  them, and we'll come up with an answer.
4  I don't think it's fair to show a Home
5  Depot printout, maybe it's right, maybe
6  it's wrong, with your internal
7  handwriting on it.  So if you have some
8  issues that you want us to look into, we
9  will look into it.
10        MR. ZEMEL:  Okay.
11     Q.  My only question was does this
12 indicate, I didn't ask to confirm it, does
13 this indicate to you that $5,000 of charges
14 to Landmark were charged against Carib
15 Villas?
16        MR. NASH:  Objection.
17     A.  Well, it indicates that we cut a
18 check from Carib for $5,000, but I don't, you
19 know, I'm not familiar with this.  I couldn't
20 say.  I don't have the --
21     Q.  I understand.
22     A.  There's no invoices.
23     Q.  So you're going to research that?
24     A.  I'd have to research it.
25        (Exhibit 6, Document relating to
```

Page 131

```
1            J. Crook
2      Amerihome Remodeling, Inc., marked for
3      identification, as of this date.)
4      Q.  Let me show you what I've marked as
5  composite Exhibit Number 6.  Are you familiar
6  with a company called Amerihome Remodeling,
7  Inc.?
8      A.  It sounds familiar.
9      Q.  There are a dozen or so invoices
10 which we've identified as invoices for work
11 done or performed at Landmark Towers, which,
12 according to your general ledger, also here
13 on your exhibit, were paid for out of Carib
14 Villas.  Can you take a look at that, please,
15 and tell me if you agree.
16     A.  I don't find -- I'm not finding
17 this first one, 2738.  27.  I don't see this
18 one.
19     Q.  Try the next one.  Each one is
20 ticked off in the general ledger.
21     A.  Well, these are highlighted.  I
22 don't see that number.  I don't see this
23 invoice number or these amounts in here.
24     Q.  Let me see it.  I think there's two
25 things going here.  I might be missing a page
```

Page 132

```
1            J. Crook
2  four 2738, but here's invoice number 2775.
3         MR. NASH:  Well, if you're missing
4     a page --
5      A.  Well, you don't see the first one.
6         MR. NASH:  Why don't you give her a
7     complete document, and she'll look into
8     it for you.
9      Q.  And invoice 27 -- see, here are the
10 invoice numbers here.
11     A.  Yes.  I just said 2738 isn't there.
12     Q.  Right.  I don't see that.  I think
13 I'm just missing one page of the general
14 ledger.  I think that's why.  But the other
15 invoices --
16     A.  Oh, there's a mistake, is it?
17 Sorry.
18     Q.  Okay.  Can you explain how it could
19 be with the review processes in place that
20 there could be so many --
21         MR. NASH:  Objection.
22     Q.  -- invoices to this particular
23 vendor that were for work performed at
24 Landmark that were charged to Carib Villas?
25     A.  I cannot.
```

J. Crook

1         J. Crook
2     MR. NASH:  We're going to look into
3 it.
4   A.  I can't.
5     MR. NASH:  You're assuming that it
6 was performed at Landmark.  We will look
7 into it.  And it's hardly so many.  Do
8 you want us to look into that one?  You
9 put it on the floor.
10    MR. ZEMEL:  Those are exhibits.
11    MR. NASH:  Why aren't they on the
12 table, then?
13    MR. ZEMEL:  I'm sorry.  Do you have
14 a bigger table?
15    MR. NASH:  It's a pretty big table,
16 Franklin.
17    (Exhibit 7, Document relating to
18 Joseph Contracting, Inc., marked for
19 identification, as of this date.)
20   Q.   Let me show you what we've marked
21 as Exhibit Number 7.  Now, Exhibit Number 7
22 includes 28 invoices from a vendor known as
23 Joseph Contracting Corp.  Do you know that
24 vendor?
25   A.  Yes, I've heard of that vendor.

1         J. Crook
2   Q.   And take a look at this composite
3 exhibit, and you'll notice that with respect
4 to these invoices, each one has the mark
5 showing that it was received by the local
6 property manager and then received here in
7 New York.  Isn't that what those received
8 stamps indicate?
9   A.  This is accounting, yes.
10   Q.   Each one of these has two stamps.
11 One would indicate it was received on the
12 inbound by the on-site property manager, and
13 the second one would indicate when it was
14 received here in New York; isn't that right?
15 At least that's the way Mr. Mehlman --
16   A.  Yes.
17   Q.  -- explained to me the way it
18 works.
19   A.  Yeah.
20   Q.   And if you look at those invoices,
21 do you see that there is all sorts of work,
22 construction work being done on Landmark
23 apartments according to these invoices?
24   A.  Yeah.
25   Q.   And you can also see from the

1         J. Crook
2 general ledger that this amount of money, I
3 forget how much, 12,000, whatever it is, was
4 paid for out of Carib Villas during the
5 bankruptcy.  Do you see that?
6   A.  Yes.  I can't explain it.
7   Q.  Okay.  That answers my next
8 question.
9    MR. ZEMEL:  Let's do this.  Let's
10 take five minutes.  During that break
11 can I ask you, please, to inventory all
12 of the exhibits and make sure we have
13 them in the right order.  And in the
14 meantime, I'm going to see how much
15 more, if anything, I have left, because
16 obviously we're not going to finish
17 today because I know that you're going
18 to go and research some things for me,
19 and there's some more documents, of
20 course, that I need as well.  But I may
21 be done for today.  Should we take five
22 minutes?
23    THE WITNESS:  I guess.
24    (Recess taken from 1:40 p.m. to
25 1:52 p.m.)

1         J. Crook
2   Q.  Can you tell me, please, what is
3 the procedure in place relating to the
4 regional managers in Florida being paid?  How
5 does that work?
6   A.  The property supervisor?
7   Q.  Well, my understanding is you have
8 an on-site property manager which gets paid
9 out of the particular property itself; is
10 that correct?
11   A.  Yes.
12   Q.  Then you have a supervisory level
13 above that, and that person I thought was
14 called like a regional manager.  Do you know
15 what the title is?
16   A.  No.  To me -- the property
17 supervisors?
18    MR. NASH:  If you know, you know.
19 If you don't know, you don't know.
20   Q.  So the property supervisor would be
21 supervising several different properties in a
22 geographical area; is that correct.
23   A.  Yes.  In a close region.
24   Q.  Yes.  Right.  And then above that
25 you have must be the regional manager in

J. Crook

1
2  charge of like the whole state of Florida, I
3  guess, is the way Mr. Mehlman explained it.
4        MR. NASH:  Objection.
5     Q.  With respect to the person that
6  supervises the on-site property managers for
7  a given area, how is their compensation
8  handled?
9     A.  In Florida and in the other regions
10  the property supervisors are paid out of GFI
11  Management for confidentiality reasons, and
12  they are allocated to the properties on a
13  per unit basis.  The cost.  The cost is
14  allocated.  They're on-site property
15  supervisors that are hands-on and, you know,
16  supervise a handful of properties.
17     Q.  I mean I understand the concept,
18  which is if somebody is supervising five
19  properties and 500 units, that their salary
20  would be fairly apportioned in some fashion
21  amongst the five properties.  I mean --
22     A.  Yeah.
23     Q.  -- that's the concept.  Am I right?
24     A.  Yes.
25     Q.  And you're telling me that that

J. Crook

1
2  supervisor's position, his salary is paid for
3  through GFI Management Services, Inc., and
4  then at some point there's I guess adjusting
5  entries?
6     A.  There's -- I believe we gave you
7  one such schedule, because it was on the
8  proof of claim.  So it's allocated on a
9  monthly basis based on the number of units in
10  the property.  It's a very common way to
11  allocate costs.
12     Q.  If that process is being adhered
13  to, would I expect to see payments from Carib
14  Villas or even Palm Gardens to the
15  supervisory people directly paying their
16  salaries?
17     A.  No.
18     Q.  So I shouldn't expect to see that?
19  That's a terrible question.  Don't answer it,
20  because I asked it in the negative.
21        Are you aware of whether or not
22  there are supervisory employees whose
23  entire --
24     A.  There is one, we have one -- had
25  one supervisor, we don't anymore, in Florida.

J. Crook

1
2     Q.  And that person's name was what?
3     A.  Pamela Albright.  She was the
4  property supervisor.  Different regions give
5  themselves different names, but.
6     Q.  Do you know an employee by the name
7  of Manuel Neira, N-e-i-r-a?
8     A.  No.  I don't know him.
9     Q.  Or Ramone Rivero Perez?
10     A.  No.  I've seen Manuel's name
11  before.  I review payroll just looking for
12  big mistakes, but.
13     Q.  I'm just trying to understand what
14  this is.  Let me just mark this as Exhibit 8.
15        (Exhibit 8, Four-Page document,
16        Daily Category Report, GFI Management
17        Services, Inc., marked for
18        identification, as of this date.)
19     Q.  Can you explain to me what is this
20  document?
21        MR. NASH:  If you know.
22     A.  Never seen it before.
23     Q.  Never?
24     A.  Never.
25     Q.  Okay.

J. Crook

1
2     A.  Oh.  Okay.  I know what this is.
3  This is -- it's not a report that I run, but
4  it's from our time management system.  We
5  have a time management system.
6     Q.  Which links to the payroll system
7  if I'm correct?
8     A.  Which uploads to payroll, yes.
9     Q.  And what this document reflects --
10  this would be like a standard report for all
11  of the properties that are linked to that
12  payroll system; isn't that right?
13        MR. NASH:  Let me see it.
14     A.  Well, it's a report that's in the
15  payroll system that you may run if you want
16  to.  The hours are imported into Paychecks.
17  We don't run and reenter them.
18     Q.  What's the name of the time --
19     A.  Stromberg.
20     Q.  Stromberg?
21     A.  Um-hmm.
22     Q.  And that links directly into a
23  payroll system?
24     A.  We upload the time records into --
25  the hours into the payroll system.

1          J. Crook
2     Q.   Is that like an outsourced payroll
3  company that handles that?
4     A.   Yes.
5     Q.   Which company is that?
6     A.   Paychecks.
7     Q.   Paychecks.  So now I understand.
8  Can you tell me are there any checks in place
9  to ensure that an employee that works
10  full-time let's say at Landmark doesn't get
11  paid out of say Carib Villas or Palm Gardens
12  or some other property?
13     A.   Well, my understanding of the
14  system, I'm not involved in the HR and the
15  new hire process.  As controller, I have an
16  interest in the dollars going out of the
17  door, but the regionals, the regions submit
18  new hire paperwork or whatever, and people
19  get put onto the appropriate payroll, and
20  then the sites submit the hours.  The site --
21  I think the property managers, I don't think
22  they use -- I think the property managers at
23  the sites enter the hours for their
24  employees.
25     Q.   The on-site property manager does?

1          J. Crook
2     A.   The on-site people, yes.
3     Q.   And so is there any way --
4     A.   And then it gets approved by the
5  supervisor.
6     Q.   And then that has to be approved
7  here in New York; isn't that right?
8     A.   And then it gets processed here in
9  New York.  The supervisors are the ones
10  actually approving the hours.
11     Q.   And so on the last two pages of
12  this exhibit, can you tell me what this is?
13  Do you notice the web link at the bottom of
14  the page?  That comes out of the GFI system,
15  does it not?
16     A.   Well, it's a web-based program, so
17  the site managers go in on a biweekly basis.
18  I don't think they do it daily.  Some of our
19  sites actually have like time clocks that
20  people will clock into.  But in Florida I
21  don't think they're using that.  So the
22  manager is responsible for tracking hours and
23  entering them into the system.  And then, you
24  know, payroll comes out of that.
25     Q.   Are there any checks in place that

1          J. Crook
2  would prevent an on-site manager from pushing
3  in 40 hours of work for an employee who
4  worked on a completely different property
5  managed by GFI Management Services?
6     A.   Why would they do that?
7     Q.   So, in other words, as far as you
8  know, that would not be permitted; is that
9  correct?
10     A.   Well, if they enter into the hours,
11  you know, my assumption is that they work in
12  that property.
13     Q.   And sitting here, are you aware of
14  whether or not there are any employees that
15  have been paid for by Palm Gardens for work
16  performed on say Landmark?
17     A.   I'm not aware of any.
18     Q.   And if employees, again, if they
19  were higher up, then their pay would only
20  come from GFI Management Services, Inc., and
21  then it would be apportioned on a per unit
22  basis?
23     A.   Correct.
24     Q.   And where in the general ledger or
25  where would I see entries showing that

1          J. Crook
2  adjustment?  Where would I see that?
3     A.   It's in a separate GL account.
4     Q.   With respect to the monthly
5  operating statements that have been filed
6  during the bankruptcy, would I find those
7  entries in there?
8     A.   (Indicating).
9     Q.   I would?
10     A.   Yes.  Well, you'd see the category.
11  You would see the line item on the income
12  statement.  The bankruptcy monthly filings
13  don't have general ledgers submitted.
14     Q.   That's my point.  So we would just
15  see how much payroll was being charged to the
16  debtor.  We would not know from looking at
17  those operating reports the specific
18  employees that performed the services?
19     A.   No.
20     Q.   And we would not see whether
21  supervisory or regionals, whether their pay
22  would have been apportioned in some way to
23  the debtor?
24     A.   You would.
25     Q.   Not in those operating reports?

1        J. Crook
2       A.  You would, because the
3   apportionment of the supervisor goes into a
4   separate line item on the income statement.
5       Q.  And that's in the operating
6   reports?
7       A.  Yes.
8       Q.  You know what, I looked for that,
9   and I just didn't see it.  Not to say that
10  it's not there.
11      A.  I think it's 6610 or 20.
12      Q.  I need my other notebook.  Can you
13  please get for me a report breaking down the
14  audit trail, if you will, of all of the
15  payroll for Carib Villas and Cutlerwood since
16  the filing of the date of the petition until
17  the time -- I guess it was in March.
18      MR. NASH:  Just put that request to
19  me in writing so I can review it.
20      MR. ZEMEL:  I'll put that in
21  writing.
22      Q.  Is that something that can be done
23  fairly easily?
24      A.  You want the payroll records for
25  Carib Villas and Cutlerwood.

1        J. Crook
2       Q.  I want to be able to confirm, if
3   you will -- we'll just talk.  What I want to
4   be able to confirm is that for the money
5   that's been paid by Carib Villas for payroll,
6   I want to confirm that that money was paid
7   for employees who actually worked at Carib or
8   at Cutlerwood.  That's what I want to see.
9   And, similarly, I want to know that same
10  thing for Palm Gardens.  I don't think I'm
11  asking for a lot.  I don't think it's
12  complicated.  And I also need to see what's
13  not in the operating statements, which is
14  with respect to the higher level employees
15  whose payroll is apportioned in some fashion,
16  I need to see those entries so I can see how
17  that was apportioned.
18      MR. NASH:  Just put it in writing.
19  We'll get back to you.  I want to make a
20  copy of this.
21      MR. ZEMEL:  Yeah.  By the way,
22  here's an extra copy of the exhibits.
23      MR. NASH:  A full copy?
24      MR. ZEMEL:  Yeah.  These are
25  copies.  And the reporter has the full

1        J. Crook
2   set as well.  But these are full copies
3   of the Home Depot papers, the Amerihome
4   papers, Joseph Contracting papers, and I
5   don't have an extra set of -- wait a
6   minute.  I don't have an extra set of
7   the JVL papers.  Wait a minute.  Yes, I
8   do.  So here's an extra set for you in
9   any event, and as you can appreciate --
10  well, I guess we'll just sit and stare
11  at each other since Mr. Nash I guess
12  left.
13      MR. NASH:  Okay.  Are we ready?
14      Q.  Does GFI Management Services manage
15  a property in Carol City, Florida?
16      A.  Yes.
17      Q.  And does GFI Management Services
18  also manage a property called Crystal Lake or
19  in Crystal Lake?
20      A.  Yes.
21      Q.  What kind of property is Crystal
22  Lakes?  What's the property called?
23      A.  Crystal Lakes.
24      Q.  Oh, it is called Crystal Lake.  And
25  I'm really just wrapping up.  I really am.

1        J. Crook
2   The supervisory type employees that you say
3   are paid from out of GFI, do they enter or
4   does anyone enter on their behalf time into a
5   time clock or time computer system, or are
6   they just sort of salaried?
7       A.  They're salaried.
8       Q.  So there's really no way that a
9   supervisory level employee could be paid for
10  directly out of the debtor?
11      MR. NASH:  Objection.
12      Q.  Is that right?
13      A.  We had, as I said, we had one
14  supervisor in Florida, and she was paid out
15  of GFI Management.
16      Q.  Yeah, but GFI is not the debtor.
17  That's the point.  In other words, if I'm
18  looking at the check register, if you will,
19  since the bankruptcy, I would not expect to
20  see any payments made as payroll to any
21  supervisory type employee; is that correct?
22      A.  Would be to Management, to GFI
23  Management.  I'm not understanding what
24  you're --
25      Q.  No.  We're saying exactly the same

Page 149

J. Crook

1  J. Crook
2  thing.  In other words, because they're paid
3  out of GFI Management Services, Inc., I would
4  not see a check from the debtor to that
5  particular supervisory employee; isn't that
6  right?
7       A.   Right.
8       Q.   And is there any way that an
9  employee at let's say the Crystal Lake
10 property could have been on the Palm Gardens
11 payroll for two years and paid for entirely
12 out of Palm Gardens?  Is there any way that
13 could have happened?
14      A.   No, that doesn't sound right.  It
15 doesn't make any sense to me at all.
16      MR. ZEMEL:  Well, I'm adjourning,
17 as we discussed earlier, because we're
18 not done, but --
19      MR. NASH:  Well, why aren't we
20 done?  We went over with Dr. Cornfeld --
21 the whole supposition of this was that
22 we were going to deal with Dr. Cornfeld
23 directly with Judith.  She's done that.
24 And, you know, it's just, you know,
25 Dr. Cornfeld calls her.  He's called her

Page 150

J. Crook

1  J. Crook
2  in the last day or two.  She's answering
3  questions.  If you don't want
4  Dr. Cornfeld to call anymore, just tell
5  me, but we should be done.
6       MR. ZEMEL:  There's more documents,
7  Ms. Crook, which I know you're going to
8  gather for me, and I want to be able to
9  see those.  And there's at least four
10 I'll call them problems or issues which
11 you're going to research for me as well.
12      MR. NASH:  But we don't need a
13 deposition for that.  We can respond to
14 you in writing what our research
15 indicates.
16      MR. ZEMEL:  Please don't interrupt.
17 Please don't interrupt me.
18      I've also given you Exhibit
19 Number 8 so that you can research for
20 me, if you would, please, this Manuel
21 Neira and this Ramone Rivero Perez,
22 which, as I understand it, Mr. Neira has
23 been on the Palm Gardens payroll for
24 more than two years, but he works at
25 Crystal Lakes, and that Ramone Rivero

Page 151

J. Crook

1  J. Crook
2  Perez works at Carol City.
3       MR. NASH:  First of all, Palm
4  Gardens isn't even part of this 2004
5  examination.
6       MR. ZEMEL:  I understand that.
7       MR. NASH:  Good.
8       MR. ZEMEL:  My understanding is
9  that he works as an electrician at Carol
10 City and he does work at Palm Gardens,
11 but he's paid for by Carib Villas.
12 That's my understanding from my notes.
13 So this is what I'm asking you to do.
14 If you look at that schedule, you'll see
15 he's paid for out of A&M Florida
16 Properties II.
17      THE WITNESS:  Which is Palm
18 Gardens.
19      MR. ZEMEL:  Which is Palm Gardens.
20 But, anyway, just research that.
21      THE WITNESS:  You said he was paid
22 out of Carib Villas?
23      MR. ZEMEL:  I think that's my
24 understanding.  This shows --
25      THE WITNESS:  I looked at --

Page 152

J. Crook

1  J. Crook
2  Dr. Cornfeld asked me about those two
3  yesterday.
4       MR. ZEMEL:  Oh, he did.
5       MR. NASH:  See, this is not fair.
6  He's still asking the same questions.
7  It's really not fair, Franklin.
8       THE WITNESS:  And they are both on
9  the Palm Gardens payroll.
10      MR. ZEMEL:  Did he discuss with you
11 that those employees don't work at Palm
12 Gardens?  Did he mention that to you?
13      THE WITNESS:  Well, he said he
14 thought -- he was a bit confused, but
15 that this guy Manuel Neira, he called
16 him a property supervisor, and he's a
17 maintenance guy according to the payroll
18 records, so.
19      MR. ZEMEL:  But that's what I'm
20 saying.  Did he ask you to look into
21 this?
22      THE WITNESS:  Yes.  And all I --
23 you know, I looked at the payroll
24 records to see whose payroll they were
25 on.  And I confirmed that they were on

Page 153

1        J. Crook
2   -- they are on Palm Gardens' payroll.
3        MR. ZEMEL:  But didn't he tell you
4   the reason he was questioning it is
5   because it's his understanding that
6   those employees don't work for Palm
7   Gardens?  Isn't that why he was asking
8   you what these two entries were?
9        THE WITNESS:  Well, I didn't see
10  these entries.  We had a phone
11  conversation.  So he was saying he had
12  been told by somebody that they worked
13  at other properties as well as Palm
14  Gardens.  So that I can't offer -- I
15  told him I don't know.  I'm in New York.
16  We have a site who is entering hours for
17  people, so I would assume and I'm pretty
18  sure the payroll clerk would assume that
19  they work in that property, so.
20       (Continued on next page to include
21  jurat.)
22
23
24
25

Page 154

1        J. Crook
2        MR. ZEMEL:  Yeah.  I think that's a
3   fair assumption, but that's what we're
4   trying to confirm.  All right, then.  I
5   have nothing further for today.
6        MR. NASH:  Thank you.
7        (Time noted:  2:15 p.m.)
8
9
10
11       _____
12        JUDITH CROOK
13
14  Subscribed and sworn to before me
15  this ___ day of _____, 2010.
16
17  _____
18
19
20
21
22
23
24
25

Page 155

1
2            C E R T I F I C A T E
3   STATE OF NEW YORK        )
4                    : ss.
5   COUNTY OF WESTCHESTER    )
6
7        I, JOAN WARNOCK, a Notary Public
8   within and for the State of New York, do
9   hereby certify:
10       That JUDITH CROOK, the witness
11  whose deposition is hereinbefore set
12  forth, was duly sworn by me and that
13  such deposition is a true record of the
14  testimony given by the witness.
15       I further certify that I am not
16  related to any of the parties to this
17  action by blood or marriage, and that I
18  am in no way interested in the outcome
19  of this matter.
20       IN WITNESS WHEREOF, I have hereunto
21  set my hand this 11th day of July, 2010.
22
23
24       _____
24        JOAN WARNOCK
25

Page 156

1
2   ------------------ I N D E X ----------------
3   WITNESS      EXAMINATION BY       PAGE
4   J. Crook     Mr. Zemel       4
5
6   ----------- INFORMATION REQUESTS -----------
7   DIRECTIONS:
8   RULINGS: 17
9   TO BE FURNISHED:
10  REQUESTS:  58, 130, 145, 150
11  MOTIONS:
12
13  ------------------ EXHIBITS ----------------
14  EXHIBIT               FOR ID.
15  EXHIBIT 1             43
16  Letter dated June 25, 2010, to
17  Franklin Zemel from Kevin Nash with
18  schedules
19  EXHIBIT 2             83
20  Proof of Claim filed by Alan Gross
21  on February 18th, 2010, for two
22  million dollars
23  EXHIBIT 3             99
24  Proof of Claim filed on or about
25  June 29th of 2010

| | | Page 157 |
|---|---|---|
| 1 | | |
| 2 | EXHIBIT 4 | 123 |
| 3 | Three-page document first page | |
| 4 | entitled "JVL Supply | |
| 5 | EXHIBIT 4-A | 128 |
| 6 | Page from General Ledger | |
| 7 | EXHIBIT 4-B | 128 |
| 8 | Page from General Ledger | |
| 9 | EXHIBIT 5 | 128 |
| 10 | Five-page document, first page | |
| 11 | entitled "HD Supply Facilities | |
| 12 | Maintenance, Inc." | |
| 13 | EXHIBIT 6 | 130 |
| 14 | Document relating to Amerihome | |
| 15 | Remodeling, Inc. | |
| 16 | EXHIBIT 7 | 133 |
| 17 | Document relating to Joseph | |
| 18 | Contracting, Inc. | |
| 19 | EXHIBIT 8 | 139 |
| 20 | Four-Page document, Daily Category | |
| 21 | Report, GFI Management Services, | |
| 22 | Inc. | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 159

```
 1    DEPOSITION ERRATA SHEET
 2 Page No.____Line No.____Change to:_____
 3 _____
 4 Reason for change:_____
 5 Page No.____Line No.____Change to:_____
 6 _____
 7 Reason for change:_____
 8 Page No.____Line No.____Change to:_____
 9 _____
10 Reason for change:_____
11 Page No.____Line No.____Change to:_____
12 _____
13 Reason for change:_____
14 Page No.____Line No.____Change to:_____
15 _____
16 Reason for change:_____
17 Page No.____Line No.____Change to:_____
18 _____
19 Reason for change:_____
20 Page No.____Line No.____Change to:_____
21 _____
22 Reason for change:_____
23
24 SIGNATURE:_____DATE:_____
25      Judith Crook
```

Page 158

```
 1    DEPOSITION ERRATA SHEET
 2
 3 Our Assignment No.: 311707
 4 Case Caption: A&M Florida Properties
 5
 6    DECLARATION UNDER PENALTY OF PERJURY
 7
 8      I declare under penalty of perjury
 9 that I have read the entire transcript of my
10 Deposition taken in the captioned matter or
11 the same has been read to me, and the same is
12 true and accurate, save and except for
13 changes and/or corrections, if any, as
14 indicated by me on the DEPOSITION ERRATA
15 SHEET hereof, with the understanding that I
16 offer these changes as if still under oath.
17 _____
18        Judith Crook
19 Subscribed and sworn to on the ____ day of
20 _____, 20 ____ before me.
21 _____
22 Notary Public,
23 in and for the State of
24 _____.
25
```

Page 160

```
 1    DEPOSITION ERRATA SHEET
 2 Page No.____Line No.____Change to:_____
 3 _____
 4 Reason for change:_____
 5 Page No.____Line No.____Change to:_____
 6 _____
 7 Reason for change:_____
 8 Page No.____Line No.____Change to:_____
 9 _____
10 Reason for change:_____
11 Page No.____Line No.____Change to:_____
12 _____
13 Reason for change:_____
14 Page No.____Line No.____Change to:_____
15 _____
16 Reason for change:_____
17 Page No.____Line No.____Change to:_____
18 _____
19 Reason for change:_____
20 Page No.____Line No.____Change to:_____
21 _____
22 Reason for change:_____
23
24 SIGNATURE:_____DATE:_____
25      Judith Crook
```

### Page 1

```
 1      IN THE CIRCUIT COURT OF THE ELEVENTH
        JUDICIAL CIRCUIT,    IN AND FOR
 2      MIAMI-DADE COUNTY,        FLORIDA
        CASE NO. 08-15709-CA-08
 3
        GFI ACQUISITION, LLC., a Delaware limited liability
 4 company, A & M FLORIDA PROPERTIES, LLC, a Florida
   limited liability company, A & M FLORIDA PROPERTIES
 5 II, LLC, a Florida limited liability company, A & M
   FLORIDA PROPERTIES III, LLC, a Florida limited
 6 liability comapny,
 7      Plaintiffs,
 8   v.
 9 AMERICAN FEDERATED TITLE CORPORATION, a Florida
   corporation, as Trustee under Land Trust #9651,
10 AMERICAN FEDERATED TITLE CORPORATION, a Florida
   corporation, as Trustee under Land Trust #61530,
11 AMERICAN FEDERATED TITLE CORPORATION, a Florida
   corporation, as Trustee under Land Trust #0751,
12 AMERICAN FEDERATED TITLE CORPORATION, a Florida
   corporation, as Trustee under Land Trust #EO-479,
13 AMERICAN FEDERATED TITLE CORPORATION, a Florida
   corporation, as Trustee under Land Trust #9548-sha,
14 AMERICAN FEDERATED TITLE CORPORATION, a Florida
   corporation, as Trustee under Land Trust
15 #1045-sil,
16      Defendants.
   - - - - - - - - - - - - - - - - - - -x
17
        1221 Brickell Avenue
18      Miami, Florida
        September 11, 2008
19      10:30 a.m. - 5:10 p.m.
20 DEPOSITION OF ALLEN GROSS
21
22      Taken before DINA AMATO, Certified Shorthand
23 Reporter, and Notary Public for the State of Florida
24 at Large, pursuant to Notice of Taking Deposition
25 filed in the above cause.
```

### Page 2

```
                 APPEARANCES

        ALAINE S. GREENBERG, ESQ., of the firm of
 3 GREENBERG TRAURIG, on behalf of the Plaintiffs.
 4      FRANKLIN L. ZEMEL, ESQ., of the firm of ARNSTEIN
   & LEHR, on behalf of the Defendants.
 5
 6 ALSO PRESENT: ROBERT CORNFELD
```

```
               I N D E X

   Witness        Dir.  Cr.  Red.  Rec.
   ALLEN GROSS       3

               E X H I B I T S

   Defendants'            For Ident.
   1-3                       3
   4                        15
   5                       129
   6                       140
   7                       164
```

### Page 3

```
 1      (EXHIBITS 1-3 MARKED FOR IDENTIFICATION)
 2 Thereupon--
 3          ALLEN GROSS
 4 was called as a witness by the Defendant and, having
 5 been first duly affirmed, testified as follows:
 6          DIRECT EXAMINATION
 7 BY MR. ZEMEL:
 8   Q.  Good morning.
 9   A.  Good morning.
10   Q.  Would you be good enough to give us your
11 name and home address for the record please?
12   A.  Allen Gross, 1345 East 27th Street,
13 Brooklyn, New York.
14   Q.  Would you spell your first name for us?
15   A.  A-L-L-E-N.
16   Q.  Can you tell us how are you currently
17 employed?
18   A.  How is a good question. I am the president
19 of GFI Capital Resources Group.
20   Q.  What does GFI stand for?
21   A.  Go for it --  it doesn't stand for
22 anything.
23   Q.  Go for it?
24   A.  Yeah. Whatever you want it to stand for.
25   Q.  Well, I could assume that G stands for
```

### Page 4

```
 1 Gross and F and I stand for the names of other
 2 current or former investors in the company?
 3   A.  No, it doesn't. G does not stand for Gross.
 4   Q.  What does GFI Capital Resources do?
 5   A.  Multifaceted company involved in real
 6 estate and financial services, investments.
 7   Q.  What do you do as president of GFI Capital
 8 Resources?
 9   A.  Manage the different facets of our company.
10   Q.  Management includes what?
11   A.  Development, real estate management,
12 mortgage banking, brokerage, insurance, sales,
13 financing.
14   Q.  Do you believe that you're highly skilled
15 in each of those areas?
16   A.  No.
17   Q.  Do you believe you're highly skilled in any
18 area?
19      MS. GREENBERG: Object to the form.
20   A.  That's not for me to say.
21   Q.  I'm asking for you to toot your horn.
22   A.  I don't toot.
23   Q.  Tell me what you believe you're highly
24 skilled in?
25      MS. GREENBERG: Object to form.
```

Gross, Allen (2008-09-11)                                   Pages 1 - 4

**EXHIBIT**
"2"

1    A.  I believe I'm highly skilled in being a
2 good person.
3    Q.  Okay. How long has GFI Capital Resources
4 been in business?
5    A.  Over 25 years.
6    Q.  Is GFI Capital Resources, is that an LLC or
7 a corporation?
8    A.  It's an LLC, maybe.
9    Q.  You said maybe?
10    A.  Maybe, maybe sub chapter S.
11    Q.  You're not sure?
12    A.  I don't know.  I'd have to check with my
13 financial people.
14    Q.  Who would you ask?
15    A.  Paul Glick.
16    Q.  What does Paul Glick do?
17    A.  He's the CFO.
18    Q.  How many employees does GFI Capital
19 Resources have?
20    A.  About a thousand.
21    Q.  Who are the owners of the entity, GFI
22 Capital Resources?
23        MS. GREENBERG: Object to form.
24    A.  I am.
25    Q.  You own 100 percent of it?

1    A.  Yes.
2    Q.  Have you always owned 100 percent?
3    A.  Yes.
4    Q.  Does GFI Capital Resources have any
5 affiliates?
6    A.  Yes.
7    Q.  How many?
8    A.  Hundreds.
9    Q.  Is that because typically you prefer to put
10 each property into a single entity?
11        MS. GREENBERG: Object to form.
12    A.  That's one of them.
13    Q.  And is A & M Florida Properties, LLC an
14 affiliate of GFI Capital Resources?
15        MS. GREENBERG: Object to form.
16    A.  Yes.
17    Q.  Is A & M Florida Properties II, LLC an
18 affiliate of GFI Capital Resources?
19    A.  Yes.
20    Q.  And is A & M Florida Properties III, LLC an
21 affiliate of GFI Capital Resources?
22    A.  Yes.
23    Q.  Can you tell me please give me the benefit
24 of your education?
25    A.  Graduated high school.

1    Q.  Any formal education beyond high school?
2    A.  Went to college.
3    Q.  Okay. Where did you go to high school?
4    A.  Yeshiva Chsan Sofer.
5    Q.  Where was that located?
6    A.  In the lower east side of New York.
7    Q.  Okay. Where did you go to college?
8    A.  Brooklyn College.
9    Q.  Did you degree at Brooklyn College?
10    A.  Yes.
11    Q.  In?
12    A.  Accounting.
13    Q.  Do you have formal education beyond
14 Brooklyn College?
15    A.  Yes.
16    Q.  Where did you go?
17    A.  New York Law.
18    Q.  What year did you graduate?
19    A.  Who remembers?
20    Q.  Well, let's start did they have electricity
21 back then?
22    A.  Yes, they had electricity and they also had
23 cars.
24    Q.  They did?
25    A.  Yes.

1    Q.  Good, I'm glad to hear that. Would you have
2 graduated in the 70s?
3    A.  Yes. Early 70s.
4    Q.  Did you achieve any honors at either
5 Brooklyn College or New York Law School?
6    A.  No.
7    Q.  Did you have any formal education beyond
8 New York Law School?
9    A.  No.
10    Q.  Are you currently a member of any Bar?
11    A.  Yes.
12    Q.  Which Bar?
13    A.  New York.
14    Q.  Are you currently a member in good standing
15 with the New York Bar?
16    A.  Yes. However, I do not practice.
17    Q.  Are you listed as inactive in the New York
18 Bar?
19    A.  I wouldn't know.
20    Q.  Do you pay your dues every year?
21    A.  One of my guys in the office takes care of
22 that, so I wouldn't know if I'm active, inactive.  I
23 know I don't get a card.
24    Q.  You don't get a Bar card?
25    A.  Right.  I would assume I'm inactive.

1  Q.  Did you ever practice law?
2  A.  A little bit.
3  Q.  Okay.  What other licenses, if any, do you
4  currently hold?
5  A.  Well, in New York, once you have a -- once
6  you are an attorney, you automatically have a real
7  estate license and I have a driver's license.
8  Q.  You have a -- you're a New York real estate
9  licensee?
10  A.  Yes.
11  Q.  My recollection was that in New York, if
12  you obtain status with the Bar, you are automatically
13  eligible as a real estate licensee, you didn't
14  automatically become a licensee?
15  A.  Like I said, it was 25 years ago.
16  Q.  So your New York licensed real estate
17  licensee, correct?
18  A.  Yes.
19  Q.  Who is the principal broker?  With whom do
20  you hang your license with?
21  A.  GFI.
22  Q.  Are you the principal broker at GFI?
23  A.  Yes.
24  Q.  When you refer to GFI, you are referring to
25  --

1  A.  GFI Realty Services, Inc.
2  Q.  Prior to the filing of this lawsuit that
3  we're here about today, have you ever been a party to
4  a lawsuit before you individually?
5  A.  Sure.
6  Q.  How many times?
7  A.  Thousands.
8  Q.  You individually have been a party
9  thousands of times?
10  A.  Sure.
11  Q.  Those are typically what, landlord tenant
12  evictions?
13  A.  Landlord tenant, slip and falls, you name
14  it.
15  Q.  Have you ever been, you yourself been a
16  party to a lawsuit where allegations of fraud have
17  been alleged against you?
18  A.  Yes.
19  Q.  How many times?
20  A.  A couple.
21  Q.  Okay.  Tell me about those couple, please?
22  A.  We won.
23  Q.  That's nice.  Where were they filed?
24  A.  Some were filed in New York.
25  Q.  Okay.  Tell me about the case, what was the

1  name of the case that was filed in New York?
2  A.  I don't recall the exact caption, but it
3  was a case about 15 years ago, 20 years ago.
4  Q.  And what were the allegations against you
5  individually?
6  A.  Allegations of one was a RICO action which
7  was dismissed and that's the one I recall most.
8  Q.  Who sued you?
9  A.  We were sued by Westside Federal -- oh,
10  I'm sorry, First Nationwide.
11  Q.  Did you give a deposition in that case?
12  A.  I don't recall.
13  Q.  What were the names of the lawyers or law
14  firm that defended you in that proceeding?
15  MS. GREENBERG:  This is totally irrelevant.
16  I gave you some latitude.  It's 15 to 20 years
17  ago.  He won.
18  I don't know -- tell me how this could lead
19  to discoverable evidence.
20  A.  I don't remember.
21  MR. ZEMEL:  Thank you, but you don't grant
22  me latitude.  Thank you.
23  MS. GREENBERG:  I'm asking you now, as you
24  gave me the whole speech this morning before we
25  went into the deposition, how is this going to

1  lead to discoverable evidence?  It's 15 to 20
2  years ago and it ended up in a --
3  MR. ZEMEL:  You are assuming he's telling
4  the truth.  I don't.
5  MS. GREENBERG:  Even if he weren't, which
6  I'm not suggesting he's not, it's irrelevant.
7  It's 15 to 20 years ago.
8  MR. ZEMEL:  You may think it's irrelevant.
9  I don't.
10  Q.  What was the name of the law firm that
11  represented you in that RICO case?
12  A.  I have to remember.  There's an individual
13  by the name of Michael Broffman but he changed firms,
14  so I don't know if it was under his old firm and I
15  don't remember the firm that he changed to.  But the
16  name was -- there was a guy Allen Liebman.  I really
17  don't recall because we used at that time two, three
18  lawyers.
19  Q.  Is that in Federal or State courts in New
20  York?
21  A.  It was in Federal Court.
22  Q.  Is that the most recent case that you
23  yourself were named as a party in which allegations
24  of fraud were directed at you?
25  A.  Again, I don't read every lawsuit.  I have

Page 13

1 general counsel that does that. So that was the one
2 that stands out the most in my mind.
3    Q.  So, as you are sitting here today, you are
4 saying that you just don't recall whether there was
5 any other lawsuit more recent than the First
6 Nationwide RICO case in which allegations were
7 directed at you individually for fraud, is that
8 correct?
9    A.  That's correct.
10    Q.  Okay. And the person with the most
11 knowledge who would be able to answer that question
12 would be your general counsel?
13    A.  Yes.
14    Q.  Okay. What is the name of your general
15 counsel?
16    A.  Alan Schacter.
17    Q.  Spell that for us, please?
18    A.  Alan, A-L-A-N, S-C-H-A-C-T-E-R.
19    Q.  Was Alan Schacter authorized by you to sign
20 any documents relating to the Purchase and Sale
21 Agreement which is the subject of this lawsuit?
22    A.  Yes.
23        MS. GREENBERG: Well, I'd like you to pause.
24 I'm going to object to the form of that, but go
25 ahead.

Page 14

1    Q.  How many times have you been deposed
2 before?
3    A.  Two, three.
4    Q.  Have you been deposed in the last five
5 years?
6    A.  Yes.
7    Q.  How many times?
8    A.  Once.
9    Q.  In what case?
10    A.  An employee that was terminated.
11    Q.  What were the allegations?
12    A.  Wrongful termination.
13    Q.  Based on what?
14    A.  Based on just he felt he was wrongfully
15 terminated.
16    Q.  Okay. That's a sort of an unknown concept
17 in Florida. It's different in New York or as you
18 like to say, New York.
19        But my question is were there allegations
20 of fraud, were there allegations of whistle blowing
21 or criminal activity?
22    A.  No, he just felt that slugging another
23 employee wasn't grounds enough for him to get
24 terminated.
25    Q.  New York.

Page 15

1    A.  He felt he was provoked and, therefore, he
2 had a right as his superior to slug the guy.
3    Q.  Obviously a Mets fan.
4    A.  Actually not.
5    Q.  Let me ask you to look at what we've
6 already marked as Exhibit-1 to your deposition which
7 is the Purchase and Sale Agreement.
8        Could you take look at that for me and tell
9 me if you can identify that exhibit?
10    A.  Yes.
11    Q.  I notice you didn't even open up past the
12 first page.
13        Would you like to check and see if that's
14 your signature on it and that's a full and complete
15 document?
16        MS. GREENBERG: Object to form.
17    Q.  Is that your signature that appears --
18    A.  I can't see, it's very light but yeap, it
19 looks like it.
20    Q.  Let me show you what I've marked as
21 Exhibit-4 to your deposition.
22        (EXHIBIT-4 MARKED FOR IDENTIFICATION)
23    Q.  This is the Amended Fifth Re-Notice Of
24 Taking Deposition Duces Tecum with respect to the
25 Rule 1.310(b)(6) representative from GFI Acquisition.

Page 16

1        Have you seen this or a similar notice of
2 deposition duces tecum relating to this case?
3    A.  No.
4    Q.  Were you ever asked by anyone to review
5 Schedule A to determine whether or not you had any
6 documents, you or anyone on your behalf had any
7 documents responsive to the schedule?
8    A.  My general counsel deals with all these
9 issues.
10    Q.  Are you here as the Rule 1.310(b)(6)
11 representative for GFI Acquisition, LLC?
12    A.  I don't know what Rule 1.310 says.
13        MR. ZEMEL: Miss Greenberg?
14        MS. GREENBERG: He is the person who is
15 being represented as the person with the most
16 knowledge although others do have knowledge.
17        MR. ZEMEL: Well, it's not a good question
18 of who has the most knowledge.
19        The question is you or someone on your
20 behalf designated him as the 1.310(b)(6)
21 representative. That's correct?
22        MS. GREENBERG: Yes.
23    Q.  Tell us as the 1.310(b)(6) representative
24 all the things that you've done to prepare yourself
25 for this deposition?

1    A.  Got up at four in the morning, bought a
2  ticket, flew down and was happy to see Dr. Cornfeld.
3    Q.  Is that the limit of the preparation that
4  you've made for this deposition?
5    A.  Just about.
6      MR. ZEMEL: Well, let's just note on the
7    record that it's a bad faith designation of
8    1.310(b)(6) but we'll proceed subject to my
9    objection.
10      MS. GREENBERG: It's not a bad faith.  I
11    completely disagree it's a bad faith.  It's the
12    person with the most knowledge of the underlying
13    facts which are the subject of this litigation.
14      MR. ZEMEL: I'll debate it with you later
15    but a 1.310(b)(6) representative has affirmative
16    obligations to be prepared for the deposition
17    and not just show up unprepared.
18      MS. GREENBERG: Nobody has suggested that he
19    showed up unprepared.
20      MR. ZEMEL: It's no different than a 30B6.
21    Let's move on.
22    Q.  Mr. Gross, let me ask you to look at
23  Schedule A.
24      Does GFI Acquisition have any documents
25  responsive to number one on the schedule?

1    A.  Where do you want me to look, sir?
2    Q.  If you listen to my questions, I said
3  please look at Schedule A to the exhibit.
4    A.  Schedule A to which exhibit?
5    Q.  To Exhibit-4, the notice of taking
6  deposition.
7    A.  You didn't say that, sir.
8    Q.  Sir?
9    A.  You didn't say that.
10    Q.  Sir, Schedule A to the notice of taking
11  deposition?
12    A.  Okay.
13    Q.  Does GFI Acquisition have any documents
14  responsive to item one on Schedule A?
15    A.  All our documents were turned over to our
16  attorneys as per their instructions.
17    Q.  Does that mean that you had turned over to
18  your attorneys all e-mails between you, GFI
19  Acquisition, and the Cornfeld entities?
20    A.  To the best of my knowledge.
21    Q.  Tell me what you did to determine that all
22  documents responsive were turned over to your
23  attorneys?
24      MS. GREENBERG: I'm going to object.  He
25    already told you his counsel took care of it.

1    Q.  Tell me what you did, sir?
2    A.  I turned to my counsel and told them take
3  care of this.
4    Q.  Okay. Do you know what efforts your general
5  counsel -- I'm sorry.  You are referring to
6  Mr. Schacter?
7    A.  Sure.
8    Q.  Can you tell me what efforts Mr. Schacter
9  undertook to determine that all e-mails and memos and
10  agreements from GFI to Robert Cornfeld and AFTC and
11  the Cornfeld Group were produced to your attorneys?
12      MS. GREENBERG: Hold on.
13    A.  I don't know.
14    Q.  Would your answer be the same to all eight
15  categories, that you just don't know what efforts
16  were taken to ensure that all documents responsive to
17  these requests were provided to your counsel?
18    A.  I assume my general counsel as legal
19  representative of our company would do everything
20  necessary to abide and to do everything that our
21  attorneys requested.
22    Q.  That wasn't my question. My question was
23  would your answer be the same, that you do not know
24  what efforts your general counsel undertook to ensure
25  that all documents responsive to this Schedule A were

1  produced by GFI Acquisition and delivered to your
2  attorneys?
3    A.  You would have to ask me every single one.
4  I didn't read all the numbers so I can't give you an
5  answer.
6    Q.  Okay. As you request, we'll go through them
7  all.
8      Let me ask you to take a look at category
9  number two, please. Can you tell us please what
10  efforts did you make to determine that all documents
11  responsive to item number two were produced to your
12  attorneys, Greenberg Traurig?
13    A.  I spoke to my general counsel and advised
14  them that we should comply with all the items
15  requested in the subpoena or deposition requests,
16  whatever you need.
17    Q.  So you specifically told Mr. Schacter to
18  produce every document responsive to this schedule,
19  is that correct?
20    A.  Yes.
21    Q.  When did you tell him that?
22    A.  When we were advised that's what we have to
23  do.
24    Q.  When were you advised you needed to do
25  that?

Page 21

1     A.  I don't recall the exact date.
2     Q.  Was it in the last week or two?
3     A.  I don't know -- not in the last week or
4  two.
5     Q.  Do you have any specific recollection of
6  ever being asked to arrange to have these documents
7  produced?
8     A.  Our attorneys know who the different people
9  in our office that deal with different items and they
10  contact them directly.
11     Q.  That wasn't my question.
12     A.  You asked me a question.
13     Q.  I'll have it read back if you'd like?
14     A.  Please read it back again.
15     (REPORTER READS BACK PREVIOUS QUESTION)
16     Q.  Would you like to answer my question now?
17     A.  Sure.
18     Q.  Good.  Do you have a specific recollection
19  of being asked to produce all documents responsive to
20  this Schedule A?
21     A.  I don't recall.
22     Q.  You don't recall if you have a recollection
23  of ever being asked?
24     A.  I don't recall.
25     Q.  So, can you tell me then if you don't

Page 22

1  recall ever being asked to produce these documents,
2  just tell me how you recall ever telling Alan
3  Schacter to please provide them?
4     A.  Alan Schacter is our general counsel and
5  Alan Schacter on a once a week basis meets me and
6  keeps me up to date of what's going on with different
7  issues with the company.
8        So I assume he would have advised me as to
9  the status of the lawsuit.
10     Q.  So, you assume that he mentioned to you
11  that there was a document request that needed to be
12  responded to?
13     MS. GREENBERG: Now we're going into
14  attorney/client privilege.  So you know, you
15  asked him who advised him.  We're not going to
16  get into the conversations he had with his
17  counsel.
18     MR. ZEMEL: Are you now instructing him not
19  to answer that question?
20     MS. GREENBERG: If it's attorney/client
21  privilege, yes, I am.
22     MR. ZEMEL: I can't answer the if.  Are you
23  instructing him?
24     MS. GREENBERG: What was the question?
25     (REPORTER READS BACK PREVIOUS QUESTION)

Page 23

1     MS. GREENBERG: You're asking for
2  conversations with his counsel.
3     MR. ZEMEL: I'm not going to quibble with
4  you.  I'm just asking if you are instructing him
5  not to answer?
6     MS. GREENBERG: Yes, I'm instructing him not
7  to answer questions about what his general
8  counsel told him.
9     MR. ZEMEL: Okay.
10     Q.  So, is it a true statement that you
11  personally have no knowledge as to what efforts were
12  undertaken to produce the documents responsive to
13  this Schedule A?
14     A.  I don't have full knowledge.
15     Q.  Do you have any personal knowledge of what
16  was done to ensure that all documents responsive to
17  Schedule A were produced to your attorneys Greenberg
18  Traurig?
19     A.  No.
20     Q.  And as -- what is your position with GFI
21  Acquisition, LLC?
22     A.  I'm the principal.
23     Q.  What does principal mean?
24     A.  I'm a principal.
25     Q.  You're a principal.  What does that mean?

Page 24

1  Who are the owners of GFI Acquisition, LLC?
2     A.  I am.
3     Q.  Anyone else other than you?
4     A.  No. I'm so sorry, I should really -- my
5  wife.
6     Q.  Your wife's name is?
7     A.  Edith Gross.
8     Q.  Is she an officer or director or have any
9  management responsibility of GFI Acquisition, LLC?
10     A.  Chief cook and bottle washer.
11     Q.  What does that mean in terms of her
12  day-to-day activities?
13     A.  Everything and anything I don't want to do
14  or anybody else doesn't want to do.
15     Q.  Does she have authority to sign documents
16  related to -- strike that.
17        Does she have authority to sign documents
18  on behalf of GFI Acquisition, LLC with respect to the
19  Purchase and Sale Agreement at issue in this case?
20     A.  Yes, she does.
21     Q.  And did your wife have authority to sign
22  documents on behalf of A & M Florida Properties, LLC?
23     A.  Yes, she does.
24     Q.  Does your wife have authority to sign
25  documents on behalf of A & M Florida Properties II,

1  LLC?
2    A.  Yes, she does.
3    Q.  Does your wife have authority to sign
4  documents on behalf of A & M Florida Properties III,
5  LLC?
6    A.  You're asking the wrong question.  You
7  should ask me does she give me authority to sign
8  documents. That's the question.
9    Q.  Okay. Does your wife give you authority to
10  sign documents on behalf of any of those entities?
11   A.  Only if I'm nice to her.
12   Q.  Are you aware of any documents responsive
13  to --
14   A.  I made him smile.  You notice that?
15  Finally.
16   Q.  Are you a --
17   A.  You're not going to take this so seriously.
18   Q.  Who?
19   A.  You.  I want to see if I could make you
20  smile a little bit.
21   Q.  Are you aware of whether any documents
22  responsive to Schedule A on this Exhibit-4 are
23  missing or have otherwise been discarded?
24       MS. GREENBERG: Object to form.
25   A.  Not to my knowledge.

1    Q.  Okay. Are you aware or have you heard that
2  any documents responsive to Schedule A have been
3  destroyed or lost?
4        MS. GREENBERG: Object to form.
5    A.  Not to my knowledge.
6    Q.  Can you tell me who is responsible for
7  calendaring your appointments?
8    A.  That is a big problem.  I've been through
9  15 secretaries in the last two years, so that's a big
10  major issue.
11   Q.  I'll introduce you to one of my partners.
12  Do you have at least a procedure in your business for
13  calendaring of your appointments?
14   A.  There is a procedure my assistant is
15  supposed to do.
16   Q.  Tell me what is the procedure?
17   A.  Regarding what appointment?
18   Q.  Tell me. Do you have a -- do you have any
19  sort of procedure in place to ensure that you know
20  where to be and when to be there?
21   A.  It's called a Blackberry.
22   Q.  How do your appointments get on your
23  Blackberry?
24   A.  My assistant is supposed to synch my
25  Blackberry with her computer.

1    Q.  And how does your secretary or assistant
2  know to even put an appointment on the calendar
3  before synching it with your Blackberry?
4    A.  She gets called from different department
5  heads with different appointments and she checks with
6  me.
7    Q.  And what calendaring program or system is
8  used in GFI Capital Resources?
9    A.  Now you are going to an area that's not my
10  expertise when you are talking what program, wrong
11  language.
12   Q.  Is --
13   A.  Me and Dr. Cornfeld share that.
14   Q.  Does GFI -- strike that.  Does GFI
15  Acquisition, LLC, is that based out of the same
16  physical address as GFI Capital Resources?
17   A.  Yes.
18   Q.  All of these businesses and affiliates,
19  they are all based out of one location in New York?
20   A.  That's our corporate headquarters.
21   Q.  I'm sorry.  You say New York.  I'm trying
22  to --
23   A.  New York.
24   Q.  I'm trying to make you feel at home.
25   A.  Guess what?  Today is a very memorial day

1  for us. I was down there.  My office is a block away
2  from the World Trade Center.
3    Q.  Still there?
4    A.  My office is still there. And I was there.
5  I saw it. I lived it.
6    Q.  Hear the unions outside still picketing?
7    A.  I don't know what they are picketing.
8    Q.  I figure you are from New York, you're used
9  to hearing that.
10   A.  No, we don't hear too much of that.
11       (OFF THE RECORD DISCUSSION)
12   Q.  Are the computers at the headquarters of
13  GFI networked?
14   A.  I assume.
15   Q.  Who is your IT person, if you know?
16   A.  The head of IT is Debbie Garfinkel.
17   Q.  Did you yourself calendar any deadlines or
18  dates with respect to the Purchase and Sale Agreement
19  at issue in this case?
20   A.  No.
21   Q.  Is there anyone in your entire organization
22  who has had the responsibility for calendaring dates
23  and deadlines relating to the Purchase and Sale
24  Agreement?
25   A.  No.

1    Q.   Is there anybody on the planet that would
2 have had responsibility for calendaring dates or
3 deadlines relating to the Purchase and Sale
4 Agreement?
5    A.   Yes.
6    Q.   Who is that?
7    A.   Moshe Lehrfield.
8    Q.   Do you know if Moshe Lehrfield calendared
9 any dates or deadlines relating to the Purchase and
10 Sale Agreement?
11    A.   I don't know.
12    Q.   Do you know if he ever calendared the
13 outside closing date as defined in the Purchase and
14 Sale Agreement?
15    A.   I don't know.
16    Q.   Have you read all or any portion of the
17 deposition of Moshe Lehrfield?
18    A.   No, I did not.
19    Q.   Did you know his deposition had been taken?
20    A.   Yes.
21    Q.   Did you know a transcript had been
22 prepared?
23    A.   No.
24    Q.   Let me ask you to take a look at what's
25 been marked as Exhibit-2.  This hefty exhibit is the

1 complaint which you caused to be filed in this case.
2    A.   No, sir, you caused it to be filed.
3    Q.   Sir, did you authorize the filing of this
4 lawsuit?
5    A.   Yes, I did.
6    Q.   Did your wife authorize you to file this
7 lawsuit?
8    A.   No, she did not. She liked Dr. Cornfeld.
9    Q.   Did you see the complaint before it was
10 filed?
11    A.   No, sir.
12    Q.   Did you participate in any way in the
13 drafting of the complaint?
14    A.   No, sir.
15    Q.   Did you make any edits or revisions in any
16 way to the complaint before it was filed?
17       MS. GREENBERG: Okay.  I'm going to object.
18    It's work product privilege. I'm instructing him
19    not to answer.
20    Q.   Have you ever read the complaint?
21    A.   Yes.
22    Q.   How long ago prior to this deposition have
23 you read the complaint?
24    A.   I read it when it was filed.
25    Q.   And at the time that you read the

1 complaint, did you find anything in the complaint
2 that you believe was either inaccurate or incorrect?
3    A.   I don't recall.
4    Q.   If you would have read the complaint and
5 found any factual allegations which were incorrect,
6 would you have brought it to someone's attention?
7       MS. GREENBERG: Object to form.
8    A.   I assume I would have.
9    Q.   You understood of course that when you
10 authorized this lawsuit to be filed, that the court
11 would rely upon this document, isn't that right?
12       MS. GREENBERG: Object to form. The court
13    doesn't rely --  that's just a
14    mischaracterization.
15    Q.   Sir, when you authorized this complaint to
16 be filed, you understood that the court was going to
17 rely upon your complaint, isn't that right?
18       MS. GREENBERG: Same objection.
19    A.   I assume.
20    Q.   And would it be fair to say that you wanted
21 the complaint to be as accurate as possible?
22    A.   Yes.
23    Q.   Is it fair to assume that at the time you
24 read the complaint, if you saw there was anything in
25 the complaint that wasn't accurate, you would have

1 said something to someone, isn't that right?
2       MS. GREENBERG: Object, asked and answered.
3    Q.   Would you like me to have that read back
4 for you, sir?
5    A.   Didn't she just say asked and answered?
6    Q.   Sir, would you answer my question, please?
7       MS. GREENBERG: You can answer the question.
8    A.   Yes.
9    Q.   As far as you know, are all of the factual
10 statements in the complaint true and accurate?
11    A.   As far as I know.
12    Q.   As you sit here now, do you have any reason
13 to believe any of the factual allegations in the
14 complaint are incorrect?
15    A.   To the best of my knowledge.
16    Q.   To the best of your knowledge what?
17    A.   They are correct.
18    Q.   Okay. Let me ask you to go back to the
19 Purchase and Sale Agreement, please, Exhibit-1.
20       Did you read that document before you
21 signed it?
22    A.   No.
23    Q.   Is that your typical procedure to sign
24 documents you haven't read?
25    A.   Yes.

Page 33

```
 1      Q.  And do you typically have these types of
 2  contracts reviewed prior to your signature?
 3      A.  Yes.
 4      Q.  Who would typically do that for you?
 5      A.  Moshe Lehrfield, my general counsel and the
 6  asset manager.
 7      Q.  Who is that?
 8      A.  At that point, it was Michael Weiser.
 9      Q.  Is he no longer with the company?
10      A.  Excuse me?
11      Q.  Is he still with GFI Capital Resources?
12      A.  Yes, he is.
13      Q.  He's no longer the asset manager?
14      A.  No.
15      Q.  What does -- what is his title now?
16      A.  He is still with the company, but he's not
17  doing the day-to-day asset management of the asset.
18      Q.  I just asked what his title was?
19      A.  He heads up dispositions and acquisitions.
20      Q.  What are his duties as heading dispositions
21  and acquisitions?
22      A.  Go sees the deals we acquire, works with
23  the acquisition people making sure of the numbers,
24  dealing with the banks, dealing with the attorneys,
25  everything that's required in an acquisition or a
```

Page 34

```
 1  disposition.
 2      Q.  And how is his position today different
 3  than what it was in July of 2007 when the Purchase
 4  and Sale Agreement was signed?
 5      A.  He was much more involved because of the
 6  situation because of my relationship with
 7  Dr. Cornfeld.
 8      Q.  Explain that, please?
 9      A.  It was -- he was much more involved dealing
10  with Dr. Cornfeld.
11      Q.  Is his position today as head of
12  dispositions and acquisitions the same position he
13  had in July of '07 when the Purchase and Sale
14  Agreement was signed by you?
15      A.  No. He doesn't get personally involved in
16  every detail of the acquisition today as he did with
17  his acquisition.
18      Q.  Okay. Was there something unique about this
19  particular acquisition as set forth in the Purchase
20  and Sale Agreement?
21      A.  Yes.
22      Q.  What was that?
23      A.  Dr. Cornfeld.
24      Q.  Explain that, please?  What makes
25  Dr. Cornfeld so unique?
```

Page 35

```
 1      A.  Dr. Cornfeld is unique.
 2      Q.  Okay. In what way?
 3      A.  In every way.
 4      Q.  Why did Michael Weiser have to spend or
 5  apply himself to additional detail on the particular
 6  acquisition set forth in the Purchase and Sale
 7  Agreement as opposed to any other transaction?
 8      A.  Because most of us were emotionally
 9  involved with Dr. Cornfeld.
10      Q.  Explain to me what that means, emotionally
11  involved?
12      A.  When somebody is emotionally involved with
13  another person, it is very difficult for them to
14  ascertain and make the right business decisions and I
15  and some of the others were emotionally involved.
16      Q.  I'm just asking you to define what that
17  means when you say emotionally involved?
18      A.  When you are emotionally involved, you
19  don't see the forest from the trees.
20      Q.  But I need you to explain to me what it
21  means to be emotionally involved?
22          MS. GREENBERG: Objection, asked and
23      answered.
24      A.  I explained it. I think you very well
25  understand what I'm saying.
```

Page 36

```
 1      Q.  No.
 2      A.  Why don't you ask Dr. Cornfeld to answer
 3  that?
 4      Q.  At some point, your attorney or attorneys
 5  will have that option.
 6          For now, you are using a phrase that you
 7  and others in your organization were emotionally
 8  involved and I don't know what that means. You loved
 9  each other, you hated each other, you despised each
10  other?
11          I don't know what that means.
12      A.  I think there was a great affinity and a
13  great amount of respect and a great friendship.
14      Q.  Between you and Dr. Cornfeld?
15      A.  That's correct.
16      Q.  And who else in your organization do you
17  believe shared this same emotional connection with
18  Dr. Cornfeld?
19      A.  David Arnow.
20      Q.  Anyone else?
21      A.  Steven Hurwitz.
22      Q.  Spell the last name?
23      A.  H-U-R-W-I-T-Z.
24      Q.  Anyone else?
25      A.  Brian Gross.
```

1    Q.   Spell Brian?
2    A.   B-R-I-A-N.
3    Q.   Related to you?
4    A.   Yes.
5    Q.   In what way?
6    A.   My son.
7    Q.   How old is he?
8         MS. GREENBERG: Don't get this wrong.
9         MR. ZEMEL: I didn't ask you -- I didn't ask
10   him his anniversary date.
11   A.   28.
12   Q.   What's your anniversary date?  You're under
13   oath?
14   A.   June 19th.
15   Q.   We'll find out if that's right.
16   A.   That is right. She doesn't let me forget.
17   And I had 33 times to practice it.
18   Q.   Who else other than Brian Gross, Steven
19   Hurwitz, David Arnow and yourself had this emotional
20   connection, if you will, with Dr. Cornfeld?
21   A.   It was everybody in my entire organization.
22   Q.   Is that unusual in your organization to
23   have some emotional connection with somebody you are
24   acquiring $40 million of property from?
25   A.   Is it unusual? No.  Dr. Cornfeld is a very

1    likeable, charismatic person and somebody that is
2    very easily looked up to.
3    Q.   So, was that unusual in your organization
4    to have an emotional affinity or connection with
5    someone you are acquiring property from?
6    A.   Very unusual.
7    Q.   Ordinarily before you sign a document to
8    acquire property, do you read it before you sign it?
9    A.   No.
10   Q.   So, it was really nothing unusual here
11   where you chose not to read the Purchase and Sale
12   Agreement before signing it, correct?
13   A.   No.
14   Q.   You would agree that if you had to sit and
15   read every single one of the documents relating to
16   acquisitions, you'd never get out of your office?
17   A.   That's true.
18   Q.   And so, because of that, you have a staff
19   of people that you rely upon and trust to review
20   these documents for you, is that correct?
21   A.   That's correct.
22   Q.   And the person who was most responsible in
23   your organization to review the documents with
24   respect to this Purchase and Sale Agreement was
25   Michael Weiser.

1         MS. GREENBERG: Object to form.
2    A.   No. My lawyer, Moshe Lehrfield.
3    Q.   My question was in your organization.
4         MR. ZEMEL: Read back the question.
5    (REPORTER READS BACK PREVIOUS QUESTION)
6    Q.   Is that correct?
7    A.   Yes. Well, no. My general counsel.
8    Q.   Alan Schacter?
9    A.   Yes.
10   Q.   Does Alan Schacter provide legal advice to
11   GFI Acquisition, LLC?
12   A.   Yes.
13   Q.   Does he also provide business advice to GFI
14   Acquisition, LLC?
15   A.   Doesn't every lawyer?
16   Q.   Sir, I'm just asking questions.  Does he
17   provide business advice as well as legal advice?
18   A.   I have never met a lawyer that doesn't.
19   Q.   That's yes?
20   A.   Yes.
21        MS. GREENBERG: I'll object to the form of
22   the question.
23   Q.   Does he also provide business advice as
24   well as legal advice to GFI Capital Resources?
25        MS. GREENBERG: Again, same objection.

1         MR. ZEMEL: You can make an objection.  You
2    don't need to say more than that.
3         MS. GREENBERG: But you are getting into the
4    area of attorney/client privilege and you are
5    suggesting --
6         MR. ZEMEL: If you want to instruct him not
7    to answer, you can.  All I'm asking, does the
8    man give business advice in addition to legal
9    advice.
10        Nobody asked him what the content was.
11        MS. GREENBERG: I understand that but --
12        MR. ZEMEL: So you understand it, so now
13   please make an objection or don't, one or the
14   other.  Let's move on.
15        MS. GREENBERG: I'm going to make the
16   objection to the extent that you were suggesting
17   that they are separate and different.
18        MR. ZEMEL: No speaking objections.
19        MS. GREENBERG: I'm going to do it because
20   of the privilege issue.
21        MR. ZEMEL: Fine.
22   Q.   Mr. Gross, does Mr. Schacter provide
23   business advice to you in addition to legal advice
24   with respect to the affairs of GFI Capital Resources,
25   LLC?

Page 41

1       MS. GREENBERG: Same objection.
2    A.  I have something very important to do.
3 You'll have to excuse me for one second.
4    Q.  You want to -- you want to answer my
5 question first ?
6       (OFF THE RECORD DISCUSSION)
7    Q.  Would you like to answer my question now,
8 sir?
9    A.  Could you repeat the question?
10      MR. ZEMEL: Miss Reporter?
11   A.  Do you remember the question?
12   Q.  I actually do.
13   A.  So what do we have to bother her for?
14      (REPORTER READS BACK PREVIOUS QUESTION)
15      MS. GREENBERG: I'm going to object to the
16   extent that you are suggesting they are separate
17   and apart.
18   A.  Yes, he does.
19   Q.  Now, let me just back up for a second
20 because earlier you told me -- well, actually, let's
21 just be clear.
22      You told me earlier that GFI Acquisition,
23 LLC is one of hundreds of affiliates of GFI Capital
24 Resources, LLC.
25      Who are the owners of GFI Acquisition, LLC?

Page 42

1    A.  Same owners as GFI Capital Resources.
2    Q.  So, my question is, is GFI Acquisition, LLC
3 owned by GFI Capital Resources which is ultimately
4 owned by you or do you actually own the ownership
5 interest in your own name of GFI Acquisition, LLC?
6    A.  I own the acquisition company.
7    Q.  In your own name?
8    A.  Yes.
9    Q.  And do all of these affiliated companies of
10 GFI Capital Resources, do they all report on a
11 consolidated tax return or do they file separate
12 independent tax returns?
13   A.  Excuse me?
14   Q.  Do the affiliates of GFI Capital Resources
15 report on a consolidated tax return or do they file
16 separate independent tax returns?
17      MS. GREENBERG: Object to form. This is way
18   beyond the scope.
19   A.  I really wouldn't know. I don't get
20 involved in the tax return filings.
21   Q.  Okay. Who would know the answer to that?
22   A.  Chief Financial Officer or the comptroller.
23   Q.  And the Chief Financial Officer you
24 mentioned was Paul Glick I think you said?
25   A.  Yes.

Page 43

1    Q.  And who is the comptroller?
2    A.  Judith Crook.
3    Q.  Spell the last name, please?
4    A.  Isn't that a great name for a comptroller?
5 Like Crook, C-R-O-O-K.
6    Q.  Has GFI Acquisition assigned any of the
7 rights that it has under the Purchase and Sale
8 Agreement to any other entity or affiliate?
9       MS. GREENBERG: Can you ask the question
10   again? I'm sorry.
11     (REPORTER READS BACK PREVIOUS QUESTION)
12      MS. GREENBERG: Object to form.
13   A.  I don't know. You would have to ask
14 Mr. Lehrfield that.
15   Q.  What should I ask Mr. Lehrfield?
16      MS. GREENBERG: Don't answer that.
17   A.  The last question.
18   Q.  Okay. Are you authorizing him to answer
19 that question?
20      MS. GREENBERG: No, he's not.
21      MR. ZEMEL: Okay.
22   Q.  Then I need an answer to the question.
23      MS. GREENBERG: You are here to ask him
24   questions. You are not here to ask him
25   permission to do other things. You can do

Page 44

1    whatever you think is appropriate, but I'm not
2    going to start asking my client whether he can
3    give you authority or advice. This is a lawsuit
4    --
5       MR. ZEMEL: Just because you raise your
6    voice doesn't mean that your objection has any
7    more substance than before.
8       I just want to know whether GFI Acquisition
9    has assigned any rights under the Purchase and
10   Sale Agreement to any other entity or affiliate.
11      MS. GREENBERG: And he answered the
12   question.
13   A.  Let me answer.
14      MS. GREENBERG: No, he answered the
15   question.
16      MR. ZEMEL: He didn't answer.
17      MS. GREENBERG: Plead read back the question
18   and answer.
19   (REPORTER READS BACK PREVIOUS QUESTION AND ANSWER)
20   Q.  The answer was go ask someone else and
21 that's not an answer.
22      Tell me, sir, has GFI Acquisition assigned
23 any of its rights under the Purchase and Sale
24 Agreement?
25      MS. GREENBERG: I'm sorry. Would you please

Page 45

1   read back the question and answer? That was not
2   his answer and I'd like to make the record very
3   clear as to what his actual answer was.
4         The question was originally has GFI
5   assigned any of its rights or interests and then
6   I asked for you to repeat the question and he
7   asked the question -- can you repeat the answer
8   for the record?
9      (REPORTER READS BACK PREVIOUS ANSWER)
10        MS. GREENBERG: For the record,
11   Mr. Lehrfield has been produced and has been
12   deposed, so we can continue.
13     Q.  Sir, has GFI Acquisition assigned any of
14   its rights under the Purchase and Sale Agreement to
15   any affiliate or subsidiary?
16        MS. GREENBERG: It's been asked and
17   answered.
18     Q.  You can answer the question.
19        MS. GREENBERG: It's been asked and
20   answered.  You've already answered the question.
21     Q.  Sir, answer my question.
22        THE WITNESS: What do I do, Doctor?  She
23   said answer -- what do I do, Doctor?  You tell
24   me what do I do?
25        MS. GREENBERG: You can answer.

Page 46

1         THE WITNESS: You're the one that knows it
2   all.  What do I do?
3         MR. CORNFELD: Answer the question.
4         THE WITNESS: You want me to answer the
5   question?
6         MR. CORNFELD: Yes.
7     A.  I don't know.
8     Q.  Can you tell me are there any successor
9   entities to GFI Acquisition, LLC?
10    A.  I don't know what that means.
11    Q.  Have you sold, transferred any interest in
12   GFI Acquisition, LLC to anyone or any entity?
13        MS. GREENBERG: Any membership interest?
14        MR. ZEMEL: Any interest.
15    Q.  Just have the question read back if you
16   didn't hear it.
17        MS. GREENBERG: I'm just trying to make the
18   record clear. I don't know what you mean any
19   interest.
20        MR. ZEMEL: You can object to the form if
21   you'd like.
22    Q.  Do you have a -- can I have an answer to
23   my question, please?
24    A.  Is that your question, have I sold any
25   interest?

Page 47

1         MR. ZEMEL: Miss Reporter, would you read
2   the question back for him please?
3      (REPORTER READS BACK PREVIOUS QUESTION)
4         MS. GREENBERG: Again, the same objection.
5     A.  No.
6     Q.  Here, now you can have your milk.
7     A.  Thank you. I hope you didn't spit into it.
8     Q.  Only a little bit.
9     A.  Okay.
10    Q.  Did GFI Acquisition ever apply for
11   financing in order to close the transaction
12   contemplated by the Purchase and Sale Agreement?
13    A.  Excuse me?
14        MR. ZEMEL: Would you read the question back
15   please?
16     (REPORTER READS BACK PREVIOUS QUESTION)
17        MS. GREENBERG: Object to form.
18    A.  The question again please?
19     (REPORTER READS BACK PREVIOUS QUESTION)
20        MS. GREENBERG: Same objection.
21    A.  Yes.
22    Q.  I'm sorry?
23    A.  Yes.
24    Q.  With whom did GFI Acquisition apply for
25   financing in order to close the transaction?

Page 48

1     A.  I got to be honest which I'm supposed to be
2   during the deposition, but I have a group that takes
3   care of all financing, so you would have to really
4   get all those answers from them.
5     Q.  Which group is that?
6     A.  There's a finance team.
7     Q.  Who heads that finance team?
8     A.  Michael Weiser.
9     Q.  There's an allegation in the complaint that
10   at all times, GFI Acquisition was ready, willing and
11   able to close this transaction.
12        Is that a true statement?
13    A.  Yes.
14    Q.  You understand that to mean that at all
15   times, GFI Acquisition had the financial ability to
16   close this transaction?
17    A.  Yes.
18    Q.  Did GFI Acquisition have --
19        MS. GREENBERG: Okay. I can ask you to just
20   breathe a little bit because I'm going to object
21   to the form of the last question.
22    Q.  Does GFI Acquisition, LLC have any assets
23   of its own?
24    A.  Yes.
25    Q.  What assets does it have?

1      MS. GREENBERG: Excuse me.  Okay, I'll let
2  you answer.
3      A.  Me.
4      Q.  Thanks, me. How are you an asset of GFI
5  Acquisition, LLC?
6      A.  My money.
7      Q.  So, with respect to the allegation at all
8  times material that GFI Acquisition was ready,
9  willing and able to close this transaction, does that
10  mean that you had the ability and the cash available
11  to close this transaction?
12      A.  Yes.
13      Q.  Sir, what's your net worth?
14      MS. GREENBERG: I'm going to object and ask
15  you not to answer.
16      MR. ZEMEL: What are those grounds?
17      MS. GREENBERG: Because this is not an
18  execution deposition.  His net worth is
19  irrelevant.  If you want to ask him if he has
20  the money, that's a different issue.
21      Q.  I asked the question how much money do you
22  have?
23      MS. GREENBERG: I'm going to object and I'm
24  going to tell him -- I'm going to object to it
25  and tell you not to answer.

1      MR. ZEMEL: On what grounds?
2      MS. GREENBERG: Because this is a deposition
3  of the 1.350(b)(6), person with the most
4  knowledge of the affairs.
5      MR. ZEMEL:  What deposition rule?
6      MS. GREENBERG: This is the deposition --
7      MR. ZEMEL: 1.310(b)(6).
8      MS. GREENBERG: Yes, 1.310(B)(6). His
9  personal wealth is irrelevant.  The fact that he
10  has the cash available to fund to the
11  corporation is relevant.
12      MR. ZEMEL: Well, let me just make my
13  record.
14      You have an allegation that the witness
15  just testified to that at all times material,
16  the entity, GFI Acquisition had the financial
17  ability to close this transaction?
18      MS. GREENBERG: Yes.
19      MR. ZEMEL: We don't think that's a true
20  statement. We don't think GFI had the ability
21  to close which is why, one of the reasons it
22  didn't close.
23      But since you have introduced the
24  allegation that they were financially able to
25  close it, we're going to test it. We're going to

1  test it and we're going to get to find out who
2  the lenders are, who the financing are, where
3  the money was going to come from.
4      MS. GREENBERG: I have no objection to that.
5  Asking a man what his net worth is --
6      MR. ZEMEL: Just a second.  When I ask the
7  1.310(b)(6) rep what are the assets of GFI and
8  he says me, he's the asset.
9      The next question is great, did he have the
10  ability to fund the transaction. He says yes.
11  Next question, what's your net worth? You object
12  improperly and instruct him not to answer, but
13  you then tell me that I can ask him how much
14  money he has.
15      So I said fine.  Then I ask him how much
16  money has he got.  Then you instruct him not to
17  answer that.
18      MS. GREENBERG: Let's be clear. What he said
19  was that the corporation has the ability to
20  receive the money by loan from him.
21      MR. ZEMEL: How do I test that assertion if
22  you keep instructing him not to answer?
23      MS. GREENBERG: I am not allowing you to ask
24  him what his net worth is.  If you want to ask
25  him what the source of those funds are, what his

1  ability to provide those funds are, that's fine.
2  But he is not here to testify to his individual
3  net worth.
4      MR. ZEMEL: Let's start with those.
5      Q.  What is the source of those funds, sir?
6      A.  Cash.
7      Q.  How much cash?
8      A.  How much cash what?
9      Q.  How much cash did you have available in
10  February of 2008 to close this transaction?
11      A.  About $30 million.
12      Q.  And what is the source of that $30 million?
13      A.  Cash.
14      Q.  Where is the money located?  Can you tell
15  me where it was in February of 2008?
16      A.  In the bank.
17      Q.  Which bank?
18      A.  HSBC among others.
19      Q.  Okay. Which branch of HSBC?
20      MS. GREENBERG: Now we're going to stop.  If
21  you want to take his deposition personally,
22  that's fine, but we're taking the deposition
23  here of the LLC.
24      MR. ZEMEL: I'll accept that.  I'll notice
25  him for deposition personally.

Page 53

1    So now I get to depose him an additional
2  time. That's okay. I don't have a problem with
3  that.
4    We'll just note the stipulation on the
5  record that I'll depose with your consent, of
6  course, Mr. Gross again as in his individual
7  capacity.
8    MS. GREENBERG: I'm not stipulating to that.
9    MR. ZEMEL: You just told me --
10   MS. GREENBERG: I told you you're not going
11  to depose him that way here. If you want to
12  depose him, you can go to New York and depose
13  him.
14   MR. ZEMEL: That's fine, I accept your
15  stipulation.
16   MS. GREENBERG: There you go.
17   THE WITNESS: Doctor, you come along. You're
18  paying.
19   Q.  Other than you, does GFI Acquisition, LLC
20  have any other assets?
21   A.  GFI has lines of credit with banks.
22   Q.  GFI Acquisition has lines of credit?
23   A.  GFI as a company.
24   Q.  GFI Capital Resources, the parent company,
25  has lines of credit?

Page 54

1    A.  Correct.
2    Q.  And with whom are those lines of credit?
3    A.  Capital One, HSBC, National City.
4    Q.  And through which branch at Capital One
5  does GFI bank with respect to its lines of credit?
6    A.  I wouldn't know.
7    Q.  Okay. Who is the bank officer at Capital
8  One with whom GFI does business?
9    A.  You would have to ask my CFO.
10   Q.  Okay. That's Paul Glick?
11   A.  Yes.
12       (SHORT BREAK)
13   Q.  As each draft of the Purchase and Sale
14  Agreement was being generated, were you reviewing the
15  drafts?
16   A.  No, sir.
17   Q.  Did the deal, as you understood it, the one
18  that was ultimately signed in July of 2007, the way
19  the deal -- was that the way you had envisioned the
20  deal, the way you first started negotiations to buy
21  the four properties?
22       MS. GREENBERG: Object to form.
23   A.  No, sir.
24   Q.  Can you tell me how you initially
25  envisioned the sale would be, the transaction would

Page 55

1  be closed?
2       MS. GREENBERG: Object to form.
3    A.  It was supposed to be $36,000 a door per
4  unit.
5    Q.  For all four properties?
6    A.  For all four properties.
7    Q.  And was this supposed to be seller
8  financing?
9    A.  No, sir.
10   Q.  Just tell me how you initially -- because
11  look, you could do this deal on a napkin in terms of
12  the terms, the closings and the financing.
13       I just want to know how you initially
14  envisioned buying the four properties?
15   A.  It was supposed to be an all cash deal of
16  $36,000 per door.
17   Q.  How soon to close in your mind did you
18  envision?
19   A.  Whatever the doctor wanted. We didn't
20  discuss that.
21   Q.  At the time, four of your affiliates were
22  -- three of your affiliates were already leasing the
23  four properties under 50 year leases, correct?
24   A.  Yes.
25   Q.  And were all -- were any of those four

Page 56

1  properties -- strike that.
2       Did any of the four properties have
3  negative cash flow at the time that you made the
4  decision that you wanted to buy the properties?
5       MS. GREENBERG: Object to form.
6    A.  I don't remember the exact numbers.
7    Q.  What prompted you to make the decision in
8  your mind that you wanted to buy the properties?
9    A.  Two of the properties needed extensive
10  renovations. One of the properties was infested with
11  termites and we were spending an enormous amount of
12  money just fixing piecemeal, so it needed an
13  extensive gut rehab.
14       And the other property was just falling
15  apart piece by piece, the balconies were crumbling
16  and there was no other way but to do extensive rehab.
17   Q.  Which of the two properties are you
18  referring to?
19   A.  Carib and Cutler.
20   Q.  Okay. So, just explain to me how that
21  factored into your decision to want to buy Carib and
22  Cutler?
23   A.  There was no way we could accomplish rehab
24  with a leasehold and there was no way of getting it
25  done financially. There was no way of getting the

Page 57

1  tax credits that we would apply for without having
2  the ownership.
3      Q.  And do you recall whether or not at the
4  time, the Carib and Cutlerwood properties had a
5  negative cash flow?
6          MS. GREENBERG: Objection, asked and
7  answered.
8      A.  I don't recall the exact numbers.
9      Q.  So, you've explained to me somewhat of your
10  thought process as to why you made the decision to
11  try to acquire Carib and Cutlerwood.
12         What was your thought process of trying to
13  acquire the Shady Oaks and the Palm property?
14     A.  Shady as well needed a complete rehab.
15     Q.  And Palm Gardens?
16     A.  And it was just either we're gonna do it or
17  not do it and that's when the vacillation came in, do
18  we do all four, do we not do all four and that's what
19  went back and forth and back and forth.
20         I really didn't care about whether we do
21  Palm or not do Palm, but it kept on going back and
22  forth.  When I said to the doctor do you want to keep
23  Palm the way it is, no, I want to finish with you.
24  So I said okay, we'll do all four.
25     Q.  I just want to get the time line down. I

Page 58

1  know that you are going to not be able to tell me
2  today specific dates, but I just want to talk about
3  generally, do you remember approximately how much
4  time it took between the time you decided that you
5  wanted to enter into negotiations to buy the four
6  properties and the time you signed the Purchase and
7  Sale Agreement?
8      A.  About four months.
9      Q.  And are you saying that there was -- you
10  refer to the word vacillation.
11         Tell me what you mean by the word
12  vacillation?
13     A.  Every day was an -- every day something new
14  happened. Every day it was like riding a roller
15  coaster.
16     Q.  I'm not sure that that tells me. I'm not
17  criticizing your use of the word vacillation.
18         I need to understand what you mean by that
19  so I can --
20     A.  Dr. Cornfeld would send a letter, it's all
21  cash, yes. Next day, we'd find out the price is not
22  the price, I didn't mean 36 for every one, I meant
23  this one 36, but now I'm going to charge you more for
24  the others.
25         And it kept on going.  The prices changed.

Page 59

1  All of sudden, we found out that there was a debt
2  that we would have to -- there were mortgages on the
3  -- debt mortgages on the properties, that there were
4  penalties on that we had no knowledge of.
5      Q.  Is all of this before the Purchase and Sale
6  Agreement was signed?
7      A.  Yes, this was going back and forth, back
8  and forth.
9          Oh, I didn't know, please excuse me.
10  Dr. Cornfeld would send a schedule on the financing.
11  It wasn't accurate because it never put in there that
12  it couldn't be prepaid.
13         And it was just going on and every time
14  there was another surprise and some of them might not
15  have been his fault.
16     Q.  So, are you saying that in the four months
17  leading up to the signing of the purchase and sale
18  contract, that the seller was vacillating is your
19  word or indecisive on how many or which of the
20  properties to sell to you?
21     A.  And at what price.
22     Q.  And at what price?
23     A.  Yes, and what terms.
24     Q.  And who was handling the lead negotiations
25  on behalf of the seller?

Page 60

1      A.  Sometimes myself.
2      Q.  I said the seller?
3      A.  Oh, for the seller, always Dr. Cornfeld,
4  never Judy.
5      Q.  And who took the lead for the negotiations
6  leading up to the execution of the contract on behalf
7  of the buyer, GFI Acquisition?
8      A.  Sometimes me and when I got frustrated,
9  Michael Weiser.  When he got frustrated, Steven
10  Hurwitz.  And when he got frustrated, Moshe
11  Lehrfield.  And when he got frustrated, me again.
12         He's good.  He can outnegotiate.  Boy, when
13  he gets up there, I want to be sitting right next to
14  him so we can negotiate because he'll negotiate
15  everything there.
16     Q.  Now let me --
17     A.  He'll make them so crazy, they'll tell him
18  okay, okay, go already. That's a compliment.
19     Q.  Once the purchase and sale contract was
20  finally signed, was there some period of time where
21  there was quiet between the buyer and seller or was
22  there constant renegotiating even from the moment
23  that the contract was signed?
24         MS. GREENBERG: I'm going to object to form.
25     A.  There was renegotiations after the contract

Gross, Allen (2008-09-11)                                    Pages 57 - 60

Page 61

1  was signed.
2      Q.   That part, I understand.  Mr. Lehrfield
3  told us that around Christmas, that there was a
4  meeting and all sorts of renegotiations.
5          I'm trying to figure out was there some
6  period of time after July 3rd, 2007 when the
7  agreement was signed where there was quiet between
8  the parties before the negotiations resumed?
9      A.   No, actually a month later --
10     MS. GREENBERG: I'm going to object to form.
11  Go ahead.
12     A.   About a month after the contract was signed
13  was the first renegotiation.
14     Q.   Tell me what you recall about that?
15     A.   There was some calculation as far as cash
16  flow that Dr. Cornfeld renegotiated.
17     Q.   Does this relate to the modified rent
18  payments that the tenants were required to pay?
19     A.   It referred to the cash flow rent payments
20  that we were paying, yes.
21     Q.   And tell me what you recall, what was this
22  recalculation?
23     A.   He basically said that, oh, I made a
24  mistake and this is not what I meant and it's not
25  fair and can we do it this way, whatever it was.

Page 62

1      Q.   You don't recall the substance --
2      A.   It had to do with something with tax and
3  insurance payments.
4          THE WITNESS: Right?  What was it?
5      Q.   He doesn't get to answer at the moment.
6      A.   But I wanted to verify it was tax and
7  insurance payments.
8          MS. GREENBERG: All right, Allen.
9      Q.   Did it have anything to do with back rent
10  payments?
11     A.   No, sir.
12     Q.   There was a period of time leading up to
13  the signing of the Purchase and Sale Agreement where
14  none of the tenants were paying any rent to the
15  landlord, isn't that right?
16     A.   No, there was no rent payments.
17     Q.   So, between November of 2006 and July of
18  2007, none of the tenants under the leases of the
19  four properties were paying rent to the landlord,
20  isn't that right?
21     A.   I don't know.
22     Q.   Who would know that on your side, who would
23  know that?
24     A.   Probably Judith Crook.
25     Q.   And so, does it refresh your recollection

Page 63

1  that perhaps this conversation that you say occurred
2  about a month after the Purchase and Sale Agreement
3  had been signed related to your position that the
4  rent, the seven months of rent leading up to the
5  agreement that had not been paid had been waived and
6  Dr. Cornfeld was arguing no, he never agreed to waive
7  seven months of rent?
8          MS. GREENBERG: Object to form.
9      Q.   Does that refresh your recollection as to
10  what you guys were talking about a month after?
11     A.   Absolutely not.
12     Q.   So the best of your recollection, this
13  recalculation that you are referring to that occurred
14  about a month afterwards related to taxes and
15  insurance, is that right?
16     A.   No, it related to defining what cash flow
17  was.
18     Q.   Was there some disagreement about whether
19  taxes and insurance should be part of the calculation
20  for determining what cash flow was?
21     A.   That's correct.
22     Q.   Do you know whether the tenants were
23  required to escrow money for taxes and insurance?
24     A.   If we were required to -- I don't
25  remember.

Page 64

1      Q.   I asked the question. Do you know whether
2  they were required to escrow payments for taxes and
3  insurance?
4      A.   I don't remember.
5      Q.   And so what was the result of this
6  recalculation or conversation that you had about a
7  month afterwards?
8      A.   Notwithstanding that a contract on its
9  basis agreed to our interpretation of what cash flow
10  is, I instructed my people to acquiesce to
11  Dr. Cornfeld and do what he asked.
12     Q.   Do you recall what the effect of that was,
13  did that mean somebody had to pay more money?
14     A.   It meant that we had to pay more money on a
15  monthly basis.
16     Q.   And that was going forward from the date
17  the purchase and sale contract was signed?
18     A.   That's correct.
19     Q.   And once that was resolved, were there any
20  other discussions about -- in other words, according
21  to Moshe Lehrfield, he says that in December,
22  December 24th of 2007, there was a meeting and that
23  you introduced the idea of buying three properties
24  instead of four.
25          Earlier this morning, you told us that

Page 65

1 there were discussions about two properties and four
2 properties, three properties. So, what I'm just
3 trying to do is refresh your recollection to tell me
4 when those discussions occurred.
5        Now, I think you've told me, am I correct,
6 that those types of discussions occurred prior to the
7 signing of the Purchase and Sale Agreement or only
8 afterwards?
9        MS. GREENBERG: I'm going to instruct you
10       not to answer that question. You've got to ask
11       him a question. Don't characterize somebody
12       else's deposition.
13    Q.   Were there discussions leading up to the
14 signing of the Purchase and Sale Agreement about how
15 many properties you were going to acquire?
16    A.   Yes.
17    Q.   Were those discussions before the draft
18 agreements were first circulated?
19    A.   Yes.
20    Q.   So, if that were true, would you agree
21 there would be draft Purchase and Sale Agreements
22 that indicated an acquisition of less than all four
23 properties?
24       MS. GREENBERG: Object to form.
25    A.   No.

Page 66

1    Q.   Why?
2    A.   Because they were before the drafts.
3    Q.   So, once -- okay. So once the drafts
4 started to circulate?
5    A.   No. Once we understood what Dr. Cornfeld
6 wanted, that's when the drafts started circulating.
7    Q.   So, initially, I'm just trying to
8 understand the evolution of this, Carib and
9 Cutlerwood needed significant capital improvements
10 and that you felt you needed to own those properties
11 in order to execute on those capital repairs,
12 correct?
13    A.   Yes.
14    Q.   And then you told me that Shady also needed
15 a complete rehab so that was the same analysis,
16 correct?
17    A.   Yes.
18    Q.   Then I asked about Palm Gardens and I asked
19 you what was your thinking for acquiring Palm Gardens
20 and that's when you started telling me there were
21 discussions about how many properties you were going
22 to acquire.
23       I'm just trying to figure out was your goal
24 from the beginning of these negotiations, to acquire
25 all four?

Page 67

1    A.   Not necessarily.
2    Q.   What was your thinking?
3    A.   My thinking was that there was an immediate
4 need for those two and then we would see how we would
5 work with Shady and then eventually get the Palm.
6    Q.   So, if I understand what you are saying, is
7 that the very genesis of the discussions were you
8 wanted to acquire Carib and Cutlerwood, is that
9 correct?
10    A.   That was the immediate need.
11       MS. GREENBERG: Just for the record, when
12       you say you, I assume you are saying GFI?
13       MR. ZEMEL: Yeah. He's the 1.310(b)(6) rep.
14       MS. GREENBERG: I just wanted to clarify for
15       the record.
16    Q.   Did you first approach Dr. Cornfeld with
17 buying the Carib and Cutlerwood properties in person,
18 do you recall?
19    A.   Yes.
20    Q.   Do you recall where you were?
21    A.   I don't. Backtrack that, I don't remember
22 if it was in person or not.
23    Q.   And so, can you just tell me the evolution
24 then, how did the immediate need of acquiring the two
25 properties ultimately end up in a contract to buy all

Page 68

1 four that was signed in July of 2007?
2    A.   We were putting in a lot of money.
3 Unfortunately, the properties got damaged in the
4 hurricane and there was extensive damage and the age
5 of the properties and we kept on putting money in and
6 money in and money in and Dr. Cornfeld was aware of
7 it. It was his insurance policy.
8        There was a lot of things that weren't
9 covered in the insurance policy which we thought were
10 covered because it was his policy, it was part of his
11 master. And, unfortunately, we weren't covered for a
12 lot of the wind damage and there's an extensive money
13 going back constantly into the properties.
14    Q.   You're referring to Carib and Cutlerwood,
15 correct?
16    A.   And, Palm, and -- yeah, and Palm as well.
17 And I said to him one day, I said this is crazy,
18 we're doing things piecemeal and we fixed this leak
19 and the next piece of the pipe goes out. Elevators
20 and things were going haywire.
21       I mean insurance went from $150 a door to
22 $1,100 a door for the property. At the same time,
23 real property taxes which are assessed based upon
24 valuation because of the conversion craze that was
25 going on, the property taxes went up quadruple and

1 with the repairs with the hurricane and everything
2 going on at the same time, there was no other way to
3 deal with these things rather than go out there and
4 rehab the property and bring it up to date and bring
5 it under code.
6        We were getting violations. Every Monday
7 and Thursday, there was a different violation.
8 Elevator, electric upgrade, fire department recalls,
9 200,000 here, 150,000 here and it was ridiculous.
10       And he agreed that, yeah, we got to rehab,
11 you got to rehab. As I did more and more research and
12 looking into how you can economically do this, came
13 to the realization that you can't do it under a lease
14 because nobody would lend us money under a leasehold
15 and we had to have the acquisition.
16       Other than that, I had a great relationship
17 with him. There was no reason -- he was understanding
18 and I was understanding for his needs. There was
19 full cooperation. You know, he laughed, and I said
20 you want it back and he said I haven't been here for
21 20 years and I'm not coming there now, take care of
22 it.
23       So, I even did him a favor when it came to
24 Shady. I never wanted Shady and he begged me to take
25 Shady. He says, please do me a favor, it's my only

1 one, take it off my hand. We were contemplating
2 buying in Tampa. And so I said, okay, we'll take it.
3        Just because of the conversion craze, we
4 ended up not buying anything because everything was
5 off the wall and we're not converters. That's not
6 what we do for a living.
7        The only question was what and when and
8 where, but the order of business was Carib and
9 Cutler. That was the first order of business. Every
10 Monday and Thursday, Cutler is a Section 8 property,
11 and we were getting stop payments.
12       MS. GREENBERG: Okay. I think we answered
13 the question.
14       A. I'm giving him the whole story.
15       MS. GREENBERG: No. Okay. I would instruct
16 you to only answer the questions that are posed
17 to you. You answered the question. Go ahead.
18 Ask him a question.
19       Q. So, I understand that. I totally get you
20 on that.
21       A. I don't think you did understand it.
22       Q. No, I don't understand. That's why I'm
23 trying to find out from you.
24       A. Okay.
25       Q. So now I understand how Shady got into this

1 which I know. By the way, when you said that
2 Dr. Cornfeld told you it was his last one or his only
3 one meaning his -- what did you mean by that?
4        A. His only multifamily property.
5        Q. How did Palm Gardens get into the mix of
6 you wishing to buy that property?
7        A. Palm Gardens had other issues. They had
8 elevator issues, Palm Gardens had parking issues. It
9 was complicated. It also needed -- again, it was
10 another property that there was a lot of deferred
11 maintenance constantly.
12       And eventually it would need that and when
13 we started having the discussions with Dr. Cornfeld,
14 he said you know what, if I'm finishing and we're
15 selling it, let me sell all of it and that's how it
16 got -- that's how we got there.
17       Q. Okay.
18       A. I don't want to have anything to do with
19 this, like this, I don't have to -- take it all off
20 my head. I'm an old man. I want to relax. Did I
21 say it right?
22       Q. Can you tell me then from the time that the
23 first drafts were circulated that included all four
24 properties, can you tell me what is the very first
25 time that there was a discussion about GFI acquiring

1 less than all four of those properties?
2        A. In December, if that's the date, when we
3 were getting ready to close, I met with Dr. Cornfeld
4 and had a discussion with him and I said is this the
5 direction we want to go right now because he was
6 worried about his tax basis, that he was going to pay
7 a lot of tax because he had no basis in any of these
8 properties and we started discussing different ways
9 of being able to set it up to minimize his taxes.
10       Q. Was Moshe Lehrfield present for this
11 meeting?
12       A. I don't recall.
13       Q. Was this at the Newport Hotel?
14       A. There was so many meetings, I don't recall
15 which one. We had a lot of meetings at the Newport
16 Hotel. All I remember was Dr. Cornfeld should have
17 had the depositions there because the sun was shining
18 right on me at the pool. And the coffee was lousy.
19       Q. So, tell me what happened in this --
20       A. Remember we had to go get coffee, we
21 couldn't find a decent cup of coffee?
22       Q. Tell me what happened in this discussion in
23 --
24       A. It wasn't -- there was a lot of discussions
25 not only in December.

1    Q.  Let me be clear -- wait, stop.  Let me be
2  clear.
3         I'm not asking about all discussions.  I'm
4  just saying when is the first time that you
5  introduced the concept of buying less than all four
6  of the properties that you had contracted to
7  purchase?
8         MS. GREENBERG: Object to form as to who
9      introduced what.
10     A.  I don't think it ever stopped being a
11  conversation because in Dr. Cornfeld's mind, it was
12  always that doubt whether -- do I sell all four, what
13  my tax basis is going to be, how much tax I'm going
14  to have to pay, how much am I going to be left with,
15  oh, the mortgages, am I giving financing.
16        We discussed a lot of things. One of the
17  things we discussed is him giving financing so he
18  should deal with it as an installment sale. There was
19  a thousand discussions.
20     Q.  Let's try to come back to that. So
21  initially what you were envisioning -- when you began
22  the negotiations to acquire all four properties, it
23  was an all cash closing, correct?
24     A.  That's correct.
25     Q.  And you were anticipating a closing, I

1  think you said on Dr. Cornfeld's schedule, correct?
2      A.  That's correct.
3      Q.  At some point in time, the concept of
4  obtaining the lender approvals on existing --  lender
5  approvals to assume certain loans was introduced into
6  the drafting process. Do you recall what prompted
7  that?
8      A.  Yes.
9      Q.  Tell me about that?
10     A.  We found out that the mortgages had huge
11  penalties.
12     Q.  Okay.  How did you find that out?
13     A.  Dr. Cornfeld.
14     Q.  Dr. Cornfeld told you that, is that
15  correct?
16     A.  Dr. Cornfeld finally, finally gave us
17  documents to review his mortgages.
18     Q.  And who reviewed them on your behalf?
19     A.  I don't recall.
20     Q.  And so, tell me what you recall when you
21  learned what were in the mortgages?
22     A.  I found out that what Dr. Cornfeld
23  represented to us wasn't accurate.
24     Q.  Tell me what he had represented to you and
25  what was inaccurate?

1      A.  I can pay off these mortgages any time,
2  they're my mortgages, nothing to do with you.
3         MS. GREENBERG: I'd like to take a break now
4      because --
5         MR. ZEMEL: Let me just get --
6         MS. GREENBERG: I think it's an appropriate
7      time.
8         MR. ZEMEL: I don't.  Let me just get
9      through this, then we can break.
10        MS. GREENBERG: She told you she had to go
11     to the meter before.
12        MR. ZEMEL: She has got a few more minutes.
13     Let me just finish these line of questions.
14        Can I have that last question back?
15     (REPORTER READS BACK PREVIOUS QUESTION)
16     Q.  So, Dr. Cornfeld told you in the
17  negotiation process that he could pay off these
18  mortgages at any time, is that what you are saying?
19     A.  Yes.
20     Q.  And how did it come to pass that you were
21  able to learn what the terms of the mortgages were
22  before the contract was signed?
23        MS. GREENBERG: I'm going to object to form.
24     A.  I don't recall the exact, who said who to
25  what, but all of a sudden, it became a fact that in

1  order to pay off these mortgages, there was a $2
2  million penalty.
3      Q.  And what about --  and that's when the
4  lender approval aspects of the agreement were then
5  negotiated and put into the draft?
6      A.  No, that's when the first negotiation --
7  not first but the 50th negotiations of our deal
8  started again because who is paying the prepayment
9  penalty.
10     Q.  Okay. And tell me about those discussions?
11     A.  Dr. Cornfeld said, well, you're getting a
12  benefit, you're going to take over the mortgages, so
13  why should I pay it.
14        So I said, Dr. Cornfeld, the mortgages are
15  50 or sometimes 40 percent of the priors, we were
16  going to take a much bigger mortgage, why would I
17  want to take these mortgages over and plus I'm
18  getting a construction loan. So, how are these
19  mortgages going to help me?
20        Don't worry, you'll figure it out. So, that
21  took time.
22     Q.  Okay. And the agreement provides that to
23  the extent that there were prepayment penalties and
24  defeasance costs and things of that nature, that that
25  would be added to the purchase price, correct?

Page 77

1    A.  No, then we got the other surprise.
2    Q.  What was that surprise?
3    A.  You know, all his mortgages, his all cash
4  deal and everything that was going to close in 60
5  days, 90 days, lo and behold, Dr. Cornfeld had a
6  mortgage that has a lockout that can't even be
7  prepaid.
8         This is when I begged him over and over and
9  over again during the last five years, please, if you
10 are taking a mortgage, talk to us, we have a whole
11 mortgage department. No, these are people I know
12 personally, these are buddies, these are friends,
13 they'll do, they'll know, they'll be.
14        I said I hope you're not taking securitized
15 loan. No, I have a relationship with the bank. It's
16 my friend, my mortgage broker.  We never were given
17 any of the copies of the documents, never discussed
18 it and I didn't want to push.  And lo and behold, we
19 have a lockout on Carib.
20        MS. GREENBERG: I have to take a break
21   because I have an obligation.
22        MR. ZEMEL: Okay.
23        (LUNCHEON ADJOURNMENT)
24    Q.  Would you take a look at Exhibit-1, the
25 Purchase and Sale Agreement, and turn to paragraph or

Page 78

1  Section 11 entitled Loan Assumption?
2         Have you ever read that paragraph 11 before
3  today?
4    A.  No.
5    Q.  Why don't you take a moment and review it
6  so I can ask you some questions about it, please?
7    A.  Okay.
8    Q.  Does this paragraph 11, is this generally
9  in accordance with your understanding of what the
10 terms of the contract were?
11   A.  I don't understand your question.
12   Q.  Well, you had some working understanding as
13 to what the terms of the agreement were, correct?
14   A.  Yes.
15   Q.  And is there anything in this Section 11
16 that you just read which is inconsistent with what
17 you thought the terms of the contract were?
18   A.  No. It's what I thought the terms were.
19   Q.  Now, before we broke for lunch, you were
20 telling me that this Section 11 relating to the
21 assumption of these loans was precipitated because
22 you have learned that the loans had prepayment
23 penalties and defeasance costs, correct?
24   A.  Yes.
25   Q.  And that you and Dr. Cornfeld prior to

Page 79

1  signing the contract had negotiated who would be
2  responsible for paying the defeasance cost if you
3  elected to assume those loans, isn't that right?
4    A.  Yes.
5    Q.  Now, can you tell me under what conditions
6  would GFI not have elected to assume those loans?
7         MS. GREENBERG: Object to form.
8    A.  Under what conditions would we have not --
9  the conditions that the lender might have come up
10 with the amount of cash that was available, our 1031
11 deal that we were doing simultaneously, how much cash
12 that gave off.
13        There were two major 1031 deals that we
14 were rolling this transaction into which the doctor
15 was fully aware of. There was a deal in Jersey that
16 we sold and a big deal in New York that we sold and
17 there was a substantial amount of cash coming in from
18 those.
19   Q.  Okay.
20   A.  So, there were a lot of factors of what's
21 happening with interest rates in the market.
22   Q.  Now, how did you learn prior to signing the
23 agreement that there were prepayment penalties
24 associated with some of these loans?
25   A.  I don't recall exactly if Dr. Cornfeld

Page 80

1  brought it to our attention or somebody picked it up,
2  so I couldn't tell you.
3         But it became an issue after everything was
4  agreed, after the terms were agreed and everything
5  was agreed, all of a sudden this became a new issue.
6    Q.  Okay. At any time between the time that you
7  first learned about the prepayment penalties
8  associated with these mortgages and the time that you
9  signed the contract, did you or anyone on your behalf
10 ask to see all of the mortgages so that you could see
11 for yourselves or your team can see for themselves
12 what the terms were?
13   A.  I wouldn't have been party to that, so I
14 don't know.  It could have been -- I don't know. I
15 really don't know.
16        We've asked many times and I don't know
17 subsequently who reviewed, what reviewed, I don't
18 know.
19   Q.  Prior to the time that the contract was
20 signed, did you tell Dr. Cornfeld that you had no
21 idea that he had refinanced these properties since
22 the time that you first signed leases on behalf of
23 your tenant entities?
24   A.  I don't know if I didn't know that he took
25 mortgages because I assumed that we would have to

1  sign estoppel agreements or subordination agreements,
2  but I remember being surprised at the amount of money
3  that he got as mortgages.
4      Q.  Meaning what?
5      A.  Meaning the extent of his financing. Like
6  Carib, I didn't know that he had $10 million mortgage
7  on it.
8      Q.  But in between the time that A & M Florida
9  Properties, LLC first leased the Carib property and
10 the time that GFI Acquisition signed this purchase
11 and sale contract, you knew that the property had
12 indeed been refinanced, isn't that right?
13     A.  Yes, but I didn't know the extent of the
14 mortgage or the terms of the mortgage because in the
15 estoppel that we signed, those terms were not
16 disclosed to us and, you know, in my conversations
17 when I knew Dr. Cornfeld was looking to finance, I
18 kept on telling him all the time, please make
19 certain, watch what kind of mortgage.
20     No, don't worry, I can do, I can be, these
21 are my friends, I know, pay it off any time, it's my
22 personal loans, don't worry about it. I said, Doctor,
23 please don't get -- and I said if you need help, I
24 have a finance team, they are available to you.
25     Q.  Let me make sure I understand what your

1  testimony is.
2      Is it true that as of the time that you
3  signed the Purchase and Sale Agreement in July of
4  2007, you knew that the Carib Villas property had
5  been refinanced but you just didn't know what the
6  terms of the refinancing were?
7      A.  I did not know at the time that I signed
8  this contract that not only was -- about the
9  prepayment penalties, I knew when I signed the
10 contract. But I did not know that there was a
11 lockout, that we couldn't even prepay if we wanted
12 to. The term in the contract allowed for an option
13 of prepayment.
14     What we didn't know and I don't think even
15 Dr. Cornfeld knew, that there was a complete lockout.
16 You were not able to pay this loan off even if you
17 wanted to and even if you paid the penalty. Is that
18 correct?
19     Q.  Let me ask you -- take a look at the
20 complaint which is this Exhibit-2 in front of you.
21     Now, the complaint is roughly 24 pages and
22 the rest are the exhibits. If you want to separate
23 the complaint from the exhibits, it might be easier
24 for you.
25     Let me ask you to take a look at paragraph

1  18 of the complaint? Now paragraph 18, if you see it
2  in the second sentence says, "Subsequently, and
3  without the knowledge or approval of A & M Land Trust
4  number 61530 encumbered Carib Villas with a new
5  mortgage with Wachovia Bank in the principal amount
6  of $10,369,000, which included a lockout period in
7  which the loan could not be prepaid, after which
8  period the payoff of the loan required payment of a
9  prohibitive prepayment penalty."
10     Do you see that?
11     A.  Yes.
12     Q.  Is that a true statement?
13     A.  Yes.
14     Q.  The part that I want to make sure I'm clear
15 on is you signed a subordination agreement for this
16 precise financing, isn't that correct?
17     A.  Yes.
18     Q.  So, you knew that the Carib property had
19 been refinanced long before you entered into any
20 negotiations with the seller to buy Carib Villas,
21 isn't that right?
22     A.  Yes.
23     Q.  So, what you're saying that you did not
24 know prior to the time you entered into the
25 negotiations with the seller to buy Carib Villas is

1  what the specific terms of the refinancing was, is
2  that correct?
3      A.  Not only the terms but the conditions which
4  affected us.
5      Q.  Okay.
6      A.  By having a reserve, not even a reserve but
7  having work requirements which our lease subordinated
8  to that loan and undertaking to do certain work which
9  he never disclosed to us was part of his requirement
10 and never disclosing to us that there was work
11 requirements done and never disclosing to us that
12 there was a lockout and never disclosing to us about
13 the prepayment penalty and never disclosing to us the
14 amount of his loan.
15     Q.  Let me ask you to look at -- did I give you
16 the other exhibit? Let me ask you to look at what
17 was marked as Exhibit-3 to your deposition?
18     A.  What's Exhibit-3?
19     Q.  Why don't you put a rubber band around
20 Exhibit-2.
21     Let me show you what's been marked as
22 Exhibit-3 which is Defendants' Verified Motion to
23 Strike and/Or Motion to Dismiss.
24     Have you seen this document before?
25     A.  No.

Page 85

```
 1     Q.   Let me ask you, if you would, to please
 2  turn to Exhibit-C of the defendants' verified motion
 3  to strike?
 4     A.   Yes.
 5     Q.   Exhibit-C is a document entitled
 6  Subordination Non-Disturbance and Attornment
 7  Agreement.
 8          Mr. Gross, you've seen documents similar to
 9  this before, have you not?
10     A.   Probably.
11     Q.   And what's your understanding as to why
12  tenants would be asked to sign a Subordination
13  Non-Disdisturbance and Attornment Agreement?
14     A.   Because our lease lien is a prior lien to
15  the bank mortgage.
16     Q.   Yes. And ordinarily, would a tenant have
17  some reason to be concerned about what a refinancing
18  -- what effects refinancing might have on the
19  tenant's lease?
20     A.   Yes.
21     Q.   And who would have reviewed this document,
22  Exhibit-C, to the verified motion prior to it being
23  executed?
24     A.   My attorney.
25     Q.   Which attorney is that?
```

Page 86

```
 1     A.   Moshe Lehrfield.
 2     Q.   Now if you turn to page five of Exhibit-C?
 3     A.   Yes.
 4     Q.   Under where it says tenant, do you see
 5  where it says A & M Florida Properties II, LLC?  Do
 6  you see that?
 7     A.   Yes.
 8     Q.   Whose signature is that?
 9     A.   Edith Gross.
10     Q.   You recognize her signature?
11     A.   Her signature?
12     Q.   Yes.
13     A.   Yes, I do.
14     Q.   Was Edith Gross authorized to sign this
15  document?
16     A.   Yes, she was.
17     Q.   And it says title is sole manager.  Was
18  Edith Gross the sole manager of A & M Florida
19  Properties II, LLC at the time this was signed?
20     A.   Yes.
21     Q.   Do you know whether or not you or anyone on
22  behalf reviewed the terms of the mortgage and the
23  refinancing in or about September of 2006 when this
24  was signed?
25     A.   Under the terms of our lease, Mr. Lehrfield
```

Page 87

```
 1  advised that --
 2          MS. GREENBERG: I'm going to instruct you
 3  not to discuss your conversations with your
 4  counsel.
 5          And can you repeat the question?
 6  (REPORTER READS BACK PREVIOUS QUESTION)
 7          MR. ZEMEL: You're instructing him not to
 8  answer?
 9          MS. GREENBERG: No, not at all.  I'm just
10  instructing him not to discuss conversations he
11  had with his counsel.
12          MR. ZEMEL: Well, if that's the answer to
13  the question, then --
14          MS. GREENBERG: No.  He started to say I was
15  advised by my counsel.
16          The question was -- that was the question.
17  The question is did somebody look at it, yes or
18  no?
19     A.   Did somebody look at the mortgage?
20          MS. GREENBERG: Read the question back.
21  (REPORTER READS BACK PREVIOUS QUESTION)
22     A.   Nobody reviewed it.
23     Q.   And do you know why nobody reviewed the
24  terms of the mortgage refinancing at or about the
25  time that A & M Florida Properties II executed the
```

Page 88

```
 1  Subordination, Non-Disturbance and Attornment
 2  Agreement.
 3     A.   The lease did not provide for right of
 4  review.
 5     Q.   Okay. Did you ask the landlord to review
 6  the terms of the refinancing?
 7     A.   No.
 8     Q.   And what is the source of your information
 9  that the lease did not permit the tenant to review
10  the terms of the refinancing?
11     A.   My attorney advised me.
12     Q.   Let me ask you to please turn to Exhibit-D
13  of the verified motion to strike. And if you turn to
14  page five of this document which is the
15  Subordination, Non-Disturbance and Attornment
16  Agreement dated April of 2006, is that your signature
17  that appears on behalf of A & M Florida Properties,
18  LLC?
19     A.   Yes, it is.
20     Q.   And were you authorized to execute this on
21  behalf of A & M Florida Properties?
22     A.   Yes, I was.
23     Q.   And at the time that --
24     A.   My wife gave me permission.
25     Q.   At the time that you executed this
```

1 Subordination, Non-Disturbance and Attornment
2 Agreement, did you or anyone on your behalf ask or
3 review the terms of the refinancing?
4    A.  No, I did not.
5    Q.  And the reasons are the same as you gave us
6 before?
7    A.  That's correct.
8    Q.  Now, my question would be so that you
9 understood that when you were negotiating to buy
10 these four properties, that there had been
11 refinancing on two of these four properties, correct?
12    A.  Yes.
13    Q.  And what you're saying is, is that during
14 the course of those negotiations, you or anyone on
15 your behalf failed to ask Dr. Cornfeld what the
16 specific terms were of the mortgages relating to the
17 four properties?
18       MS. GREENBERG: I'm sorry, could you read
19    that question back?
20    (REPORTER READS BACK PREVIOUS QUESTION)
21       MS. GREENBERG: Negotiations of what?
22       MR. ZEMEL: Well, let me try it differently
23    then.
24    Q.  At any time prior to the execution of the
25 Purchase and Sale Agreement, did you or anyone on

1 your behalf request to see what the mortgages and the
2 terms of the mortgages were as it related to each of
3 these four properties?
4       MS. GREENBERG: Object to form.
5    A.  During the negotiations, we were always
6 assured and even after the execution of these
7 documents by Dr. Cornfeld that I can pay him off any
8 time I want to.
9       They're my mortgages, nothing to do with
10 you. If I don't pay them, I'm personally responsible,
11 why are you worried? It's my responsibility, my
12 responsibility, my responsibility. And all of a
13 sudden, we found out when we asked him to provide us
14 with a schedule of the mortgages, the terms, that's
15 when we found out about the prepayment penalty.
16       It is only after we started making the
17 applications for the assumption and we started
18 digging in deeper into the loans, if we're going to
19 assume or not going to assume, pay off or not pay off
20 that we found out that Carib could not even be paid
21 off if we wanted to.
22    Q.  So, at the time that you signed the
23 Purchase and Sale Agreement, had you or anyone on
24 your behalf actually seen the notes and mortgages
25 with respect to the four properties?

1       MS. GREENBERG: Object to form.
2    A.  No.
3    Q.  If I understand your testimony, prior to
4 the time that you signed the Purchase and Sale
5 Agreement, you were surprised to learn that one or
6 more of these mortgages had prepayment penalties
7 which you thought was inconsistent with
8 representations made by Dr. Cornfeld, correct?
9    A.  Finish your question.
10    Q.  I did.
11       MS. GREENBERG: Why don't you read it back.
12    A.  Read it back. I thought you were, like
13 some of your questions, you know, that you were
14 leading up to somewhere but then the road stopped.
15 It was like the bridge to nowhere.
16    Q.  That's the left hand.
17    (REPORTER READS BACK PREVIOUS QUESTION)
18    A.  Yes.
19    Q.  And after you learned that representations
20 made to you by Dr. Cornfeld were inconsistent with
21 the mortgage documents, did you or anyone on your
22 behalf review all of the mortgage documents prior to
23 the time the Purchase and Sale Agreement was
24 executed?
25       MS. GREENBERG: Can you read back that

1 question?
2    (REPORTER READS BACK PREVIOUS QUESTION)
3       MS. GREENBERG: That's a mischaracterization
4 of his testimony he said he looked at a
5 schedule. He didn't say he looked at the
6 document.
7    Q.  Answer my question, please. You have to
8 answer.
9       MS. GREENBERG: I'm objecting. I have
10 objected.
11    A.  I looked at the schedule and I did not
12 review the mortgage documents because I assumed that
13 Dr. Cornfeld's people reviewed the documents and the
14 schedule was accurate.
15       So the only thing was a question of money
16 which was the surprise of what the prepayment penalty
17 was.
18    Q.  These aren't the trick questions. Those are
19 later. I'm just trying to get very simple
20 information.
21    A.  I thought we passed the trick questions
22 already.
23    Q.  No, they're coming.
24       MS. GREENBERG: The question just doesn't
25    make any sense.

1    Q.   Is it a fair statement that prior to the
2  time that you signed the Purchase and Sale Agreement,
3  you learned that the terms of the notes and mortgages
4  underlying Carib Villas was such that it had a
5  prepayment penalty, right?
6       I'll try it again.
7       MS. GREENBERG: Object to form.
8    Q.   I'll try plain English.  I can try plain
9  English.
10   A.   How about Yiddish?
11   Q.   As I understand your testimony so far,
12  originally this was going to be an all cash deal, a
13  fairly quick closing but at some point along the
14  line, you learned that there were mortgages on the
15  property that had prepayment penalties which is the
16  genesis of Section 11 of the contract.
17      Is that a fair statement so far?
18      MS. GREENBERG: Object to form.
19   A.   Yes.
20   Q.   Okay. The reason that Section 11 relating
21  to loan approvals was injected into the mix of the
22  negotiations because you learned prior to signing the
23  Purchase and Sale Agreement that the one or more of
24  these loans had prepayment penalties?
25   A.   Correct.

1    Q.   And when you learned that one or more of
2  these loans had prepayment penalties, that was
3  inconsistent with what you had already understood,
4  correct?
5    A.   Yes.
6    Q.   And the reason that there was an
7  inconsistency is you felt that the terms of the
8  mortgages were inconsistent with what Dr. Cornfeld
9  had led you to believe up to that point?
10   A.   No.
11      MS. GREENBERG: Object to form.
12   Q.   Is that correct?
13   A.   No, they were of no interest because he was
14  going to pay them off.  So why would I be interested
15  what the terms of his loan was?
16      I had no interest in them.  I had absolutely
17  zero interest in what his loans were because the
18  object was he was going to pay them off so why would
19  I care. And I never even knew that they were
20  assumable.  For all I knew is they were private loans
21  made to the doctor.  I never seen, heard of who his
22  financing was. They were personal loans because he's
23  big Dr. Cornfeld.
24   Q.   Obviously in his point in time, it did
25  become your concern because Section 11 specifically

1  provides if you were to elect to assume these loans,
2  that the defeasance costs would be added to the
3  purchase price and ultimately GFI would be paying
4  them, correct?
5    A.   Only when all of a sudden these fees, these
6  prepayment penalties became our obligation on the
7  52nd retrade.
8    Q.   I understand.
9    A.   You don't understand.
10   Q.   This is before you signed the Purchase and
11  Sale Agreement?
12   A.   That's correct.  And at that point because
13  of our 1031s that we signed selling property based
14  upon the reliance that we're going to buy these
15  properties, we were so strung out that we had no
16  other option but to go along with again being
17  retraded.
18      It's very important that you understand
19  because I know that you want to get to the truth.
20   Q.   I'm trying to understand it.
21   A.   And you have to understand everything that
22  happened that went by this. Now, whether -- do I
23  think or know whether Dr. Cornfeld knew about these
24  prepayment penalties, I don't know. I really don't
25  know and those are the questions that I ask today,

1  was this done deliberately or was it not done
2  deliberately. Was it done deliberately not telling us
3  that the Carib Villas bank had a whole host of
4  repairs that had to be done on the property which
5  were not contemplated on our lease?
6       Was it a whole host of things that he
7  didn't let us know, that there wasn't even an ability
8  to prepay even if you wanted to paying them a five
9  million prepayment penalty, there was no ability.
10      MS. GREENBERG: Okay.  There's no question
11  on the table.
12   A.   I'm very upset because where this is going
13  is a crock, really a crock. We're incompetent for
14  trusting a man that we've been doing business with
15  for seven years?  We're incompetent for not reviewing
16  his documents?
17      If he said something, that was it. There
18  was no need to review.  If he said it's my loan, I'll
19  take care of it, don't worry about it, it's not your
20  headache --
21   Q.   I don't want to argue with you.
22   A.   You are arguing because you keep on going
23  back, nobody reviewed it, what are we a bunch of
24  idiots. No, we're not a bunch of idiots.  We assumed
25  a seasoned real estate man who is doing this, who is

1  running a three, $400 million empire building huge
2  hotels and everything else has the knowledge and when
3  he tells us a loan is no problem, it's his loan,
4  that's what we assumed.
5      Why would I think differently?  Why would I
6  in my wildest dreams think anything he tells me is
7  not accurate?
8      Q.  Well, you've already told me that you
9  learned that one of the things that he told you
10  turned out to be inaccurate which is that there were
11  prepayment penalties involved, correct?
12      A.  Yeah.
13      Q.  And you learned that before you signed the
14  Purchase and Sale Agreement, correct?
15      A.  Correct.
16      Q.  So you knew at the time that you signed the
17  Purchase and Sale Agreement that Dr. Cornfeld didn't
18  always give you accurate information, isn't that
19  right?
20      A.  No, sir.
21      Q.  When you learned that there were prepayment
22  penalties, did you or anyone on your behalf look at
23  the note or mortgage terms to determine how much the
24  prepayment penalties were?
25      A.  No, because he gave us the numbers, he

1  called up the lender. It was his lender.  I wasn't
2  privy to be able to call up the lender. I didn't even
3  know who the lenders were.
4      Q.  I'm just --
5      A.  I didn't know who the services were.  We
6  never got notice who the services are. He called up,
7  he found out and he got back, oi vay, we got a
8  problem. We got these monies, I didn't even know. I
9  didn't even know. What should we do now?  Allen, what
10  should we do now?
11      It became "our". I said, Dr. Cornfeld,
12  what do you mean what should we do now? For years
13  you've been telling me these are my mortgages, it's
14  my problem, it's my obligation and now it became we.
15  Who is we, kemosabi?
16      THE WITNESS: You can say it loud,
17  Dr. Cornfeld. Say it loud.  Say it loud. You
18  don't have to whisper.  You can say it loud.  If
19  I'm not saying the truth, say it.
20      MR. ZEMEL: You want me to ask him if he'll
21  agree to that?
22      THE WITNESS: Go ahead, ask me.  What are
23  you afraid to ask me?  All of a sudden, you're
24  afraid to ask me.  You know how to talk. You
25  don't need him talking for you.

1      MR. ZEMEL: Gentlemen, let's move on.
2      THE WITNESS: By the way, you should know
3  because you said something to me in the bathroom
4  about your check, your money was deposited,
5  $299,000 was deposited into court pursuant to
6  what your lawyer wanted.
7      MR. CORNFELD: You think I asked you that?
8      THE WITNESS: Is he your lawyer?  He asked
9  for that.  That's where your money is, in the
10  court as your lawyer requested.
11      So I hope your lawyer makes your mortgage
12  payments.
13      MR. ZEMEL: Gentlemen, can we move on?
14      THE WITNESS: That's what you wanted.  You
15  got what you wanted.
16      MR. ZEMEL: Guys.
17      THE WITNESS: That's what he wanted.  He
18  wanted it in the court, not in your pocket.
19      Q.  He asked me a question in the bathroom.  I
20  forgot to give him the answer because --
21      MR. CORNFELD: Are you willing to put it in
22  my pocket?
23      THE WITNESS: You put it in the hand of your
24  lawyer.  That's where you put everything.
25  That's where this is going. Just like the letter

1  started and then all of a sudden, the lawsuit.
2  That's where you put it, that's the driver of
3  the bus. Not you, you're not driving.
4      When you decide what you want, that's when
5  you tell him. Until now, he doesn't know what
6  you want. I don't know what you want. Alaine
7  doesn't know what you want.  I don't think Judy
8  knows what you want. Nobody knows what you
9  want.
10      MR. CORNFELD: I don't think you know what
11  you want.
12      THE WITNESS: I don't think you know what
13  you want.
14      MR. ZEMEL: I'll just wait.
15      A.  The only one who knows what you want, you
16  know you have to put money in your meter.
17      MR. ZEMEL: When you guys are ready to
18  resume the deposition, let me know.
19      A.  I'm ready, bring it on.
20      Q.  How soon after you signed the Purchase and
21  Sale Agreement did GFI first apply to assume any of
22  the loans?
23      A.  I don't know.
24      Q.  Who would know that?
25      A.  Dr. Cornfeld.

1    Q.   And why would he know that?
2    A.   Because he was in touch constantly.
3    Q.   Would that request to assume the loans have
4  been done in writing?
5    A.   I don't know.
6    Q.   Would someone on your staff have handled
7  the loan assumptions that the banks would have
8  required?
9    A.   Yes.
10   Q.   Who would have been responsible for
11 handling that?
12   A.   I think Dr. Cornfeld was in charge of
13 getting us the assumption papers, there was an
14 application.
15   Q.   Okay. And at some point in time, did you or
16 anyone on your behalf receive letters back from one
17 or more of the lenders setting forth what the
18 requirements would be for assuming the loans?
19   A.   I don't know, I wasn't involved in that.
20   Q.   Now you mentioned that it was only after
21 you had signed the Purchase and Sale Agreement that
22 you had learned about a lockout, is that correct?
23   A.   Correct.
24   Q.   Now, do you have any -- do you have an
25 understanding one way or another whether or not

1  mortgages are recorded in the public record and
2  freely available to anyone who wants to look at them,
3  is that your understanding of how it works here in
4  Florida?
5    A.   No, sir.
6    Q.   What's your understanding about mortgages
7  being recorded and them being available for anyone to
8  review?
9    A.   Mortgages could be recorded, notes are not
10 recorded.
11   Q.   I didn't ask you about the notes.
12   A.   You asked me if everything is recorded.
13   Q.   I actual asked you just about the
14 mortgages.
15   A.   Mortgages are recorded.
16   Q.   So you could have looked at the mortgages
17 if you chose, correct?  They are freely available in
18 the public records?
19   A.   Again, mortgages wouldn't give me terms of
20 a deal.
21   Q.   Why would it be important for you to know
22 what the terms of the deal were?
23   A.   Interest rate, amount owed, where would you
24 find that?
25   Q.   You tell me, where would you find it?

1    A.   In the note.
2    Q.   So my question is did you or anyone on your
3  behalf, anyone on your behalf ever request to look at
4  any of the promissory notes relating to the mortgages
5  at issue in this case?
6    A.   No, because the intention was to pay off
7  these loans.
8    Q.   Then why was there a six-month period built
9  into this contract to allow GFI the time to assume
10 these loans if it chose to?
11   A.   Because in the event, in the event that we
12 couldn't for any reasons, our 1031s wouldn't close
13 and we wanted, needed more time, we would assume the
14 existing loans and proceed to a closing and pay them
15 off later.
16   Q.   At the time that you signed the Purchase
17 and Sale Agreement, were you anticipating a close in
18 30 to 60 days?
19   A.   No, because once we found out that there
20 were assumption issues and there were prepayment
21 penalties and later on we found out it couldn't be
22 paid off at all, that threw everything into a tiz.
23   Q.   Don't go there yet.  At the time that you
24 signed --
25   A.   I'm there.

1    Q.   At the time, I want to know what your
2  thinking was at the time you signed the document.
3         At the time you signed the Purchase and
4  Sale Agreement, what timeframe were you thinking that
5  GFI would be ready, willing and able to close the
6  transaction?
7    A.   I couldn't tell you because we were waiting
8  to see what time our 1031 monies would close.
9    Q.   Okay. And so closing this transaction, the
10 subject of this lawsuit, was subject to or contingent
11 upon closings of the 1031 exchanges in New York and
12 New Jersey that you mentioned?
13   A.   It was not contingent.
14   Q.   GFI Acquisition had the money available
15 from other sources other than the 1031?
16   A.   Yes, sir.
17   Q.   And is it your testimony that GFI could
18 have closed this transaction at any time after the --
19   A.   Excuse me, what?
20   Q.   At the time that you signed the Purchase
21 and Sale Agreement, did GFI have the financial
22 ability to close this transaction irrespective of
23 whether or not the 1031 exchanges closed?
24       MS. GREENBERG: Objection, asked and
25 answered.

Page 105

1      You could answer it.
2      A.  Yes.
3      Q.  And what were those other resources from
4  which GFI could have closed this transaction other
5  than the 1031 exchanges?
6      A.  We had huge credit lines, we have banks
7  that lend us money besides our credit lines that we
8  have relationships with, we have cash in the bank.
9      Q.  Did GFI Acquisition ever make a formal
10  application to any lender for the purchase money to
11  close this transaction?
12      A.  Yes. I don't know formal but, yes, we did
13  speak to lenders.
14      Q.  Was there ever a lender commitment or
15  lender approval to fund this transaction?
16      A.  I don't know if it was commitment but we
17  did have a lender lined up.
18      Q.  Who was the lender?
19      A.  CIBC. In fact, there were two lenders, HSBC
20  because Carib -- there was a term sheet for that too.
21  I'm almost sure -- not Carib, Cutlerwood.
22      Q.  Was there a mortgage on Cutlerwood?
23      A.  No -- there was, but that was the only one
24  that he was able to prepay, so all his prepayment
25  mortgages he's able to prepay from four became one.

Page 106

1      Q.  Now, as you saw in Section 11 of the
2  contract that GFI had --
3      A.  By the way, Mr. Zemel, this prepayment,
4  right, the prepayment penalties also evolved.
5      Q.  In what way?
6      A.  It also evolved. It was first one of them,
7  I found out one, then two. And then it evolved. It
8  never happened, all of it.
9      So everything was an evolutionary process.
10      Q.  Then, why didn't you ask someone on your
11  team to physically go down and get copies of the
12  notes so you could see exactly what you were dealing
13  with?
14      A.  Because at that time, all we thought about
15  is that it's only a question of money and the
16  question was if the deal cost us this much, our
17  taxable -- we had a very serious 1031 that we have a
18  huge profit in, we had a $20 million profit in a deal
19  that we sold and it was a $10 million tax savings to
20  get this deal done.
21      So if I'm spending another million $2
22  million, so be it. I had no choice. We were long
23  foregone, committed. The other deal was a hard deal.
24  We knew it was going to close. The buyers were
25  Apollo, so there was no ifs, ands and butts about it

Page 107

1  happening. The only question was when it was going
2  to close.
3      Q.  Prior to the time that you had signed the
4  Purchase and Sale Agreement, had you ever requested
5  any information from Dr. Cornfeld or anyone on his
6  behalf that did not provide the information to you?
7      A.  Yes.
8      Q.  Tell me about that?
9      A.  The mortgages.
10      Q.  You asked to see the mortgages?
11      A.  I asked Dr. Cornfeld, Dr. Cornfeld, please
12  go sit down -- yeah, I know, I know, I know these
13  things. I did it, I know.
14      Q.  I just want to be clear. You asked
15  Dr. Cornfeld?
16      A.  I said, Dr. Cornfeld, can you pay off these
17  loans? Is there any problem? Is it securitized?
18  No, I didn't do a securitized loan.
19      Q.  I understand that.
20      A.  No, you don't understand. You just asked
21  me. I asked him specifically, Dr. Cornfeld, are
22  these securitized loans?
23      He said, no, it's not securitized. It's my
24  personal loans, my banks.
25      Q.  What you're telling me is he gave you

Page 108

1  inaccurate information. That isn't my question.
2      My question is did you ever ask
3  Dr. Cornfeld to provide you with any documents prior
4  to July 3rd, 2007 that he did not provide you or your
5  organization with?
6      A.  I would really have to think about that
7  question.
8      Q.  Okay.
9      A.  I would really have to -- I'll have to get
10  back to you about that because, you know, there's
11  seven years of history. And, you know, I can answer
12  it one way, in my frame of mind, would I think, would
13  I ever think that he would intentionally withhold
14  information if that's your question? The answer is
15  no. In my mind, this was a gentleman.
16      So, do I think he knowingly, willfully did
17  a Hank Rodstein on me, would I think that? Not in my
18  wildest dreams. Do I think it now? I don't know.
19  That's what hurts me most because I don't know if he
20  knew about these prepayments or not.
21      Q.  Can you explain to me --
22      A.  Or if it was just a Columbo routine.
23      Q.  Can you explain to me why it is that you
24  accused the defendant, AFTC, of misrepresenting the
25  cash flow and financials to their lenders?

Page 109

1    A.  Could you repeat the question?
2    Q.  Yeah.  I mean I'm going from what you just
3  told me.
4    A.  Could you repeat the question because I
5  want to answer it.
6    Q.  Can you tell me why you accused Cornfeld of
7  misrepresenting the cash flow and financials to his
8  lender?
9    A.  Okay.  When -- during the course of
10  application of the lenders, there were certain
11  inconsistencies and the fact that the lender came
12  back and made a request for something to condition
13  the assumption which as a lender had no right to do
14  because it wasn't in the mortgage documents, the
15  mortgage document provided that the lender with
16  consent to an assumption, and it never had the right
17  to consent to an assumption and require that the new
18  borrower who was assuming agree to personal recourse
19  because the loan in and of itself was a non-recourse
20  loan.
21       And when a lender comes back and asks for
22  that, then there's a rotten fish in Denmark.
23    Q.  Apparently I interrupted you.
24    A.  No, no, go ahead.
25    Q.  So, was A & M Florida Properties supplying

Page 110

1  financial data or financial information to the
2  landlord?
3    A.  Yes.
4    Q.  And as far as you know, wasn't that
5  information received from A & M Florida Properties
6  transmitted to the lender?
7    A.  No.  How would I know?  I had no privy with
8  his lender.
9    Q.  So, other than what you've told me, what is
10  the factual basis for your claim that Cornfeld was
11  misrepresenting the cash flow and financials to the
12  lender?
13    A.  Being somebody that's in this business a
14  long time and by seeing what was happening and the
15  amount of loan that he was able to obtain and knowing
16  the actual cash flows of the property, I had serious
17  doubts that the accurate numbers were the ones that
18  were conveyed to the lender.
19    Q.  What does that have to do with your claim
20  in this lawsuit?
21    A.  What does that have to do?
22    Q.  Yeah.
23    A.  I subordinated my lease to a loan that in a
24  second can wipe me out like this.  The lender can
25  foreclose in five seconds.  Did you ever hear of bank

Page 111

1  fraud?
2    Q.  The question is why is that an issue in
3  this lawsuit for a specific performance?
4    A.  Because part of what we had to do was
5  assume a loan that was not accurate.
6    Q.  That you were assuming that the loan wasn't
7  accurate?
8    A.  Yeah.
9    Q.  So, the allegation in the complaint is just
10  based upon your assumption, is that right?
11    A.  More than just assumption and it could be
12  what Dr. Cornfeld's mortgage broker gave into the
13  lender, I don't know.  Somebody gave lender numbers
14  that don't make sense.
15    Q.  Were all of the financial statements that
16  the A & M Florida Properties tenant entity supplied
17  to the landlord true and accurate?
18    A.  To the best of my knowledge.  I didn't get
19  involved in that.
20       I have an accounting department that does
21  that.
22    Q.  You also learned prior to the time that you
23  signed the Purchase and Sale Agreement that there
24  were certain capital reserve and repair requirements,
25  isn't that right?

Page 112

1    A.  No, sir.
2    Q.  You didn't know that before you signed the
3  Purchase and Sale Agreement?
4    A.  No, sir.
5    Q.  You -- when did you first learn about
6  that?
7    A.  During the assumption when we applied for
8  the assumption of the loan.
9    Q.  Would that have been before December 24th,
10  2007?
11    A.  Yes, sir.
12    Q.  What did you do about it when you learned
13  about these capital reserves and the repair
14  requirements?
15    A.  What did I do about it?
16    Q.  Yeah.
17    A.  I asked Dr. Cornfeld what are these about?
18  He says don't worry, I'm very good with the lender.
19  You're doing work anyway, what's the problem?
20    Q.  At any time -- well, if you go back and
21  look at paragraph 11, if you look at paragraph number
22  11, you see that GFI had a six-month period of time
23  where it could have terminated this contract, do you
24  see that?
25    A.  Yes.

Page 113

1    Q.   And if the contract was signed on July 3rd,
2  2007, GFI would have had until approximately January
3  3rd, 2008 within which to terminate this contract, is
4  that correct?
5    A.   Yes.
6    Q.   At any time between July 7th -- July 3rd,
7  2007 and the first week of January of 2008, did GFI
8  ever say to the seller that it wanted to terminate
9  this contract?
10   A.   No, sir.
11   Q.   During that same six-month period, did GFI
12  ever ask the seller for a reduction in the purchase
13  price?
14   A.   I don't recall.
15   Q.   Did GFI ask for reductions to account for
16  these capital reserves or repair requirements?
17   A.   I wouldn't know because most of the
18  conversations were with other people in my office at
19  that point.
20   Q.   Can you tell me why didn't GFI Acquisition
21  terminate this Purchase and Sale Agreement prior to
22  the expiration of the six-month period?
23   A.   Because we were so far gone with our 1031
24  and we had such serious tax implications from our
25  other transactions that there was no other choice. We

Page 114

1  had a $10 million tax cost.
2    Q.   Let me ask you to turn to paragraph 42 of
3  the complaint. That's that document right there. In
4  fact, why don't you put that back together, the
5  verified motion?
6        Let me ask you to look at paragraph 42 of
7  the complaint, please? Did you do that?
8        Did you read it?
9    A.   Yes, I did.
10   Q.   Do you have any personal knowledge with
11  respect to the allegations set forth in paragraph 42?
12       MS. GREENBERG: Can I see it?
13   A.   Excuse me?
14       MR. ZEMEL: Would you read it back for him
15  please?
16       (REPORTER READS BACK PREVIOUS QUESTION)
17       MS. GREENBERG: Let's take a two minute
18  break.
19           (SHORT BREAK)
20   Q.   Paragraph 42, Mr. Gross, do you have any
21  knowledge with respect to the allegations of
22  paragraph 42?
23   A.   Yes.
24   Q.   What information do you have?
25   A.   I know that after the hurricane, things got

Page 115

1  very, very bad. We had a tremendous amount of damage,
2  properties of roofs and facades, windows, driveways,
3  concrete, trees, landscaping, terraces, balconies, a
4  lot of damage. And, unfortunately, we were not aware
5  that Dr. Cornfeld's policy which we were all under
6  did not provide us with adequate coverage to be able
7  to sustain the damages that we had because of the
8  hurricane and we were required to do the repairs, we
9  had to do the repairs.
10       Otherwise, all the properties would have
11  vacated. The tenants would have vacated and we were
12  spending a lot of money on repairing the property and
13  at that time as soon as that happened, insurance went
14  to $1,100 a unit which was just the insurance alone
15  cost us over a million dollars more a year and then
16  on top of that, real estate taxes quadrupled on top
17  of that and conversations with Dr. Cornfeld, he was
18  very well aware what was going on at the same time.
19   Q.   There was a period of time that we got hit
20  with four hurricanes back to back to back in '05. Is
21  that the time period you are referring to?
22   A.   '05 to -- '05 leading up to or going into
23  '06. We didn't know the insurance company wasn't
24  paying.
25   Q.   And --

Page 116

1    A.   Different claims we made and everything was
2  being rejected.
3    Q.   When you refer to the hurricane, are you
4  talking about Wilma or a succession? Are we talking
5  about a succession of hurricanes or you don't know?
6    A.   I don't know, Wilma, Gus, Katrina, Andrew,
7  names are names. All I know is the results.
8    Q.   Was one of the issues with the insurance
9  policy the deductible?
10   A.   The issues were that the wind coverage, the
11  requirement for certain value, valuation, up to a
12  certain valuation wasn't a dollar amount, it was not
13  only the deductible but it had to do with a
14  percentage of valuation which took us completely by
15  surprise and it was just a catastrophe.
16   Q.   How many properties did GFI Capital
17  Resources own or control in Florida other than these
18  four properties at issue here?
19   A.   I think three.
20   Q.   30?
21   A.   Three or four.
22   Q.   And where are they located?
23   A.   One is in Plantation, one is in -- I can't
24  remember the names.
25   Q.   Just tell me if they are in South Florida?