UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

AMERICAN FEDERATED TITLE
CORPORATION,

                         Plaintiff,                         13-CV-6437 (KMW)

        -against-                           **OPINION and ORDER**

GFI MANAGEMENT SERVICES, INC.,
ALLEN I. GROSS, and EDITH GROSS,

                        Defendants.
-------------------------------------------------------------X

KIMBA M. WOOD, U.S.D.J.:

      In 2009, as part of an adversary proceeding in bankruptcy court, Plaintiff American

Federated Title Corporation ("AFTC") sued four limited liability companies for breach of

contract and unpaid rent.  A year later, AFTC settled those claims for a total of $7.5 million.  The

limited liability companies then failed to satisfy any portion of the judgment, and in 2013, AFTC

commenced this special proceeding under Federal Rule of Civil Procedure 69(a) and New York

CPLR § 5225(b), a state statute that permits judgment creditors to recover funds improperly held

by third parties.  AFTC seeks to collect its full $7.5 million judgment from Defendants Allen and

Edith Gross (the owners of the four limited liability companies) and GFI Management Services,

Inc. ("GFIM," an affiliated corporation) by piercing the veils of the limited liability companies

and recovering allegedly fraudulent conveyances.

      After AFTC's action survived a motion to dismiss, the Court held a three-day bench trial

during the week of July 6, 2015.  As set forth in the following findings of fact and conclusions of

law, the Court declines to pierce the corporate veil, but orders Defendants to pay AFTC

$485,000 in funds fraudulently conveyed by the limited liability companies.

## I.      Findings of Fact

After considering the evidence admitted during trial, the Court makes the following findings of fact.

**Lease Agreements**

1.       AFTC is a Florida corporation owned solely by Robert Cornfeld.  At all times relevant to this lawsuit, AFTC held legal title to four residential apartment complexes in Florida: Carib Villas Apartments, Cutlerwood Apartments, Palm Gardens Apartments, and Shady Oaks Apartments.  (Stipulated/Agreed Statements of Fact and Law ("Stip. Fact") No. 7 [ECF No. 133]).  Those properties lie at the heart of the $7.5 million settlement that the present action seeks to enforce.

2.       In 2000, Allen Gross contacted Cornfeld and expressed interest in purchasing Carib Villas and Cutlerwood.  (Declaration of Allen I. Gross ("Gross Dec.") ¶ 12 [ECF No. 203]).  After further discussion, they agreed to pursue a lease arrangement instead of a sale.  *Id.* At Allen Gross's direction, a new limited liability company — A&M Florida Properties, LLC ("A&M I") — was created to act as the lessee of the properties.  *Id.* ¶ 13.  The company initially owned solely by Allen Gross's wife, Edith Gross, and subsequently came to be owned jointly by Allen and Edith.  (Stip. Fact No. 9).

3.       In August 2000, AFTC and A&M I executed two 50-year leases for Carib Villas and Cutlerwood.  (Stip. Fact No. 8).  Each lease provided that A&M I's principals would not be subject to "personal liability . . . with respect to any of the [lease's] terms, covenants, conditions and provisions" beyond a limited personal guaranty.  (Joint Ex. 4 (Carib Villas Lease) at 38; Joint Ex. 7 (Cutlerwood Lease) at 39).  Cornfeld signed each lease on behalf of AFTC, and Edith Gross signed on behalf of A&M I.  Cornfeld found it "strange" that Edith was A&M I's owner and signatory, since he "did all the negotiations with Allen."  (Trial Tr. at 359:19–360:7).

Nonetheless, Cornfeld decided that the arrangement was "OK" and agreed to execute the leases. *Id.* at 360:14–22.

4.      The leases for Carib Villas and Cutlerwood required A&M I to pay an aggregate security deposit of $2 million.  (Stip. Fact No. 13).  To satisfy that requirement, the Grosses transferred $2 million from their personal funds into an escrow account managed by Greenberg Traurig, P.A., which served as counsel to A&M I (as well as to the Grosses).  (*Id.*; Gross Dec. ¶ 16).  Cornfeld knew that the Grosses had funded A&M I's aggregate security deposit with their personal funds, and he did not object.  (*See* Trial Tr. at 348:18–21).

5.      This was not the Grosses' first foray into the real estate business.  In 2000, they already owned several other corporations and companies that offered real estate services or invested in real property.  One of those corporations was Defendant GFIM, which provided property management services.  At all times relevant to this action, Allen Gross was the sole owner of GFIM.  (Stip. Fact No. 20).

6.      After signing the leases for Carib Villas and Cutlerwood, A&M I hired GFIM to manage the properties.  In that capacity, GFIM performed a range of services, including "maintenance at the [p]roperties, incidental repairs and alterations, entering into utility contracts, rubbage removal contracts, fuel oil contracts, vermin extermination, purchase of necessary supplies, obtaining insurance coverage, paying bills and taxes, supervising the moving in and out of tenants, billing tenants for rent and other charges, attending to complaints of tenants, maintaining records of rent and general management of the properties."  (Stip. Fact No. 18).  In other words, GFIM conducted rental operations on the properties and "kept [A&M I's] books." (Trial Tr. 29:21–24).  During trial, Allen Gross testified that GFIM executed a management agreement with A&M I, and that GFIM's fee was set at the standard Florida market rate.  (Trial

Tr. at 203:23–25, 204:3–8).  That rate appears to have been six percent of rental revenue.  (*See* Trial Tr. at 47:4–11, 119:8–13, 120:14–21, 205:15–206:2).  Defendants were unable to produce a copy of GFIM's management agreement with A&M I before trial.  (First Additional Stip. Fact Nos. 2–5 [ECF No. 228]).  Nonetheless, AFTC declined to dispute (for the purposes of this action) that GFIM's management fee was proportional to the services that it performed.  (Trial Tr. at 225:6–14).  A&M I's fee payments were calculated and paid on a monthly basis.  (*See* Plaintiff's Ex. 300 (accounting records of monthly management fee payments); *see also* Defendant's Ex. 34 at 5 (unsigned management agreement between A&M I and GFIM, dated 2002, providing for monthly fee payments)).

      7.      The A&M companies and GFIM shared a corporate address.  (Stip. Fact Nos. 88–89).

      8.      When Cornfeld signed the leases for Carib Villas and Cutlerwood, he knew that A&M I would hire GFIM, or a comparable entity owned by the Grosses, to manage the properties.  (*See* Trial Tr. at 360:23–361:3).  He did not object to the arrangement.  After the leases were executed, GFIM provided Cornfeld with periodic operating reports for the properties and answered any questions he had about the figures.  *Id.* at 350:6–18; Gross Dec. ¶ 23.

      9.      In 2001, Cornfeld and Allen Gross negotiated a similar lease agreement for the Palm Gardens property.  At Allen Gross's direction, a new limited liability company — A&M Florida Properties II, LLC ("A&M II") — was created to act as the lessee.  (Gross Dec. ¶ 17).  Like A&M I, the new company was initially owned solely by Edith Gross, and subsequently came to be owned jointly by Allen and Edith.  (Stip. Fact No. 9).  In August 2001, AFTC and A&M II executed a 50-year lease.  The agreement required a $300,000 security deposit, (Stip. Fact No. 15), and provided that A&M II's principals would not be subject to "personal

liability . . . with respect to any of the [lease's] terms, covenants, conditions and provisions"
beyond a limited personal guaranty, (Joint Ex. 2 (Palm Gardens Lease) at 36).

10.     As they did under the previous leases, the Grosses personally funded A&M II's
security deposit. (Gross Dec. ¶ 21; Stip. Fact No. 15). A&M II then hired GFIM to manage the
leased property, apparently under terms similar to those reached by A&M I. (*See* Trial Tr. at
47:4–8 (referring to GFIM's management fee as six percent for Palm Gardens, among other
properties); Plaintiff's Ex. 300 (listing monthly management fee payments from A&M II)). As it
did for Carib Villas and Cutlerwood, GFIM provided Cornfeld with periodic operating reports
regarding Palm Gardens. (Trial Tr. at 350:6–18; Gross Dec. ¶ 23).

11.     In 2005, Cornfeld and Allen Gross negotiated a similar lease agreement for the
Shady Oaks property. At Allen Gross's direction, a new limited liability company — A&M
Florida Properties III, LLC ("A&M III") — was created to act as the lessee. (Gross Dec. ¶ 17).
The company was initially owned solely by Allen Gross, and subsequently came to be owned
jointly by Allen and Edith. (Stip. Fact No. 10). In January 2005, AFTC and A&M III signed a
50-year lease. The agreement required a $300,000 security deposit, (Stip. Fact No. 16), and
provided that A&M III's principals would not be subject to "personal liability . . . with respect to
any of the [lease's] terms, covenants, conditions and provisions" beyond a limited personal
guaranty, (Joint Ex. 1 (Shady Oaks Lease) at 43).

12.     As they did under the previous leases, the Grosses personally funded A&M III's
security deposit. (Gross Dec. ¶ 21; Stip. Fact No. 16). A&M III then hired GFIM to manage the
leased property, apparently under terms similar to those reached by the other A&M companies.
(*See* Trial Tr. at 47:4–8 (referring to GFIM's management fee as six percent for Shady Oaks,
among other properties); Plaintiff's Ex. 300 (listing monthly management fee payments from

A&M III)).  GFIM provided periodic operating reports regarding Shady Oaks to Cornfeld.  (Trial Tr. at 350:6–18; Gross Dec. ¶ 23).

### Loans From Related Entities

13.     Between 2000 and late 2006, the A&M companies encountered several unexpectedly high operating costs.  First, the leased properties sustained significant hurricane damage that required expensive repairs, which were not fully funded by insurance proceeds.  (Trial Tr. at 208:3–7, 208:10–24, 352:11–23).  Second, the threat of further hurricane damage drove up the cost of insuring the properties.  *Id.* at 208:7–10.  Third, rising property valuations in Florida led to higher property taxes.  *Id.* at 210:1–5.  And fourth, the properties experienced high tenant turnover, requiring costly efforts to attract new renters.  *Id.* at 211:22–25.  Allen Gross informed Cornfeld about those costs during 2006, if not earlier.  *Id.* at 212:5–9.

14.     Collectively, the A&M companies paid for the unanticipated costs of operating their properties — particularly the expense of repairing hurricane damage — partly by taking out more than one million dollars in interest-free loans from related entities.  Some of those loans came from Allen Gross, Edith Gross, and GFIM directly.  (*See* Gross Dec. ¶ 25; Stip. Fact Nos. 26, 37–39, 45).  Other loans came from separate corporations or companies that the Grosses owned and GFIM managed.  (*See* Plaintiff's Exs. 297–298 (summarizing accounting entries for inter-company loans involving the A&M companies)).  Those inter-company loans were arranged and executed by GFIM, which identified affiliated entities that could afford to loan money to the A&M companies; transferred funds accordingly; and recorded the transfers in a dedicated accounting ledger.  (Stip. Fact Nos. 27, 32–33; *see also* Trial Tr. at 56:2–9).  GFIM conceived of the loans as "short-term" transfers to address passing "cash flow issues," to be "repaid when cash was available."  (Trial Tr. at 56:6–9).  During trial, Allen Gross testified that

GFIM was authorized to execute some types of loan transactions between companies that he owned without his particularized approval, but that GFIM would seek his explicit signoff in certain circumstances.  (*See* Trial Tr. at 178:6–182:23).  The trial record does not indicate whether Allen Gross gave particularized approval for any of the inter-company loans to the A&M companies.[1]

15.     In late 2006, Allen Gross informed Cornfeld that because of their unexpected operating costs — particularly ongoing repair expenses — the A&M companies "no longer generated enough income" to pay their lease obligations to AFTC.  (Gross Dec. ¶ 25; *see also* Trial Tr. at 212:12–24).  During trial, Gross testified that he also told Cornfeld that the Grosses and several entities that they owned had loaned money to the A&M companies, which needed to be repaid "because [the lenders] thought they would be paid back long before."  (Trial Tr. 216:5–8; *see also* Gross Dec. ¶ 25).  Gross further testified that he told Cornfeld that it "didn't make sense" for Gross to loan more of his personal funds for further repairs to the leased properties, because the properties were "a bottomless pit" and would remain so absent a "complete gut renovation."  (Trial Tr. at 287:23–288:1).  During his own trial testimony, Cornfeld appeared not to dispute that he and Gross had discussed the repayment of loans, although his statements on the subject were vague.  (*See* Trial Tr. at 337:5–7 (indicating that Cornfeld had "a discussion with Mr. Gross about repayment of loans")).

16.     Soon after he informed Cornfeld that the A&M companies could no longer afford to pay their lease obligations, Allen Gross proposed purchasing the leased properties from AFTC.  Gross testified that he believed the purchase "would enable us to obtain institutional financing for the cost of needed repairs to the properties and . . . take advantage of certain tax

---

[1] GFIM also arranged and executed loans among the A&M companies.  (*See* Plaintiff's Exs. 297–298 (summarizing accounting entries for those loans)).

credits that were available with respect to the properties," which would render them economically viable. (Gross Dec. ¶ 26; *see also* Trial Tr. 200:11–17). Moshe Lehrfield, a lawyer at Greenberg Traurig who represented Gross and the A&M companies, offered similar testimony. (*See* Declaration of Moshe Lehrfield ("Lehrfield Dec.") ¶ 26 [ECF No. 205]). In response to Gross's request, Cornfeld agreed to negotiate a Purchase and Sale Agreement ("PSA") for the four leased properties. Gross testified that Cornfeld later "acknowledged that the lessees simply could not afford to pay rent at the previous levels because of economic conditions." (Gross Dec. ¶ 35).

17.     Around the same time, Allen Gross asked Cornfeld to grant the A&M companies a "rent abatement." (Trial Tr. at 213:9–20). A rent abatement entails the reduction of a tenant's lease obligations, usually in recognition of a deficiency in the leased property. *See, e.g.*, *Bates Adver. USA, Inc. v. 498 Seventh, LLC*, 7 N.Y.3d 115 (N.Y. 2006). Cornfeld did not agree to such a reduction. Instead, he offered to suspend collection of the A&M companies' lease obligations while the PSA was negotiated, as long as Gross agreed that the cumulative arrearage would be added to the purchase price for the four properties. (*See* Trial Tr. at 331:7–19). Gross assented. (*See* Gross Dec. ¶ 32). During trial, Gross testified that before the agreement regarding suspension of lease obligations was finalized, he told Cornfeld that the A&M companies planned to "do repairs" and "pay back loans," including to Gross, during the suspension period. (Trial Tr. at 330:22–331:22, 332:14–21). According to Gross, Cornfeld "didn't object" to those plans.[2] *Id.* at 332:23. Cornfeld, however, testified that Gross stated only

---

[2] In its post-trial briefing, AFTC dramatically misconstrues this portion of Allen Gross's testimony by claiming that he was "forced to admit that Dr. Cornfeld ***would have objected*** had he known" that the A&M companies intended to repay loans during the suspension period. (Plaintiff's Post-Trial Brief at 24 [ECF No. 234]). Gross made no such admission.

that the A&M companies planned to perform repairs — not that the A&M companies would make loan repayments to Gross during the suspension period.  *Id.* at 337:9–13.

18.     Cornfeld, Gross, and others negotiated the PSA throughout the first half of 2007. During that period, AFTC suspended collecting approximately two million dollars of the A&M companies' lease obligations.  (Stip. Fact No. 104).  The A&M companies, in turn, made repairs to the leased properties, (Trial Tr. at 216:9–12), and repaid more than one million dollars of loans from the Grosses, GFIM, and several affiliated entities.  (Stip. Fact Nos. 36–40, 44–47). Those repayments included the following transfers to Defendants:

- In June 2007, A&M repaid $350,000 to Allen Gross.  (Stip. Fact No. 37).

- In June 2007, A&M repaid $100,000 to Edith Gross.  (Stip. Fact No. 38).

- In June 2007, A&M repaid $10,000 to GFIM.  (Stip. Fact No. 39).

- In June 2007, A&M III repaid $25,000 to Edith Gross.  (Stip. Fact No. 45).

### The Signing and Dissolution of the PSA

19.     The PSA was finalized and signed on July 3, 2007.  (*See* Joint Ex. 19 (PSA) at 1). The agreement provided, in relevant part, that:

- AFTC would sell Carib Villas, Cutlerwood, Palm Gardens, and Shady Oaks to GFI Acquisition, LLC ("GFIA"), a company owned by Allen Gross, for $41,457,647.46 upon closing.  *Id.* at 2.  GFIA was required to prepare "counterpart closing statements and such other documents as are reasonably necessary to consummate [the] transaction."  *Id.* at 6.

- The security deposits for the A&M companies' leases, which totaled $2.6 million, would serve as a deposit for the sale.  *Id.* at 2.  In the event of GFIA's default

without fault on AFTC's part, that deposit would serve as liquidated damages. *Id.* at 4.

- The A&M companies' leases would remain in force until closing, but the companies would be obligated to pay "the lesser of [their normal lease obligations] or the actual cash flow (i.e., [r]ent received less ordinary operating expenses[).]" *Id.* at 3. In the event of GFIA's default, AFTC would have the right to terminate the A&M companies' leases. *Id.* at 3–4.

20.    Greenberg Traurig represented the A&M companies and GFIA in connection with the PSA. (*See* Stip. Fact No. 78). It appears that the A&M companies, but not GFIA, paid the corresponding legal fees. (*See* Stip. Fact Nos. 79–80).

21.    Ultimately, the PSA was scheduled to close in February 2008. In the months leading up to that date, the A&M companies and GFIA acquired letters of intent from an entity called Pinnacle Housing Group to purchase Carib Villas, Cutlerwood, and Shady Oaks for a total of $43,014,000. (*See* Plaintiff's Ex. 262). Allen Gross testified at trial that he informed Cornfeld about his dealings with Pinnacle, (Trial Tr. at 270:7–12), a claim that Cornfeld did not refute during his testimony. Around the same time, Gross explored the possibility of performing an "exchange of property" under 26 U.S.C. § 1031 by funding GFIA's purchase under the PSA with the proceeds from recent property sales conducted by other companies that Gross owned. (*See* Trial Tr. 265:16–19; Sept. 15, 2009 Deposition of Alan Schacter at 94:14–17, 114:12–25). Such an exchange would have deferred tax liability for the reinvested sale proceeds. (Trial Tr. at 265:20–266:10).

22.    When the designated closing date arrived, GFIA did not present the documents that it was required to prepare, and the PSA failed to close. During trial, Allen Gross, Lehrfield

and Cornfeld provided competing explanations for the failed closing.  Gross testified that before

the closing date, Cornfeld made clear "that he had changed his mind about the sale and did not

want to go through with it because he would have a substantial tax liability as a result."  (Gross

Dec. ¶ 41).  Lehrfield offered similar testimony.  (*See* Lehrfield Dec. ¶ 38).  Cornfeld, in

contrast, testified that AFTC was "ready, willing, and able and anxious to close," but could not

because GFIA did not provide the requisite documents.  (Trial Tr. at 359:1–4).

      23.    In March 2008, GFIA and the A&M companies sued AFTC in Florida court,

alleging that AFTC had fraudulently induced, and then breached, the PSA.  The plaintiffs sought

several remedies, including specific performance of the contract.  (*See* Joint Ex. 16).  The Court

refers to this suit as the PSA Action.

      24.    Around the same time, AFTC declared that the A&M companies had defaulted on

their leases and brought eviction lawsuits in several Florida courts.  (*See* Plaintiff's Ex. 273–

278).  Those courts then ordered the A&M companies to deposit at least portions of their alleged

arrearages and ongoing lease obligations into escrow.  (*See* Plaintiff's Ex. 65 (Palm Gardens

escrow order); Plaintiff's Ex. 67 (Carib Villas escrow order); Plaintiff's Ex. 286 (Cutlerwood

escrow order); Plaintiff's Ex. 290 (Shady Oaks escrow order)).

      25.    A&M II did not meet the deadline for its court-ordered escrow payments for Palm

Gardens.  In December 2008 — soon after the deadline had passed, and before AFTC could

obtain a writ of possession for the property — A&M II filed a Chapter 11 petition for bankruptcy

in the Southern District of New York.  (Plaintiff's Ex. 14).  The petition noted that AFTC's

eviction action "could potentially lead to forfeiture" of Palm Gardens, and claimed that A&M II

was "compelled to seek Chapter 11 relief in order to preserve the status quo pending final

resolution of the [PSA Action] for specific performance."  *Id.* at Affidavit 3.

26.     A&M III also failed to meet the deadline for its court-ordered escrow payments for Shady Oaks.  Unlike A&M II, however, A&M III did not seek to preserve the status quo by filing a bankruptcy petition, and AFTC was awarded a writ of possession for the property in December 2008.  A&M III complied with that writ and surrendered Shady Oaks.  (*See* Stip. Fact No. 108).

27.     A&M I, in turn, did not meet the deadline for its court-ordered escrow payments for Cutlerwood.  As a result, AFTC was awarded writs of possession for the property in July 2009.  (Plaintiff's Ex. 265).  At that time, A&M I was actively litigating the order that compelled escrow payments for Carib Villas.  Before resolving that litigation, A&M I filed a Chapter 11 bankruptcy petition in the Southern District of New York.  (Plaintiff's Ex. 13).  Echoing A&M II's petition, A&M I stated that AFTC's eviction actions "could potentially lead to forfeiture" of Cutlerwood or Carib Villas, and claimed that it was "compelled to seek Chapter 11 relief in order to preserve the status quo pending final resolution of the [PSA Action]."  *Id.* at Affidavit 3. Nonetheless, around this time, A&M I complied with AFTC's writs of possession and surrendered Cutlerwood.  (*See* Stip. Fact No. 108).

28.     In connection with A&M II's bankruptcy petition, the parties agreed to transfer the PSA Action to the bankruptcy court as an adversary proceeding.  The transfer was completed in April 2009.  (*See* Plaintiff's Ex. 39 at 1–2).  Shortly thereafter, AFTC filed counterclaims against GFIA (for breaching the PSA) and the A&M companies (for non-payment of their lease obligations).  *See id.* at 2; Joint Ex. 21 at 2–3.

### Bankruptcy Proceedings and Settlement

29.     Although the parties did not submit a complete record of the underlying bankruptcy proceedings, they established the following relevant facts at trial.

30.     First, soon after A&M II filed its Chapter 11 petition, AFTC filed a motion for relief from the bankruptcy proceeding's automatic stay.  To resolve that motion and retain the stay, A&M II agreed in January 2008 to make escrow payments similar to those that had been ordered in the prior eviction proceeding:  the alleged arrearage for Palm Gardens (in two installments), along with a portion of new lease payments allegedly due.  (*See* Plaintiff's Ex. 268).  The parties further agreed that A&M II would "be permitted to make payment of actual, reasonable and necessary management fees which will not exceed 6%, upon appropriate application to the Court, if required."  *Id.* ¶ 6.

31.     Around this time, A&M I and A&M III repaid several outstanding loans that they had received from A&M II.  A&M I repaid $40,000 in December 2008, and another $200,000 in February 2009.  (Stip. Fact Nos. 41–42).  A&M III, in turn, repaid $95,000 in April 2009.  (Stip. Fact No. 48).

32.     After A&M II filed for bankruptcy in December 2008, GFIM continued to provide property management services for Palm Gardens until January 2009.  A&M II made corresponding monthly fee payments, which were listed in monthly operating reports that the company filed with the bankruptcy court.  (*See* Plaintiff's Ex. 300 at 2; Plaintiff's Ex. 257 (2009 A&M II operating reports) at 5, 41).

33.     Similarly, after A&M I filed for bankruptcy in July 2009, GFIM continued to provide property management services for Carib Villas until March 2010.  A&M I made corresponding monthly fee payments, which were listed in monthly operating reports that the company filed with the bankruptcy court.  (*See* Plaintiff's Ex. 300 at 2–3; Plaintiff's Ex. 167 (2009 A&M I operating reports); Plaintiff's Ex. 166 (2010 A&M I operating reports)).  In the course of managing A&M I's accounts, GFIM paid $22,189.92 in April 2010 "for materials and

13

contracting services provided to a property in Florida owned or leased by Landmark Towers, LLC, an entity owned by Mrs. Gross and affiliated with A & M [I]." (Stip. Fact No. 69).

34.     In July 2010, AFTC filed a turnover motion against GFIM in connection with A&M I's bankruptcy. (*See* Joint Ex. 10). The motion sought to recover A&M I's post-petition management fee payments, which AFTC deemed improper because GFIM had not received prior approval from the court to manage A&M I in bankruptcy. *Id.* at 4–10. The motion also sought reimbursement from GFIM for the payments on behalf of Landmark Towers, which purportedly did not benefit A&M I. *Id.* at 11–13.

35.     All the while, AFTC, the A&M companies, and GFIA continued to litigate the PSA Action, which had been transferred to the bankruptcy court as an adversary proceeding. In July 2010, the bankruptcy court granted summary judgment for AFTC on the A&M companies' and GFIA's surviving claims, which related to fraudulent inducement and breach of contract.[3] (Plaintiff's Ex. 32).

36.     Soon after, in October 2010, the bankruptcy court approved a comprehensive stipulation of settlement among AFTC, the A&M companies, GFIA, and GFIM. (Joint Ex. 21). Under the agreement, AFTC's counterclaims were granted, with corresponding judgments of $7 million against the A&M companies and $500,000 against GFIA. *Id.* at 3. Separately, GFIM settled AFTC's turnover motion for $100,000. *Id.* at 4. A&M I and A&M II's bankruptcy petitions were dismissed.

37.     Greenberg Traurig represented the A&M companies and GFIA in connection with the PSA Action and the related adversary proceeding. (*See* Stip. Fact No. 78). It appears that the A&M companies, but not GFIA, paid the corresponding legal fees. (*See* Stip. Fact Nos. 79–80).

---

[3] The A&M companies and GFIA had previously abandoned their request for specific performance. (*See* Plaintiff's Ex. 32 at 4).

38.     GFIM paid its $100,000 judgment in full.  (*See* Defendants' Ex. 20).  The A&M companies and GFIA, however, paid no portion of their aggregate $7.5 million judgment. (Second Additional Stip. Fact. Nos. 1–2 [ECF No. 232]).

## II.     Legal Framework

Having failed to collect the $7.5 million judgment from the A&M companies or GFIA, AFTC commenced this special proceeding under CPLR § 5225(b) to recover all or part of the judgment from Defendants, on two theories.  First, AFTC claims that the A&M companies' payment of management fees to GFIM and repayment of loans to all Defendants constituted fraudulent conveyances under New York Debtor and Creditor Law ("DCL") §§ 273, 273-a, and 276.  AFTC seeks to compel Defendants to return those conveyances in satisfaction of the settlement.  Second, AFTC claims that Defendants should be held liable for all debts of the A&M companies and GFIA — including the full $7.5 million settlement — under the doctrine of veil piercing.  This section details the legal framework that governs AFTC's claims.[4]

### A.  CPLR § 5225(b)

When a plaintiff wins a judgment that remains unpaid, CPLR § 5225(b) enables the plaintiff (or "judgment creditor") to satisfy the judgment by recovering certain money or property held by third parties.  The statute provides, in relevant part, that:

> Upon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor and, if the amount to be so paid is insufficient

---

[4] The Court previously dismissed Defendants' counterclaim for breach of contract.  (*See* July 1, 2015 Order [ECF No. 224]).

to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment, to a designated sheriff.

N.Y. CPLR § 5225(b).

A judgment creditor may raise several types of claims within a special proceeding, including a fraudulent conveyance claim against a third party to which the judgment debtor transferred assets, *see F.D.I.C. v. Conte*, 204 A.D.2d 845, 846 (2d Dep't 1994), and a claim to pierce the judgment debtor's corporate veil and hold a third party responsible for the debtor's obligations, *see Am. Fed. Title Corp. v. GFI Mgmt. Servs.*, 39 F. Supp. 3d 516, 522 (S.D.N.Y. 2014) (Nathan, J.). Notably, a party is not "in possession or custody" of an asset if the party exerts merely constructive possession over it. *See Commonwealth of N. Mariana Islands v. Canadian Imperial Bank of Commerce*, 21 N.Y.3d 55, 61 (N.Y. 2013) (holding that the phrase "possession or custody" in § 5225(b) requires actual, and not merely constructive, possession). Thus, § 5225(b) does not permit a plaintiff to recover property held by a defendant corporation's non-party subsidiary based merely on a showing that the defendant corporation constructively possesses the property. *See id.* at 59–60.

B. Fraudulent Conveyances

DCL §§ 273, 273-a, and 276 define several types of conveyances by a debtor as fraudulent, and thus recoverable by creditors. Those conveyances fall into two distinct categories: constructively fraudulent conveyances, as defined by DCL §§ 273 and 273-a, and actually fraudulent conveyances, as defined by DCL § 276.[5]

Constructively fraudulent conveyances under DCL §§ 273 and 273-a are defined exclusively by the objective conditions of the asset transfer at issue, without regard to the

---

[5] DCL §§ 274 and 275 define additional types of fraudulent conveyances. Those provisions are not at issue in this case.

debtor's intent in making the transfer.  Under DCL § 273, a conveyance is constructively fraudulent if it lacks "fair consideration" and the debtor "is or will be thereby rendered insolvent."  DCL § 273.  And under DCL § 273-a, a debtor's transfer of assets is constructively fraudulent if the transfer lacks "fair consideration" and the debtor "is a defendant in an action for money damages" and ultimately "fails to satisfy the [resulting final] judgment."  DCL § 273-a. These conveyances need not be intentionally harmful to creditors; it is the effect of the transfers alone, and not their purpose, that renders them constructively fraudulent.

The concept of fair consideration merits brief elaboration.  Generally, a transfer of assets is made for fair consideration if the transferor receives (or has received) "fair equivalent" value in return.  DCL § 272.  Thus, in most cases, the repayment of an antecedent debt is made for fair consideration.  *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir. 1995) (stating that "the preferential repayment of pre-existing debts to some creditors" generally "does not constitute a [constructively] fraudulent conveyance" under New York law); DCL § 272 (stating that the repayment of an antecedent debt may constitute fair consideration).  But there is a significant exception to that rule:  the repayment of an antecedent debt is never made for fair consideration where the transferee is a "corporate insider," *Frank*, 48 F.3d at 635, including "an officer, director, or major shareholder of the transferor," *In re Sharp Int'l Corp.*, 403 F.3d 43, 54 (2d Cir. 2005) (internal quotation marks omitted).  That exception applies only to payments that satisfy preexisting obligations.  Thus, a debtor may receive fair consideration if it makes a payment to a corporate insider in exchange for new value contemporaneously provided.  *See Frank*, 48 F.3d at 635 (holding that the exception for repayment of an insider's antecedent debt did not apply to a debtor's conveyance of two mortgages to a former officer, "regardless of whether she was a corporate insider, because each of her mortgages secured a *contemporaneous*

17

advance of funds, not a pre-existing debt"); *see also Cilco Cement Corp. v. White*, 55 A.D.2d 668, 668 (2d Dep't 1976) (holding that an insolvent corporation's salary payments to a corporate officer did not lack fair consideration because there was "no evidence that [the] salary was either excessive or unreasonable, or that the corporation did not receive full value in return").

Actually fraudulent conveyances, in contrast to constructively fraudulent transfers, are defined exclusively by the debtor's intent.  Under DCL § 276, a debtor's transfer of assets is actually fraudulent if it was made "to hinder, delay, or defraud either present or future creditors." DCL § 276.  The objective conditions and effect of the asset transfer are not irrelevant under this statute, as they may provide evidence of the debtor's fraudulent intent.  Ultimately, however, it is the debtor's wrongful purpose that renders a conveyance actually fraudulent.

The primary remedy for any fraudulent conveyance is avoidance, which permits a plaintiff creditor to recover the transferred assets from the third-party recipient.  If the recipient has since "spent or dissipated the property conveyed," CPLR § 5225(b) "furnishes a mechanism for obtaining [an equivalent] money judgment against the recipient."  *F.D.I.C. v. Conte*, 204 A.D.2d 845, 846 (2d Dep't 1994).  Additionally, the plaintiff is entitled to an award of reasonable attorney's fees if the "conveyance is found to have been made by the debtor and received by the transferee with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors."  DCF § 276-a.

### C. Piercing the Corporate Veil

The equitable doctrine of veil piercing permits courts to "disregard the corporate form" and hold a third party liable for a corporate entity's debts in certain circumstances.  *Walkovszky v. Carlton*, 18 N.Y.2d 414, 417 (N.Y. 1966).  To decide whether to pierce the corporate veil, New York courts apply a two-prong standard that requires proof of both external control and

wrongdoing.  To establish external control, the plaintiff must prove that a third party "exercised complete domination of the corporation in respect to the transaction attacked."  *Morris v. New York State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 141 (1993).[6]  To establish wrongdoing, in turn, the plaintiff must prove that the third party used its control over the corporation "to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury."  *Id.*; *see also Freeman*, 119 F.3d at 1053 ("New York law will not allow the corporate veil to be pierced in the absence of a showing that [external] control was used to commit wrong, fraud, or the breach of a legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights, and that the control and breach of duty proximately caused the injury complained of." (internal quotation marks omitted)).  In other words, the plaintiff must establish that the third party "abused the privilege of doing business in the corporate form."  *Morris*, 82 N.Y.2d at 142.

The veil-piercing standard is broadly worded and grants substantial equitable discretion to the court.  *See Brunswick Corp. v. Waxman*, 599 F.2d 34, 36 (2d Cir. 1979) ("'What the formula comes down to, once shorn of verbiage . . . is that liability is imposed to reach an equitable result.'" (quoting Elvin R. Latty, *Subsidiaries and Affiliated Corporations* 191 (1936)).  As a result, "[v]eil piercing determinations are fact specific and differ with the circumstances of each case."  *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 777–78 (2d Cir. 1995) (internal quotations and modification removed).  That said, prior decisions provide useful guidance regarding the threshold for liability.

---

[6] In certain decisions, the Second Circuit has phrased this showing differently, requiring plaintiffs to prove that "the owner has exercised such control that the corporation has become a mere instrumentality of the owner, which is the real actor."  *Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044, 1052 (2d Cir. 1997); *see also Atateks Foreign Trade, Ltd. v. Private Label Sourcing, LLC*, 402 F. App'x 623, 625 (2d Cir. 2010) (same).  AFTC argues that this language requires something less than "complete domination," and thus imposes a more lenient standard for external control.  (*See* Plaintiff's Post-Trial Brief at 8).  The Court disagrees.  The Second Circuit's language merely rephrases the New York Court of Appeals's "complete domination" standard, which is the definitive statement of state veil-piercing law.

As an initial matter, New York courts have made clear that the veil-piercing standard is demanding.  The Court of Appeals has repeatedly emphasized that "'[t]hose seeking to pierce a corporate veil . . . bear a heavy burden.'"  *ABN AMRO Bank, N.V. v. MBIA Inc.*, 17 N.Y.3d 208, 235 (N.Y. 2011) (quoting *TNS Holdings v. MKI Sec. Corp.*, 92 N.Y.2d 335, 339 (N.Y. 1998)).  In the same vein, lower courts routinely caution that "the corporate form is not lightly to be disregarded."  *Treeline Mineola, LLC v. Berg*, 21 A.D.3d 1028, 1029 (2d Dep't 2005) (internal quotation marks omitted).  These refrains reflect a measure of judicial concern about impinging on legitimately advantageous uses of the corporate form.  It is "well established . . . that a business can be incorporated for the very purpose of enabling its proprietor to escape personal liability" for the business's operations, even though the proprietor continues to benefit from the business's success.  *Id.*  New York's demanding veil-piercing standard serves in part to ensure that courts do not mistake that type of permissibly advantageous incorporation for inequitable abuse.

Turning to the distinct prongs of the veil-piercing standard, the Second Circuit has identified several factors that may be relevant to a determination of external control.  Those factors include:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Wm. Passalacqua Builders, Inc. v. Resnick Developers* S., *Inc.*, 933 F.2d 131, 139 (2d Cir.

1991).  This list of factors is neither exhaustive nor universally relevant.  The significance of

corporate formalities, for example, changes depending on the corporate form at issue.  *See, e.g.*,

*Capricorn Investors III, L.P. v. Coolbrands Int'l, Inc.*, 897 N.Y.S.2d 668, at *5 (N.Y. Sup. Ct.),

*aff'd*, 66 A.D.3d 409 (1st Dep't 2009) (explaining that the absence of "officers or directors" and

"board or executive committee meetings," although unusual for many corporate forms, is "not

[a] persuasive veil piercing factor[] for an LLC, where plaintiff does not argue that management

was required to be centralized in a board").  In any event, "[n]o one factor is determinative and

courts must conduct a broad-based inquiry into the totality of the facts to determine whether the

party seeking to pierce the corporate veil has established the domination prong of the test."  *In re

Stamou*, No. 8-09-78895, 2013 WL 209473, at *7 (Bankr. E.D.N.Y. Jan. 17, 2013).

As for the threshold for wrongdoing, prior decisions have emphasized that the controlling

party must compel the corporation to act in furtherance of a deceitful or otherwise unjust

purpose.  *See Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 257 F. Supp. 2d 751, 760 (S.D.N.Y. 2003)

(Marrero, J.) (explaining that only "intentionally deceptive" or "intentional and unjust" acts

justify piercing the corporate veil); *see also In re Kummerfeld*, 444 B.R. 28, 49–50 (Bankr.

S.D.N.Y. 2011) (Gonzalez, J.) (explaining that in New York veil-piercing actions, "[t]he liability

stems from using the control over the corporation for a wrongful purpose"); *Margarine

Verkaufsunion G.m.B.H. v. M.T.G.C. Brovig*, 318 F. Supp. 977, 980 (S.D.N.Y. 1970) (Weinfeld,

J.) (suggesting that "an intent to commit a fraud or to violate a statutory duty" is necessary "to

justify piercing the corporate veil"); *Morris*, 82 N.Y.2d at 141–42 (requiring a "wrongful or

unjust act toward plaintiff").  Thus, "a [corporation's] breach of contract, without evidence of

fraud or corporate misconduct, is not sufficient to pierce the corporate veil, which is an equitable

21

remedy at its core." *Ross Univ. Sch. of Med., Ltd. v. Brooklyn-Queens Health Care, Inc.*, No. 09-CV-1410, 2013 WL 1334271, at *16 (E.D.N.Y. Mar. 28, 2013) (citing *Sheridan Broadcasting Corp. v. Small*, 2004 WL 5833748 (N.Y. Sup. Ct. July 30, 2004), *aff'd*, 19 A.D.3d 331 (1st Dep't 2005)); *see also Cary Oil*, 257 F. Supp. 2d at 759–60 (holding that a corporation's breach of contract alone, without evidence of "bad faith, the commission of a fraud, or any sort of nefarious motivation on the part of any of the [controlling] Defendants," does not warrant veil piercing).[7]

Although courts have pierced the corporate veil based on a variety of deceitful or unjust acts, one type of culpable conduct recurs with particular frequency:  a controlling party intentionally renders a corporation judgment-proof in order to avoid paying obligations to the corporation's creditors.  In some cases, the controlling party creates a judgment-proof "dummy" corporation as a means to incur, but ultimately avoid paying, personal obligations.  *See, e.g.*, *Thrift Drug v. Prescription Plan Serv. Corp.*, 1 F. Supp. 2d 387, 388 (S.D.N.Y. 1998) (Knapp, J.) (piercing the veils of several corporations because their owner's "sole reason for creating and maintaining the[] corporations was to enable him to conduct his personal business in such a manner that no assets used in the businesses could ever be reached by any creditor"); *Ventresca Realty Corp. v. Houlihan*, 41 A.D.3d 707, 709 (2d Dep't 2007) (piercing the veil of a corporation created as "a mere 'dummy' or 'shell' entity . . . for the purpose of signing the lease" on property that the controlling shareholders used for personal and unrelated business activity).  In other

---

[7] This emphasis on the defendant's unjust motive is compelled by New York's two-prong legal standard.  If a controlling party could be held liable for any corporate transaction, regardless of the intent with which it was carried out, then proof of external control and causation alone could suffice to pierce the corporate veil.  Whatever the policy appeal of that approach, it is not New York's law.  *See Morris*, 82 N.Y.2d at 141–42 (explaining that "domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required" to pierce the corporate veil); *see also Guptill Holding Corp. v. State*, 33 A.D.2d 362, 365 (3d Dep't 1970), *aff'd*, 31 N.Y.2d 897 (N.Y. 1972) (declining to pierce the corporate veil because "[w]hile [defendant] clearly had complete dominion and control over the [corporation], this is not the type of case where this control was used to commit a wrong").

cases, the controlling party strips the assets from a previously legitimate corporation in order to avoid satisfying preexisting obligations that the corporation incurred in the ordinary course of business.  *See, e.g.*, *Matter of Arbitration Between Holborn Oil Trading Ltd. & Interpol Bermuda Ltd.*, 774 F. Supp. 840, 847 (S.D.N.Y. 1991) (Leisure, J.) ("It is clear that proof of a stripping of the assets of the subsidiary by the parent, motivated by a desire to render the subsidiary judgment proof, would constitute a 'fraud or wrong' justifying piercing of the corporate veil." (internal quotation marks omitted)); *Rebh v. Rotterdam Ventures Inc.*, 252 A.D.2d 609, 611 (3d Dep't 1998) (recognizing that a controlling party's "scheme to denude [a corporation] of its assets in order to render it unable to honor its obligations" would justify piercing the corporate veil (internal quotation marks omitted)).  As discussed below, AFTC's veil-piercing claim is modeled on the claims in the latter line of decisions.

    D.  <u>Relationship Between the Veil Piercing Doctrine and Fraudulent Conveyance Law</u>

The relationship between New York's veil-piercing doctrine and fraudulent conveyance law is somewhat complex, and highlights the fundamental distinction between actually and constructively fraudulent transfers.  On one hand, veil-piercing actions premised on the intentional stripping of corporate assets are closely related to actually fraudulent conveyance claims under DCL § 276.  When a controlling party "denude[s] the [corporation] of its assets in order to render it unable to honor its obligations," *Rebh*, 252 A.D.2d at 611, the controlling party necessarily makes conveyances "to hinder, delay, or defraud either present or future creditors," DCL § 276.  Thus, a successful veil-piercing action premised on asset stripping proves an actually fraudulent conveyance under DCL § 276, and a successful claim under DCL § 276 usually establishes wrongdoing (although perhaps not control or causation) sufficient to justify veil-piercing.  *See, e.g.*, *NPR, LLC v. Met Fin. Mgmt., Inc.*, 63 A.D.3d 1128, 1130 (2d Dep't

2009) (affirming holding that deemed actually fraudulent conveyances under DCL § 276 a sufficient basis for veil piercing).

On the other hand, the connection between veil-piercing and constructively fraudulent conveyances under DCL §§ 273 and 273-a is more tenuous.  Such conveyances are defined exclusively by the objective conditions of transfer, without regard to actual intent.  Thus, even if a constructively fraudulent transfer has the *effect* of removing assets that could have been used to satisfy a corporation's obligations to other creditors, the transfer may not have been made with a deceitful or unjust *purpose*.  Absent persuasive evidence of a culpable motive, therefore, a claim that is successful under DCL §§ 273 or 273-a may not establish wrongdoing sufficient to justify veil-piercing.  *See TLC Merch. Bankers, Inc. v. Brauser*, No. 01-CV-3044, 2003 WL 1090280, at *5 (S.D.N.Y. Mar. 11, 2003) (Lynch, J.) (finding that the owner of a judgment-proof corporation had previously transferred some of its assets to another entity that the owner controlled, but concluding that "[w]hether or not this transaction constituted constructive fraud for the purposes of [DCL] § 273 – a provision that denotes certain transactions as 'fraudulent . . . *without regard to . . . actual intent*' – there is no showing here of the *purposeful* abuse of the corporate form required to pierce the corporate veil so as to reach individual stockholders" (emphases added)); *see also Port Chester Electric Const. Co. v. Atlas*, 40 N.Y.2d 652, 656–57 (N.Y. 1976) (finding that the owner of a judgment-proof corporation had fraudulently conveyed its assets to other entities that the owner controlled, but declining to pierce the corporate veil on that basis).  By the same token, evidence that a controlling party executed a constructively fraudulent transfer with a deceitful or unjust purpose can justify veil-piercing, even absent a successful claim under DCL § 276.  *See Atateks Foreign Trade Ltd. v. Private Label Sourcing, LLC*, No. 07-CV-6665, 2009 WL 1803458, at *15–16, 18 (S.D.N.Y. June 23, 2009) (Baer, J.), *aff'd*, 402 F. App'x 623 (2d

Cir. 2010) (holding that a corporation's payment of "commissions" to one of its owners was constructively fraudulent under DCL § 273 and justified piercing the corporate veil because the commissions were inappropriately transferred for the owner's "personal use" without compensation to the corporation, apparently as part of a "'kickback' scheme" devised by the owner).

    E.  Burdens of Proof

        The parties agree — and case law makes clear — that AFTC must prove its claim under DCL § 276 by clear and convincing evidence. *See United States v. McCombs*, 30 F.3d 310, 328 (2d Cir. 1994); *U.S. Bancorp Equip. Fin., Inc. v. Rubashkin*, 98 A.D.3d 1057, 1060 (2d Dep't 2012). But the parties disagree about which evidentiary standard applies to AFTC's claims under DCL § 273, DCL § 237-a, and the veil piercing doctrine: AFTC argues for the preponderance standard, while Defendants contend that the clear-and-convincing standard applies. The case law on these issues, particularly the burden of proof under DCL §§ 273 and 273-a, leaves some room for debate.[8] As explained below, however, the Court would resolve AFTC's claims under DCL § 273, DCL § 273-a, and the veil-piercing doctrine the same way

---

[8] In 2003, another court in this District held in *Lippe v. Bairnco Corporation* that the preponderance standard governs claims under § 273, for reasons that apply with equal force to § 273-a. *See* 249 F.Supp.2d 357, 376 n.6 (S.D.N.Y. 2003) (Chin, J.). The Second Circuit affirmed that decision, *Lippe v. Bairnco Corp.*, 99 F. App'x 274 (2d Cir. 2004), and several subsequent federal decisions have taken the same approach, *see In re Dreier LLP*, 452 B.R. 391, 442 (Bankr. S.D.N.Y. 2011); *In re Borriello*, 329 B.R. 367, 373 (Bankr. E.D.N.Y. 2005). After *Lippe* was decided, however, two New York appellate courts applied the clear-and-convincing standard to claims under §§ 273 and 273-a. *See Rubashkin*, 98 A.D.3d at 1060 (reversing judgment in plaintiff's favor because the plaintiff "failed to establish, by clear and convincing evidence, . . . a fraudulent conveyance under either section 273 or section 275 of the Debtor and Creditor Law"); *Farkas v. D'Oca*, 305 A.D.2d 237, 237 (1st Dep't 2003) ("The trial court properly dismissed the complaint upon the ground that plaintiff had failed to establish by clear and convincing evidence that the payments at issue . . . were fraudulent conveyances under either section 273 or section 273-a of the Debtor and Creditor Law."). The conflict between these lines of cases remains unresolved. *See Fed. Nat. Mortgage Ass'n v. Olympia Mortgage Corp.*, No. 04-CV-4971, 2011 WL 2414685, at *8 (E.D.N.Y. June 8, 2011) (noting, without resolving, the "dispute as to the appropriate standard of proof required to prove constructive fraud under § 273").

under either the preponderance standard or the clear-and-convincing standard.  Accordingly, the Court need not decide which standard applies to those claims.

## III.    Conclusions of Law

Applying the foregoing legal framework to its findings of fact, the Court holds that AFTC has prevailed on some of its fraudulent conveyance claims, but not on its veil-piercing claim.

### A.  Fraudulent Conveyances

AFTC contends that Defendants received two types of fraudulent conveyances from the A&M companies:  the management fees paid to GFIM and the loan repayments made to all Defendants.  According to AFTC, those transfers were constructively fraudulent under CPLR §§ 273 and 273-a and actually fraudulent under CPLR § 276.  The Court evaluates each type of transfer in turn.

### Management Fees

Regarding management fees, AFTC failed to establish — even under the preponderance standard — that the A&M companies' payments to GFIM lacked fair consideration under CPLR §§ 273 or 273-a.  As an initial matter, AFTC offered no evidence that the management fees were disproportional to the value of GFIM's management services.  Indeed, during an exchange with the Court, AFTC's counsel expressly declined to contend that the management fees were disproportional.  (Trial Tr. at 225:6–14).  AFTC thus failed to prove that the management fee payments were not transferred for "fair equivalent" value.  DCL § 272.  *Cf. In re White Metal Rolling & Stamping Corp.*, 222 B.R. 417, 430 (Bankr. S.D.N.Y. 1998) (holding that management fees lacked fair consideration because the recipient "never rendered" corresponding management services).

26

As AFTC emphasizes in its post-trial briefing, the management fee payments would nonetheless have lacked fair consideration if they had been made in satisfaction of an antecedent debt to a corporate insider.  (*See* Plaintiff's Post-Trial Brief at 31–32).  During trial, however, AFTC failed to establish — again, even under the preponderance standard — that any management fee payment satisfied an obligation that qualified as antecedent under DCL §§ 273 or 273-a.  As noted in the preceding findings of fact, the relevant evidence in the record indicates that the A&M companies became obligated to — and did — pay additional management fees to GFIM each month.  (*See* Plaintiff's Ex. 300 (accounting records of monthly management fee payments)).  AFTC has cited no evidence that any of the A&M companies' monthly fee payments satisfied an arrearage rather than a new monthly obligation; indeed, AFTC never sought to establish that the A&M companies accumulated an arrearage to GFIM in the first place, let alone that the companies paid down such an arrearage after they became insolvent or were named as defendants.  Accordingly, based on the trial record, the Court concludes that the A&M companies satisfied their monthly obligations to GFIM only as they came due, in exchange for essentially contemporaneous management services.  Under New York law, such payments are made for fair consideration where, as here, they are exchanged for fair equivalent value — even if the transferees are corporate insiders.[9]  *See Frank*, 48 F.3d at 635; *see also Cilco Cement*, 55 A.D.2d at 668; *cf. In re White Metal Rolling*, 222 B.R. at 430 (suggesting that "the payment to an insider on account of *past due* management fees lacks fair consideration" under New York law, but making no mention of timely management fees (emphasis added)).

---

[9] AFTC may characterize the A&M companies' management fee payments to GFIM as "antecedent" because they were made pursuant to preexisting agreements among the parties.  But it is the particular obligation satisfied, and not the underlying agreement, that must qualify as "antecedent" under DCL §§ 273 and 273-a.  As explained above, AFTC has not established that the A&M companies paid GFIM in satisfaction of antecedent monthly obligations.

Turning to DCL § 276, AFTC failed to establish by clear and convincing evidence that the management fee payments were intended to "hinder, delay, or defraud" AFTC in its capacity as creditor. The payments were disclosed to Cornfeld, and served to fairly compensate GFIM for the value that the A&M companies received from GFIM's management services. There is no significant evidence in the trial record that the payments served some other, wrongful purpose, such as interference with AFTC's collection of debts.

### Loan Repayments

Unlike the management fee payments, the loan repayments to Defendants were constructively fraudulent under DCL § 273 (even under the clear-and-convincing standard).[10] Allen Gross informed Cornfeld in late 2006 that the A&M companies could no longer afford to pay their lease obligations — in other words, that the companies were insolvent. The A&M companies remained insolvent during the first half of 2007; although Cornfeld agreed to suspend collection of the companies' lease obligations during this period, the obligations still accumulated into an arrearage for which the A&M companies were (conditionally) responsible, but which they could not afford to pay. (*See* Gross Dec. ¶ 32 (acknowledging that the A&M companies were significantly "in arrears" under their leases when the PSA was finalized)). In June 2007, while insolvent, the A&M companies repaid antecedent debts owed to Defendants, who — because of their ownership of or managerial authority over the A&M companies —

---

[10] AFTC appears to seek recovery under DCL § 273 of the loan repayments that the A&M companies made to non-party corporate entities owned by Allen or Edith Gross. (*See* Plaintiff's Post-Trial Brief at 32; *but see* June 2, 2015 Hearing Transcript at 14:23–15:7 [ECF No. 199] (statements by AFTC's counsel suggesting that AFTC does not seek to recover transfers from the A&M companies to non-parties under fraudulent conveyance law)). That recovery would be improper. The corporate entities are not defendants in this action, and although the Grosses or GFIM might have constructively possessed funds transferred to those entities — a fact not established at trial — constructive possession alone is not a basis for recovery under CPLR § 5225(b). *See Canadian Imperial Bank*, 21 N.Y.3d at 61; N.Y. CPLR § 5225(b).

qualified as corporate insiders.  Those payments lacked fair consideration, and so were constructively fraudulent under DCL § 273.[11]

That said, AFTC did not establish by clear and convincing evidence that the transfers were actually fraudulent under DCL § 276.  Throughout this action, AFTC has contended that the A&M companies repaid Defendants with the fraudulent intent of removing from AFTC's reach assets that would otherwise have been used, at some point in the future, to satisfy the companies' arrearages under the leases.  That contention simply was not borne out at trial. Rather, the evidence submitted shows that at the time of the loan repayments, the A&M companies and Defendants believed that the arrearages would be satisfied by the purchaser under the PSA, without recourse to additional assets from the A&M companies.  There is thus insufficient evidence that the A&M companies made the loan repayments with the fraudulent intent to harm AFTC.

Critically, in June 2007, Allen Gross and the A&M companies had already agreed with Cornfeld that the companies' unpaid lease obligations would be added to the PSA purchase price and settled by the purchaser at closing.  Several facts in the record indicate that Gross and the A&M companies genuinely intended to close on the PSA, both at the time of the loan repayments and afterward.  First, a few weeks after the loan repayments, GFIA and the A&M companies signed the PSA.  Second, in late 2007, those entities negotiated letters of intent from Pinnacle to purchase three of the properties for a significant premium relative to the PSA valuations, which would be possible only if the PSA closed.  Third, Allen Gross and his employees made plans to execute the PSA through an 18 U.S.C. § 1031 exchange, which

---

[11] To the extent that Defendants' affirmative defenses — including acceptance and ratification, waiver, and res judicata (*see* Joint Pretrial Report at 4 [ECF No. 133]) — are intended to apply to AFTC's § 273 claim regarding the loan repayments, the Court rejects those defenses.

promised substantial tax benefits.  And fourth, after the PSA failed to close, GFIA and the A&M companies sued AFTC for specific performance, effectively fighting for the opportunity to pay the negotiated purchase price.  Further, Allen Gross and Moshe Lehrfield, who provided legal counsel to the A&M companies regarding the PSA, testified that they intended to complete the purchase of the properties, and did not close in February 2008 only because they believed that Cornfeld had refuted the transaction.

AFTC has not clearly and convincingly rebutted the evidence that Gross and the A&M companies intended to close the PSA at the time of the loan repayments.  AFTC does not dispute, for example, that Gross planned to follow through on either the planned § 1031 exchange or the resale to Pinnacle.  (*See* Plaintiff's Post-Trial Brief at 2, 18–19).  As for the PSA Action, AFTC argues that the lawsuit was a "sham" because its breach-of-contract and fraudulent inducement claims failed on the merits.  *Id.* at 19.  The lawsuit's eventual dismissal, however, does not suffice to prove that the A&M companies and Gross did not intend to close the PSA in June 2007.

AFTC has thus failed to establish that the A&M companies acted with actual fraudulent intent to harm AFTC when they repaid loans from Defendants.  At the time the repayments were made, Cornfeld and Gross had agreed that the purchaser under the PSA, rather than the A&M companies, would satisfy outstanding lease obligations to AFTC.  There is no compelling evidence that this agreement was a sham.  Accordingly, the Court concludes that the A&M companies repaid loans to Defendants in anticipation of being *released* from obligations to

AFTC, rather than encumbered by them.[12]  That fact is no defense to liability under DCL § 273, but it is fatal to AFTC's claim under DCL § 276.[13]

B.  Veil Piercing

As explained above, "the corporate form is not lightly to be disregarded."  *Berg*, 21 A.D.3d at 1029.  To pierce the veils of the A&M companies and GFIA, AFTC must prove not merely that Defendants exercised "complete domination" over those entities, but also that Defendants "abused the privilege of doing business in the corporate form" by using their domination to commit a deceptive or intentionally unjust act that harmed AFTC.  *Morris*, 82 N.Y.2d at 142.  That is a "heavy burden" for any plaintiff, *ABN AMRO*, 17 N.Y.3d at 235, and one that AFTC has failed to carry here (even under the preponderance standard).

Before trial, AFTC alleged that Defendants had engaged in a deceptive scheme designed to "intentionally and methodically strip[] [the A&M companies] of their assets" so that they would be unable to meet their lease obligations to AFTC.  (Am. Compl. ¶ 4).  According to

---

[12] In its pre-trial brief, AFTC claims that Allen Gross asked Cornfeld to suspend collection of the A&M companies' lease obligations so that the companies could pay for property repairs, but then compelled the companies "to repay [Gross] for purported 'loans'" instead.  (Plaintiff's Pre-Trial Brief at 3 [ECF No. 207]).  This section of AFTC's brief could be read to suggest that Gross fraudulently induced Cornfeld to agree to suspend collection of the lease obligations, although AFTC never makes that claim explicitly.

Two points bear mention about that potential fraudulent inducement claim.  First, it is not adequately supported by the record.  During trial, Gross testified that he informed Cornfeld in late 2006 that the loans from himself, his wife and their other companies needed to be repaid.  Cornfeld did not dispute that testimony.  Moreover, Cornfeld did not testify that Gross expressly represented that the A&M companies would *not* repay the loans during the suspension period — or that Cornfeld himself affirmatively imposed such a condition.  Rather, Cornfeld testified merely that Gross did not explicitly request permission to repay the loans.  That record does not establish by clear and convincing evidence that Gross intentionally misled Cornfeld about how the A&M companies would spend money while their lease obligations were suspended, or that Cornfeld (who planned to be repaid in full by the purchaser under the PSA) relied on any perceived representation to that effect when he agreed to the suspension.

Second, even if Gross had fraudulently induced Cornfeld to agree to the suspension, that fact — on its own — would not establish that the loan repayments themselves were made with the intent to "delay, defraud, or hinder" AFTC, as required under DCL § 276.

[13] In its post-trial brief, AFTC argues that Defendants' loans to the A&M companies actually constitute capital contributions, and the loan repayments were in fact returns of capital.  (*See* Plaintiff's Post-Trial Brief at 9–13).  The Court need not resolve that issue.  Although the distinction between loans and capital is critical when determining priority among creditors, it would make no difference to the Court's fraudulent conveyance analysis:  if the loan repayments were actually returns of capital, they still would have lacked fair consideration under DCL § 273, and they still would not have been actually fraudulent under DCL § 276.

AFTC's Amended Complaint, the scheme started when Allen Gross, acting in "bad faith," asked Cornfeld to suspend the collection of the A&M companies' lease payments during negotiations for the PSA. *Id.* ¶¶ 24–25. Defendants then began "collecting sub-tenant rent and moving those revenues away from the [A&M companies]." *Id.* ¶ 25. To "perpetuate" that "scheme," Defendants first compelled GFIA and the A&M companies to initiate the PSA Action, which was a "sham" lawsuit intended merely to delay transfer of the leased properties to AFTC. *Id.* ¶¶ 27–28. Defendants then "staged" the bankruptcy filings of A&M I and A&M II "several months apart" in order "to draw out Defendants' ability to line their pockets with the sub-tenant rents while not paying [lease obligations] to AFTC." *Id.* ¶ 29. Finally, in October 2010, Defendants arranged the bankruptcy settlement with AFTC without revealing that they had "systematically transferred the assets of the [A&M companies] and [GFIA] away from those entities in order to hinder, delay and defraud AFTC of its ability to collect on the [settlement judgment]." *Id.* ¶ 35.

As Judge Nathan held at the motion-to-dismiss stage, the purposeful asset-stripping scheme that AFTC alleged before trial — if proved — would justify veil piercing under New York law. *See Am. Fed.*, 39 F. Supp. 3d at 526–27. Siphoning assets to frustrate a creditor is precisely the type of deceptive and unjust abuse of corporate limited liability that warrants equitable relief. *See, e.g.*, *Holborn Oil*, 774 F. Supp. at 847; *Rebh*, 252 A.D.2d at 611.

During trial, however, AFTC failed to offer adequate proof that Defendants intentionally stripped assets from the A&M companies to avoid satisfying corporate obligations. AFTC contends that Defendants completely dominated the A&M companies and GFIA and compelled them to perform several wrongful acts, all of which were part of a sustained effort to siphon assets: (1) the A&M companies' payment of management fees to GFIM; (2) the A&M

companies' repayment of loans to Defendants and affiliated corporate entities; (3) the A&M

companies' payment of legal fees to Greenberg Traurig; and (4) the litigation of the PSA Action

and A&M I and A&M II's bankruptcy petitions. (*See* Plaintiff's Post-Trial Brief at 18–25).

Defendants may well have exercised domination over the A&M companies and GFIA regarding

those acts; GFIM possessed broad authority to manage the A&M companies' financial affairs,

while Allen Gross appears to have dictated GFIA's operations. But "domination, standing alone,

is not enough." *Morris*, 82 N.Y.2d at 141. AFTC must also establish that the acts themselves

were sufficiently deceptive or intentionally unjust — either in isolation or cumulatively — to

warrant veil piercing. As explained below, AFTC has failed to make that showing.

### Management Fees

First, the record indicates that the A&M companies paid management fees to GFIM as

fair compensation for valuable services rendered. That arrangement — and Allen Gross's

ownership of GFIM — was disclosed to Cornfeld when the lease agreements were signed. As

transfers made for equivalent value, the management fees could not have served to *reduce* the

value of the A&M companies and frustrate AFTC's efforts to collect its debts. It is true, as

AFTC emphasizes, that GFIM was delegated the authority to execute management fee payments

to itself, and that GFIM (and, indirectly, Allen Gross as GFIM's owner) benefited from those

payments. But AFTC has not established that the payments were made *solely* for GFIM or

Gross's benefit, at the expense of the A&M companies — the type of corporate abuse that might

justify veil piercing. Rather, the record shows that the fee payments compensated GFIM for

maintaining rental operations on the leased properties, a service that benefited the A&M

companies as leaseholders.

**Loan Repayments**

Unlike the management fee payments, the A&M companies' loan repayments qualify as constructively fraudulent conveyances under DCL § 273.  That fact alone does not establish an abuse of the corporate form, *see TLC Merch. Bankers*, 2003 WL 1090280, at *5, but it calls for close scrutiny of the repayments and their underlying motive.  Having performed that scrutiny, the Court concludes that in the unique circumstances of this case, the loan repayments (even if compelled by one of the Defendants) did not constitute the type of wrongful conduct that justifies veil piercing.  As the Court has already held, the record indicates that the A&M companies repaid loans to Defendants in anticipation of being released from their obligations to AFTC, rather than encumbered by them.[14]  Such payments could not have been part of a purposeful scheme to strip the A&M companies of assets in order to frustrate AFTC in its capacity as creditor.  Ultimately, as AFTC emphasizes, the loan repayments had the *effect* of reducing the assets available to satisfy the A&M companies' debts to AFTC.  That was an improper result, but one that DCL § 273 serves to remedy.  AFTC has not established an adequate basis for the Court to augment that statutory relief by piercing the A&M companies' corporate veils.

**Legal Fees**

Next, AFTC argues that Defendants "further reduced the overall assets available" to satisfy the underlying judgment by compelling the A&M companies (but not GFIA) to pay for the legal work that Greenberg Traurig performed in drafting the PSA and litigating the PSA Action.  (Plaintiff's Post-Trial Brief at 25; *see also* Plaintiff's Pre-Trial Brief at 12).  Although this claim is not well-developed, AFTC appears to suggest that the A&M companies' legal fee

---

[14] The Court previously reached that conclusion under the clear-and-convincing standard that applies under DCL § 276.  The Court now reaches the same conclusion under the preponderance standard.

payments lacked fair consideration to the extent that they covered costs that "should have been GFIA's expense." (Plaintiff's Pre-Trial Brief at 12). AFTC has not indicated the precise expense that it believes GFIA should have shouldered, or cited case law on the issue.

AFTC's claim regarding legal fees is unpersuasive. The three A&M companies and GFIA were jointly represented by Greenberg Traurig regarding both the PSA, to which all four entities were signatories, and the PSA Action, in which all four entities were co-plaintiffs. The A&M companies and GFIA each benefited from that joint representation, and AFTC has not disputed that Greenberg Traurig's rates were reasonable. In such circumstances, parties are not required to divide legal expenses equally; one party may pay all legal fees for joint representation and still receive fair consideration in return. *See Frank*, 48 F.3d at 639 (holding that where co-defendants "conducted a joint defense" that "provided a benefit to each defendant," the "joint services represented 'fair consideration' for the payment of reasonable compensation, regardless of which defendant paid the bill"). AFTC has thus failed to establish that the A&M companies' legal fee payments were wrongful, let alone the type of deceptive or intentionally unjust corporate abuse that justifies veil piercing.

### PSA Action and Bankruptcy Filings

Finally, in its post-trial briefing, AFTC argues that the A&M companies, GFIA, and Defendants "abuse[d] . . . the litigation process" by filing the PSA Action and subsequent bankruptcy petitions. (Plaintiff's Post-Trial Brief at 18). AFTC's briefing does not expressly identify those filings as wrongs justifying veil piercing. *Cf. id.* at 22–25 (identifying "specific examples of harm" that purportedly warrant veil piercing). At the pleading stage, however, AFTC alleged that the PSA Action and bankruptcy petitions constituted corporate abuses because they were initiated solely "to draw out Defendants' ability to line their pockets" by

siphoning assets from the A&M companies.  (Am. Compl. ¶ 29).  The Court construes AFTC's post-trial briefing as preserving that claim.

On the trial record, the Court cannot conclude that the PSA Action or the bankruptcy petitions were abuses of the corporate form that warrant veil piercing.  On their face, those legal actions sought to promote the corporate interests of the A&M companies and GFIA by enforcing a transaction to which they had previously agreed.  Through the PSA Action, the A&M companies and GFIA fought to compel AFTC to close on the PSA, which would have eliminated the A&M companies' arrearages and granted GFIA title to the leased properties; relatedly, through the bankruptcy petitions, A&M I and A&M II pursued federal stays to preserve the status quo pending resolution of the PSA Action.  Those filings may well have been weak on the merits; ultimately, they ended unfavorably for the A&M companies and GFIA.  But AFTC has not made the distinct showing that the actions actually constituted a deceptive or intentionally unjust effort to facilitate the stripping of corporate assets.  It is true that the A&M companies made management fee payments to GFIM and legal fee payments to Greenberg Traurig during the pendency of the PSA Action and related bankruptcy proceedings.  There is no compelling evidence, however, that the legal actions were commenced for the purpose of facilitating those payments.  And in any event, the Court has already declined to hold that those payments were intended to siphon value from the A&M companies.  Put simply, AFTC's claim that the PSA Action and the bankruptcy petitions were abuses of the corporate form fails because its premise — that Defendants had commenced an asset-stripping scheme that could be prolonged through litigation — fails.[15]

---

[15] AFTC also suggests that A&M II could have delayed its bankruptcy petition by collecting in December 2008, rather than the months thereafter, debts owed to it by A&M I and A&M III.  (*See* Plaintiff's Pre-Trial Brief at 6).  It is not clear from the trial record that AFTC's claim is correct.  In any event, though, AFTC has not convincingly explained why A&M II's decision not to collect the debts before filing for bankruptcy would constitute

In sum, AFTC has failed to prove that any of the Defendants abused the privilege of doing business in the corporate form.  There is no question that the A&M companies, GFIA, and GFIM were closely related corporate entities with common owners.  Such close corporate ties may facilitate corporate abuse; for that reason, the Court has carefully scrutinized the transactions at issue in this case.  But close corporate ties alone are not a sufficient ground for veil piercing.  AFTC bears the "heavy burden" of proving not merely that Defendants had the capacity to exert "complete domination" over the A&M companies and GFIA, but also that they actually used that domination to compel deceptive or intentionally unjust corporate conduct.  AFTC met that heavy burden at the pleading stage by alleging that Defendants had purposefully stripped assets from the A&M companies in order to frustrate AFTC in its capacity as creditor.  That allegation, however, were not borne out at trial.  As a result, the Court declines to pierce the corporate veils of the A&M companies and GFIA.

## IV.    Conclusion

For the foregoing reasons, the Court orders Defendants to make the following payments to AFTC:  $350,000 from Allen Gross, $125,000 from Edith Gross, and $10,000 from GFIM.


SO ORDERED.

Dated:  New York, New York
        August 28, 2015


                                        _____
                                             /s/
                                        Kimba M. Wood
                                        United States District Judge

---

the type of corporate abuse that justifies piercing the corporate veil, or how A&M II's decision would have harmed AFTC.